BOSWELL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Cr. No.: 19-20075 TLP |
| ) | |
| vs. ) | 21 U.S.C. § 841(a), (b)(1)(C), (b)(2) |
| ) | 18 U.S.C. § 2 |
| DR. RICHARD FARMER, ) | |
| ) | |
| Defendant. ) | **FILED UNDER SEAL** |

# INDICTMENT

**THE GRAND JURY CHARGES:**

At all times material to this indictment:

### DEFENDANT

1. Defendant **DR. RICHARD FARMER ("FARMER")** was a doctor of psychiatry, licensed by the State of Tennessee. **FARMER** maintained a Drug Enforcement Administration Registration ("DEA") Number. **FARMER** issued prescriptions for controlled substances, including the Schedule II controlled substances of Oxycodone and Hydrocodone, and the Schedule IV controlled substances Alprazolam and Clonazepam, at his medical clinic in Memphis, Tennessee, outside the usual scope of professional practice and without a legitimate medical purpose, and often in exchange for sexual favors or companionship.

### CONTROLLED SUBSTANCE STATUTES AND CONTROLLING REGULATIONS

2. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to

knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

3. Medical practitioners, such as physicians and nurse practitioners, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b); 21 C.F.R. § 1306.03. Upon application by the practitioner, the DEA assigned a unique registration number to each qualifying medical practitioner including physicians and nurse practitioners.

4. The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five Schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

5. A controlled substance assigned to Schedule II meant that the drug had a high potential for abuse, was highly addictive, and that the drug had a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions. Abuse of a Schedule II controlled substance could lead to severe psychological and/or physical dependence. Pursuant to the CSA and its implementing regulations:

> a. Hydrocodone was classified as a Schedule II controlled substance after October 2014, before which time it was classified as a Schedule III controlled substance. It was an opioid pain medication.

  b. Oxycodone was classified as a Schedule II controlled substance. Oxycodone was sold generically and under a variety of brand names, including OxyContin®, Roxicodone®, Endocet®, and Percacet. Oxycodone, an opioid pain medication, is about fifty percent stronger than Morphine.

  c. Hydrocodone and Oxycodone were among the Schedule II opioid controlled substances that had the highest potential for abuse and associated risk of fatal overdose.

6. A controlled substance assigned to Schedule IV meant that the drug or other substance had a lower potential for abuse than Schedule II drugs or other substances, the drug or other substance had a currently accepted medical use in the United States, and abuse of the drug or other substances may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in the higher Schedules. Pursuant to the CSA and its implementing regulations:

  a. Alprazolam, a benzodiazepine, was classified as a Schedule IV controlled substance. Alprazolam, sometimes prescribed under brand name Xanax, was a medication used to treat anxiety.

  b. Clonazepam, a benzodiazepine, was classified as a Schedule IV controlled substance. Clonazepam, sometimes prescribed under brand name Klonopin, was a medication used to treat anxiety and seizures.

7. Chapter 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Chapter 21 of the

Code of Federal Regulations, Section 1306.04, further directed that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

8. It was well known that the combination of high-dose opioids and benzodiazepines (*e.g.*, Alprazolam) in any dose had a significant impact upon the risk of patient intoxication and overdose. For a treating physician to prescribe this combination of high-dose opioids and benzodiazepines for a legitimate medical purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risk(s) to the patient's life.

9. On March 16, 2016, the Centers for Disease Control and Prevention ("CDC") issued CDC Guidelines for Prescribing Opioids for Chronic Pain. In that guidance, the CDC warned that medical professionals should avoid prescribing opioids and benzodiazepines (e.g. Xanax, Alprazolam, Lorazepam) concurrently whenever possible because of the risk of potentially fatal overdose. Prescribing and issuing these two medications around the same time compounds the patient's risk of overdose and death from the prescribed drugs, by four times. Moreover, there is a significant diversion risk of prescribing or issuing these drugs around the same time. A benzodiazepine serves as a "potentiator" for the opioid's euphoric effect by increasing the "high" a user may obtain from opioid, and is therefore often sought for this non-legitimate medical purpose.

4

10. On August 31, 2016, the U.S. Food and Drug Administration ("FDA") issued a "Black Box" Warning, its strongest warning, to the drug labeling of prescription opioid pain medicines and benzodiazepines. The FDA specifically warned that combined use of opioids and benzodiazepines depresses the central nervous system and results in serious side effects, such as slowed or difficult breathing and death. The FDA further warned health care professionals to limit prescribing opioids with benzodiazepines and cautioned that such medications should only be prescribed together when alternative treatment options are inadequate.

11. Urine drug screens were relied upon in the pain-management industry as a means of identifying a patient's non-compliance with the patient's treatment plan. Urine drug screens were used to identify abuse of illicit and controlled substances not prescribed to a patient, and to identify a patient's failure to take drugs prescribed for the patient's treatment of pain.

12. Tennessee's controlled substance monitoring program ("CSMD") was a means of detecting a pain management patient's non-compliance with the patient's treatment plan. A CSMD report contained prescription data for all controlled substances dispensed by pharmacies in the State of Tennessee. Pharmacies were required to report the patient's name, the particular controlled substance and dosage dispensed, the quantity dispensed, the number of days supplied, the prescribing physician's name, the date the prescription was issued, the dispensing pharmacy's name, the type of payment, and the date the controlled substances were dispensed.

### DEFENDANT FARMER'S CONTROLLED SUBSTANCE PRESCRIPTION PRACTICES

13. Defendant **FARMER** often prescribed Oxycodone and Alprazolam to

purported patients in exchange for sexual favors and the companionship of female patients.

14. Defendant **FARMER** did not maintain patient files, or maintained woefully inadequate patient files regarding his purported patients.

15. Defendant **FARMER** often did not see or treat his purported patients before prescribing them controlled substances.

16. Defendant **FARMER** did not require his purported patients to submit to urine drug screens before issuing them prescriptions for highly-addictive controlled substances.

17. Defendant **FARMER** ignored the risks of addiction and drug diversion in his prescribing practices relating to his purported patients.

18. Defendant **FARMER** often prescribed to his purported patients the dangerous combination of Oxycodone and Alprazolam.

19. Defendant **FARMER** prescribed Oxycodone to patient MT while she was pregnant, and before and after she was pregnant, not for a legitimate medical purpose and outside the scope of professional practice.

### COUNTS ONE - NINE
**Unlawfully Distributing and Dispensing Controlled Substances and Aiding and Abetting**
**(21 U.S.C. § 841 & 18 U.S.C. § 2)**

20. Paragraphs 1 through 19 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

21. During the dates specified below, in the Western District of Tennessee, Defendant **FARMER**, aiding and abetting and aided and abetted by others known and

unknown to the Grand Jury, did intentionally and knowingly distribute and dispense, not for a legitimate medical purpose and outside the scope of professional practice, the controlled substances alleged in the following counts:

| Count | On or About | Controlled Substances | "Patient" |
|---|---|---|---|
| 1 | November 2, 2018 | Oxycodone | MT |
| 2 | November 2, 2018 | Oxycodone | WW |
| 3 | January 9, 2017 | Oxycodone | JT |
| 4 | March 19, 2017 | Hydrocodone | TT |
| 5 | September 8, 2018 | Oxycodone | JG |
| 6 | January 9, 2017 | Alprazolam | MT |
| 7 | January 9, 2017 | Alprazolam | JT |
| 8 | March 19, 2017 | Alprazolam | TT |
| 9 | September 8, 2018 | Alprazolam | JG |

All in violation of Title 21, United States Code, Section 841(a), (b)(1)(C), (b)(2) & Title 18, United States Code, Section 2.

## NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853)

22. The allegations contained in Count 1 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853.

23. Pursuant to Title 21, United States Code, Section 853, the United States gives notice to defendant **FARMER** that upon conviction of an offense in violation of Title 21, United States Code, Section 841, the following property shall be subject to forfeiture:

   a. All property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offense; and

   b. All property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offense.

24. The defendant **FARMER** is notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture.

25. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the defendants up to the total value of the property subject to forfeiture.

A TRUE BILL:

_____
FOREPERSON

DATED: _____

_____
D. MICHAEL DUNAVANT
UNITED STATES ATTORNEY

_____
JOSEPH BEEMSTERBOER
CHIEF, FRAUD SECTION, CRIMINAL DIVISION