IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,          |
                                   |
              Plaintiff,           |
                                   |
VS.                                | No. 19-20075
                                   |
DR. RICHARD FARMER,                |
                                   |
              Defendant.           |
_____


TRANSCRIPT OF TRIAL PROCEEDINGS

BEFORE THE

HON. THOMAS L. PARKER


FEBRUARY 14, 2020




MARK S. DODSON
OFFICIAL COURT REPORTER
167 N. MAIN STREET - SUITE 422
MEMPHIS, TENNESSEE 38103


UNREDACTED TRANSCRIPT

```
 1

 2                      – A-P-P-E-A-R-A-N-C-E-S –

 3

     For the Plaintiff:
 4
                              DAMON KEITH GRIFFIN
 5                            ASSISTANT U.S. ATTORNEY
                              800 – 167 NORTH MAIN STREET
 6                            MEMPHIS, TN 38103

 7
                              JILLIAN D. WILLIS
 8                            U.S. DEPT. OF JUSTICE
                              FRAUD SECTION
 9                            1400 NEW YORK AVENUE, NW
                              WASHINGTON, DC 20530
10

11   For the Defendant:

12                            CHARLES S. MITCHELL
                              AMY WORRELL STERLING
13                            530 OAK COURT DR.
                              SUITE 360
14                            MEMPHIS, TN 38117

15

16

17

18

19

20

21

22

23

24

25
```

1              W I T N E S S   I N D E X

2        WITNESS                                    PAGE LINE
       ----------------------------------------------------------
3
   MARK WRAY                                         39    1
4     REDIRECT EXAMINATION BY MS. WILLIS             39    5
   LYNN ELLIS                                        42    1
5     DIRECT EXAMINATION BY MS. WILLIS:              42   10
      CROSS-EXAMINATION BY MS. STERLING:             51   15
6  ASHLEY ROTHSTEIN                                  77    1
      DIRECT EXAMINATION BY MR. MITCHELL             77    5
7     CROSS-EXAMINATION BY MR. GRIFFIN               84    1
      REDIRECT EXAMINATION BY MR. MITCHELL           87   19
8  SGT. BRET SIMONSEN                                89    1
      DIRECT EXAMINATION BY MR. MITCHELL             89   10
9     CROSS-EXAMINATION BY MS. WILLIS:               95    1
      REDIRECT EXAMINATION BY MR. MITCHELL           96    4
10 MICHAEL TILLERY                                   97    1
      DIRECT EXAMINATION BY MR. MITCHELL             97    5
11    CROSS-EXAMINATION BY MS. WILLIS:              108   21
      REDIRECT EXAMINATION MR. MITCHELL             115   23
12 GRANT SPERRY                                     127    1
      DIRECT EXAMINATION BY MS. STERLING            127   11
13    CROSS-EXAMINATION BY MS. WILLIS               163   14
      REDIRECT EXAMINATION BY MS. STERLING          169   24
14 RICHARD FARMER                                   172    1
      DIRECT EXAMINATION BY MR. MITCHELL            172    5
15 MARK WRAY                                        176    1
      DIRECT EXAMINATION BY MS. WILLIS              176    9
16    CROSS-EXAMINATION BY MR. MITCHELL             178   15

17

18

19

20

21

22

23

24

25

1               E X H I B I T   I N D E X

2           MARKED                        PAGE LINE
  ----------------------------------------------------------
3    Exhibits 18-22                        58    17
     Exhibit 23-26                         59     2
4    Exhibit 27-30                         59     9
     Exhibits 31-33                        66    15
5    Exhibit 34                           101    16
     Exhibit 35 for identification        111    14
6    Exhibits 36 through 38               155    23
     Collective Exhibit 39                177    23

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        FEBRUARY 14, 2020

2

3           THE COURT:  Counsel, as you are getting

4    squared away, what I want to do is pull out the table of

5    contents for the Sixth Circuit Pattern Jury Instructions.

6    I did receive the submissions by both parties overnight.

7    I assume each of you got copies of what the other wanted

8    to do.  Then I would also ask that you pull up the actual

9    pattern jury instructions online so that we can look at

10   each one if we have specific questions about it.

11          MR. MITCHELL:  I don't believe that we

12   received you-all's submissions.

13          THE COURT:  The verdict form?

14          MS. WILLIS:  Verdict form?

15          MS. STERLING:  Oh, for the verdict form.

16          Are you doing the jury instruction?

17          MS. WILLIS:  Yeah.

18          (Pause.)

19          THE COURT:  Y'all ready?

20          MS. WILLIS:  Yes, Your Honor.

21          THE COURT:  So step one is going to be to go

22   through the table of contents for the pattern jury

23   instructions; and I'm going to walk through each chapter.

24          And, Ms. Willis, you look troubled.

25          MS. WILLIS:  I had an internal question about
```

 1    something.  So I'm just looking it up.

 2            **THE COURT:**  No problem.  Okay.

 3            So Chapter 1 is general principles.  The

 4    Court's going to go through all nine sections of that.

 5            Do y'all have the table of contents in front

 6    of you?

 7            **MR. GRIFFIN:**  Yes, Your Honor.

 8            **MR. MITCHELL:**  Yes, Your Honor.

 9            **MS. WILLIS:**  Yes, Your Honor.

10            **THE COURT:**  So we're going to go through all

11    of those.

12            Chapter 2, Defining the Crime.  Now we will

13    talk about the specifics of how we're going to define the

14    crime when we look at 2.02 in particular, but I just want

15    to walk through the ones in Chapter 2 that I think are

16    pertinent.  2.01; 2.01(a); 2.02 -- and, again, we will

17    deal with the inspection of that -- 2.04, on or about;

18    2.06, it's marked "knowingly" but "knowingly" is actually

19    part of the instruction for the crime itself.  The Sixth

20    Circuit does not have a pattern instruction on the word

21    "knowingly."

22            Now I have 2.07 marked, but that is also part

23    of the specific definition of the crime.  Inferring

24    required mental state is 2.08.  My read is that 2.10 does

25    not -- is not a helpful instruction.  It talks about

1    constructive and actual possession.  It just doesn't work

2    for the facts of this case.

3              Do either of you disagree?

4              **MR. MITCHELL:**  We don't disagree with that.

5              **MS. WILLIS:**  We don't disagree.

6              **THE COURT:**  All right.  So we're not going to

7    include that.  2.12, use of the word "and" in the

8    indictment, okay.

9              So then we roll to Chapter 4.

10             **MS. WILLIS:**  Your Honor, may I ask a question?

11             **THE COURT:**  Yes, ma'am.

12             **MS. WILLIS:**  So does -- when you were saying

13   that 2.06 and 2.07 are included in the definition of

14   crime, that means you are not going to read 2.6 and 2.07;

15   is that correct?

16             **THE COURT:**  There's nothing to read.

17             **MS. WILLIS:**  Okay.

18             **THE COURT:**  The way that the Sixth Circuit

19   pattern instructions work is they have that tab.  You go

20   to it, and they say the Sixth Circuit does not have a

21   generic instruction on this point.

22             **MS. WILLIS:**  I apologize.  I pulled it up as

23   you were saying that, and I see that.  My apologies.

24             **THE COURT:**  No problem.

25             Chapter 4, 4.01, Aiding and Abetting; 4.01(a)

```
 1    causing an act, yes or no.
 2              MS. WILLIS:  The Government would like that
 3    one.
 4              THE COURT:  All right.
 5              MR. MITCHELL:  We would certainly object to
 6    that one.
 7              THE COURT:  Well, let's talk about it.  Will
 8    you pull it up, please?
 9              Ms. Willis, paragraph 2 of that section says:
10    But for you to find defendant guilty of unlawful
11    distribution of controlled substances, you must be
12    convinced that the Government has proved each and every
13    one of the following elements beyond a reasonable doubt.
14              First -- and there are gaps in that one.  What
15    is it that you believe the defendant is -- what would
16    that first element, how would it read?
17              MS. WILLIS:  To the extent that there is an
18    argument that any pharmacist who filled the prescription
19    committed the act of unlawful distribution, we would
20    argue that the defendant caused that because he caused
21    those prescriptions to be submitted to the pharmacy.
22              THE COURT:  Okay.  But here's what I want is
23    for somebody to wordsmith this --
24              MS. WILLIS:  Okay.
25              THE COURT:  -- to the point where we can
```

9

1    understand what the instruction's going to read.

2             Yes, sir.

3             **MR. MITCHELL:**   I'll just say that didn't occur

4    to us to argue that.  So but I understand the

5    Government's position.

6             **MS. WILLIS:**   And the only reason that we

7    thought that it might be an argument is because it was

8    raised, whether pharmacists committed crimes by filling

9    them, and a pharmacist is about to testify, so to the

10   extent we're talking about how it might be prescriptions

11   got filled.

12            **THE COURT:**   All right.

13            **MR. MITCHELL:**   I understand, Your Honor.

14            **THE COURT:**   Why don't we just -- we'll put a

15   tab there and I could see how it could be useful here but

16   I could see where it could be confusing.  So let's be

17   careful about what we say about causing the act, and I

18   really want somebody to be thinking about how it would be

19   defined.

20            So Chapter 6, I don't believe we have, in

21   fact, I know I don't have a defense theory; and I don't

22   think any of the others apply here.

23            **THE CLERK:**   Do we need to bring the defendant

24   out?

25            **THE COURT:**   Probably, yes.

UNREDACTED TRANSCRIPT

1          Marshal, can we go ahead and have the

2    defendant brought out?  Thank you.

3          (The following occurred in the presence of the

4          defendant:)

5          **THE COURT:**  So I will -- maybe I jumped right

6    in.  So let's start at the beginning.

7          This is United States versus Farmer.  Ms.

8    Willis, Mr. Griffin are here for the Government.

9    Mr. Mitchell, Ms. Sterling are here for the defense.  We

10   are in the process of talking about the jury

11   instructions.

12         Does he have the ear buds?

13         **MR. MITCHELL:**  He does.

14         **THE COURT:**  Are you good?

15         **MR. MITCHELL:**  We're good, Your Honor.

16         **THE COURT:**  So we are now on Chapter 6.  I

17   don't think any of these instructions on defenses apply.

18         Agreed?

19         **MS. STERLING:**  Agreed on behalf of defense.

20         **THE COURT:**  Government, too, I'm sure.

21         **MS. WILLIS:**  Yes.

22         **THE COURT:**  Chapter 7, 7.01, the introduction.

23   Now, 7.02(a) or (b) will apply, depending on what the

24   defendant decides; but both of them will not, obviously.

25         7.02(c), there was potential for that; but it

1    didn't happen, correct?

2              **MR. MITCHELL:**  Correct.

3              **MS. WILLIS:**  That's correct.

4              **THE COURT:**  7.03, Opinion Testimony.  By my

5    recollection, the only opinion witness has been Dr.

6    Kyser.  Any disagreement about that?

7              **MS. WILLIS:**  Not from the Government.

8              **MR. MITCHELL:**  So far we intend to put on one,

9    possibly two experts.

10             **THE COURT:**  Okay.  7.03(a), Witness Testifying

11   to Both Facts and Opinions.  I was listening for Agent

12   Wray as to whether he had any opinions, but I don't

13   believe he expressed any.  Does anybody disagree with

14   that?  Well, I'll put it a different way.  Does anybody

15   believe that that instruction needs to be included?

16             **MS. WILLIS:**  No, Your Honor.

17             **MR. MITCHELL:**  One minute, Your Honor.

18             (Pause.)

19             **MS. STERLING:**  We don't need it, Your Honor.

20             **THE COURT:**  So, seven -- that will not be

21   included.

22             7.04 is Impeachment by Prior Inconsistent

23   Statements Not Under Oath.  Now, when you look at that

24   instruction, it has a gap for "you have heard the

25   testimony of" as if you're going to include the names or

```
 1    name of whoever was impeached.  In this case we had
 2    several witnesses that had given statements not under
 3    oath.  They were recorded.  In some instances we had
 4    transcripts, whatnot.
 5            My suggestion is to say that you have heard
 6    the testimony of witnesses and you have heard -- and we
 7    could -- I could list them, if you want, ones who have
 8    given prior inconsistent statements.  But virtually -- I
 9    mean, I think part of your impeachment, other than Dr.
10    Kyser, included prior inconsistent statements or at least
11    what you thought were prior inconsistent statements for
12    every witness.
13            MR. MITCHELL:  I think we would like to have
14    them listed, if you want to put witnesses, and then
15    semicolon or however the Court wants to do it.
16            THE COURT:  All right.  Well, tell me who you
17    think has given prior inconsistent statements.
18            MR. MITCHELL:  Tiffanie Tutor, Jennifer Tutor,
19    Meagan Tutor, William Winchell.  I don't believe Jody
20    Govea.
21            MS. WILLIS:  I just don't recall.  Can we look
22    back really quickly and see if Tiffanie Tutor did.
23            THE COURT:  I can tell you those four --
24            MS. WILLIS:  Okay.
25            THE COURT:  -- were impeached --
```

UNREDACTED TRANSCRIPT

1          **MS. WILLIS:**  Okay.

2          **THE COURT:**  -- by prior statements.  Sometimes

3    it was refreshing recollection; but, in essence they had

4    given inconsistent statements.  So --

5          **MR. GRIFFIN:**  And I think that's what kind of

6    causes me concern, if we're going to list every witness,

7    because in some instances when the witness -- when their

8    recollection was being refreshed, it may have appeared to

9    be an inconsistent statement but I think the way it was

10   being presented to the witness it was really refreshing

11   their recollection.  So I don't -- it causes concern for

12   me to list witnesses instead of just generally, Your

13   Honor.

14         **THE COURT:**  Well, I think when you listen to

15   the rest of the instruction, though, it gives leeway.

16             You have heard the testimony of.

17             Then you list the name.

18             You've also heard testimony that before this

19   trial, they made a statement that may be different from

20   their testimony here in court.  This earlier statement

21   was brought to your attention only to help you decide how

22   believable their testimony was.  You cannot use it as

23   proof of anything else.  You can only use it as one way

24   of evaluating the testimony here in court.

25             I think that gives enough leeway for both

14

```
1    sides to argue, Mr. Griffin.  So I think it's okay to
2    list the names.  So I'll list the four names that
3    Mr. Mitchell suggested.
4             7.05(a) does not apply.  7.05(b), Impeachment
5    Of a Witness Other Than the Defendant by a Prior
6    Conviction, this would seem to apply to the Tutors.
7             MS. WILLIS:  It would not apply to Meagan
8    Tutor, Your Honor.
9             THE COURT:  I thought --
10            MS. WILLIS:  No.
11            MS. STERLING:  She has not had a prior
12   conviction.
13            THE COURT:  Okay.  All right.  Well, then so
14   we're talking Tiffanie Tutor, Jennifer Tutor, Jody Govea,
15   and William Winchell, right?
16            MS. STERLING:  Yes.
17            MS. WILLIS:  Yes, Your Honor.
18            MR. MITCHELL:  Yes, Your Honor.
19            THE COURT:  Okay.  I don't see how 7.06
20   applies, Paid Informant.
21            Now these next few get into a lot of
22   overlapping concepts.  You've got testimony of an addict
23   informant, testimony of an accomplice.  Does anybody have
24   thoughts on how to address these?
25            MS. WILLIS:  The Government takes the position
```

UNREDACTED TRANSCRIPT

1   that 7.06(b) does not apply.  7.07 does not apply.  We

2   don't think 7.08 applies.

3            **THE COURT:**  Okay.  Well, let me ask this.

4            Mr. Winchell testified.

5            **MS. WILLIS:**  Uh-huh.

6            **THE COURT:**  -- and there were specific

7   excerpts of his statement that were given back to him

8   where the officer said things like, "We want you to be a

9   witness, not a defendant.  We want to go after the big

10  fish," things like that, that to me constitute questions

11  of whether they're going to get something.  Now it's not

12  a grant of immunity, I'll grant you that.

13           **MS. WILLIS:**  But -- I didn't mean to interrupt

14  you.  He also testified that he still went to jail after

15  that and didn't get anything.  Some he didn't -- I mean,

16  based on the testimony -- based on the testimony, there

17  is no evidence that he actually got anything for

18  testifying, that they were saying that to him during the

19  interview, but he said still, "I went to jail anyway.  I

20  knew I was going to jail because I had a probation hold,

21  a parole hold."  So the Government didn't promise him

22  anything.  Well, he didn't get anything from the

23  Government.  There was no exchange.  He didn't get, like,

24  a -- he didn't get letter immunity.  He didn't get

25  anybody --

UNREDACTED TRANSCRIPT

1        **THE COURT:**  Was he ever charged with forgery,

2   forging the prescriptions --

3            **MS. WILLIS:**  So that --

4        **THE COURT:**  -- as a separate charge?

5        **MS. WILLIS:**  That is that whole issue of

6   what's happening in Mississippi.  So I don't -- I cannot

7   say that he will never be charged.  I cannot say that he

8   will.  But I don't think that there is any evidence in

9   the record of what's going on in Mississippi either.

10        **THE COURT:**  Mr. Mitchell?

11        **MR. MITCHELL:**  Judge, my concern is that he

12   was arrested on February 4th, 2019, and then he made bond

13   and was arrested on February 15th, 2019.  At that point

14   that triggered some type of parole violation, which any

15   type of arrest will trigger that parole violation.  In my

16   experience there is then a separate process through what

17   I'm going to call the Mississippi Department of

18   Corrections where they have to sort through that.  He was

19   released in June of 2019.  Those cases have not been

20   prosecuted.

21        And I believe that the Government has spoken

22   with Detective Thomas Yancy in Mississippi, and Mr. Yancy

23   has informed the Government that they're keeping an eye

24   on how cooperative Mr. Winchell is to determine whether

25   or not they're going to submit those cases to the grand

1    jury.

2              And then you kind of put on -- then you add on

3    top of that the fact that he is somehow caught up in this

4    incident where he's buying Oxycodone, January 20th.

5    So --

6              **THE COURT:**  Well --

7              **MR. MITCHELL:**  The appearance is there and I

8    understand we have different jurisdiction and stuff but

9    the appearance is certainly there.

10             **MS. WILLIS:**  And from the Government's, the

11   defense raised that up to save the appearance; but there

12   has been no exchange.

13             **THE COURT:**  I hear you, Ms. Willis, and I hear

14   your position on it but I'm also suggesting to you that

15   this witness testified that his understanding, when he

16   sat down to give a statement was, "You cooperate with us,

17   and we're going after Farmer.  We're not coming after

18   you.  We'd rather you be a witness."  That is the sort of

19   deal we're talking about.

20             Whether these two members of the Government

21   made a promise or an agreement, I think, you know, we

22   don't want to get into a deal where I explain to them the

23   difference between, you know, sovereigns and who gets to

24   make decisions on charging and whatnot.  The agents --

25   and I'm sure you were cringing when you heard it -- were

1    saying things that might have been more than they should

2    have in terms of what they could do and what they

3    couldn't.  I don't know if they did or not; but there

4    might have been some of that, because my understanding is

5    that the prosecutors are the ones who make the decision

6    about whether to charge or not.  It sounds like those

7    agents were saying things to him that made it seem like

8    they were in control of that.

9         And so I think that there is enough here for

10   us to include the instruction but I want to be careful

11   about how we phrase it, because it is not a promise of

12   immunity, and so let's look at the actual wording.  Now

13   this instruction speaks in terms of addiction, right.

14        And so it's as if -- let's just put in it a

15   different context.  The Government pulls somebody over

16   who has a small amount of heroin on them.  It turns out

17   they're a heroin addict.  They give information about who

18   their heroin dealer is.  The Government prosecutes that

19   heroin dealer and says to the addict, "We won't prosecute

20   you as long as you come forward and testify."  That seems

21   to be what this is addressing.

22        **MS. WILLIS:**  And, Your Honor, I think -- I'm

23   sorry.  We're confused.  I thought, if we were talking

24   about anything, we were talking about 7.07.  I didn't

25   realize we were talking about 7.06(b).

UNREDACTED TRANSCRIPT

19

1          **THE COURT:**  Well, what is 707?  That might be

2   cleaner, honestly.  7.07 would be perhaps cleaner.

3          Do y'all agree?

4          **MS. WILLIS:**  To the extent that one of these

5   has to be included, we would say the 7.07 would be --

6          **THE COURT:**  Better.

7          **MS. WILLIS:**  -- better than the 7.06(b).

8          **THE COURT:**  I think it's easier to get where

9   we need to be in 7.07.  I would agree with that.

10          So, unless somebody has a better idea, what

11   I'm inclined to say is:

12          You've heard the testimony of William

13   Winchell.  You've also heard that the Government promised

14   him that he would not be prosecuted in exchange for his

15   cooperation.

16          **MS. WILLIS:**  And I just don't see that that's

17   factually correct.

18          **THE COURT:**  Well, what do you think the agents

19   meant when they said, "We want you to be a witness and

20   not a defendant"?

21          **MS. WILLIS:**  I mean, I'm not the agent.  I

22   don't know.  But I don't think that that's evidence that

23   there was a promise there, but we will just defer to the

24   Court because we don't agree.  So I don't think that --

25          **MS. STERLING:**  Your Honor, it talks about

UNREDACTED TRANSCRIPT

1    promises.  It doesn't say that the Government followed

2    through with the promise.  I think that's a very fair

3    thing to say, that they promised it, even if they didn't

4    mean it, even if they didn't follow through with it.

5    They said those things to him.

6         **MS. WILLIS:**  The Government will just defer to

7    the Court.

8         **THE COURT:**  Well, it's a struggle because

9    prosecutors do, especially in Federal court, the

10   prosecutors are going to be the one that actually make

11   the call as to whether to pursue charges.  Now whether

12   Winchell was ever in the running to be charged in Federal

13   court, I don't know.  It doesn't sound like it but --

14        **MS. WILLIS:**  Your Honor, may I have a moment

15   to step away?

16        **THE COURT:**  Yes, ma'am.

17        (Pause).

18        **MS. WILLIS:**  Thank you, Your Honor.

19        **THE COURT:**  Anything to add?

20        **MS. WILLIS:**  No.  Just our position is clear

21   for the record.

22        **THE COURT:**  Yeah.

23        **MS. WILLIS:**  As you kind of indicated, agents

24   don't have the authority to give a grant of immunity.

25   There was never a grant of immunity or a promise that he

1   would not be prosecuted from the Government, but we

2   understand the Court's position.  We just wanted to put

3   our position on the record.

4           **THE COURT:**  And I appreciate it, and I do

5   understand where you are coming from.  As I'm reading

6   this -- I don't know if it helps or not -- but I think it

7   would actually be more precise to say that:

8           You've heard testimony of William Winchell.

9   You have also heard that Government agents promised him

10  that he would not be prosecuted in exchange for his

11  cooperation.  It is permissible for the Government to

12  make such a promise and then go further.

13          Does that make it any better from the

14  Government's perspective?

15          **MS. WILLIS:**  Yes, Your Honor.  We just want to

16  put our position on the record and that is --

17          **THE COURT:**  And you can argue, "We didn't

18  promise him anything.  You heard him testify that he, you

19  know, he ended up going to prison.  He didn't see it as

20  any benefit," right?  But we also heard testimony that he

21  was made these promises.  So --

22          **MS. WILLIS:**  Yes, Your Honor.

23          **THE COURT:**  I think testimony of an accomplice

24  does not come in.

25          I don't think 7.09 comes in, do you?

1          **MS. STERLING:**  No, Your Honor.

2          **THE COURT:**  So I think 7.11 should come in.

3    We had witnesses come in and point out Dr. Farmer.  So I

4    think that comes in, not identification at another

5    setting or anything like that but in-court.  We'll find

6    the paragraph that deals with in-court identification.

7          Okay?  Any problem with it?

8          **MS. WILLIS:**  No problem with it.

9          **THE COURT:**  It's not a big deal.  It's just --

10          **MS. WILLIS:**  We don't have any problem with

11   it.

12          **THE COURT:**  Okay.

13          **MS. WILLIS:**  We don't think ID is an issue.

14          **THE COURT:**  So the next thing that looks like

15   it might apply, to me, is 7.19, Judicial Notice.  Now, we

16   had testimony -- this is 7.20 -- we had testimony about

17   from Agent Wray that Dr. Farmer admitted that he had

18   written prescriptions.  So, to me, that is a statement by

19   a defendant.  Anybody disagree with that?

20          **MS. WILLIS:**  We don't disagree, Your Honor.

21   The Government does not.

22          **MS. STERLING:**  We do not disagree either.

23          **THE COURT:**  Sounds like there are going to be

24   stipulations.  So we'll include that.  The rest of this

25   is proforma almost.  8.01, 8.02, 8.03, 8.04, 8.05, 8.06

23

1    will all be included, 8.09, 8.10.

2              Now does anybody have anything else you want

3    me to include before we get to the language that the

4    defense has proposed?

5              **MS. WILLIS:**  Court's indulgence, please.

6              **THE COURT:**  We are also going to include 8.08,

7    which is that the verdict is limited to the charges

8    against this defendant.  It's a typical instruction that

9    we normally include.

10             **MS. WILLIS:**  Your Honor, we would also ask

11   for, going back to Chapter 2 for 2.09, Deliberate

12   Ignorance.  I'm sorry if I missed that.

13             **THE COURT:**  I was not planning to do it.

14             (Pause.)

15             **THE COURT:**  But, Ms. Willis, I'm going to need

16   some language here.

17             **MS. WILLIS:**  So with the blank:  If you are

18   convinced that the defendant deliberately ignored a high

19   probability that -- that the prescriptions at issue were

20   distributed from his office, then you may find that he

21   knew that they were distributed from the office.

22             So what we're trying to --

23             **THE COURT:**  What I think -- well, what do you

24   think?

25             **MR. MITCHELL:**  Your Honor, I think that's a

UNREDACTED TRANSCRIPT

1    large leap and a large assumption that if it was -- if

2    they came from his office and they knew it came from his

3    office.  I don't think there is any evidence of any

4    deliberate indifference on the part of Dr. Farmer.

5         **THE COURT:**  It's deliberate ignorance but I'll

6    think about this but I want y'all to think about the

7    language.

8         **MS. WILLIS:**  Yes, Your Honor.

9         **THE COURT:**  Okay?  Now the standard, as we're

10   about to talk about, is the -- and y'all correct me where

11   I'm wrong -- but it's the usual course of professional

12   practice for a legitimate medical purpose.  Now, it seems

13   to me that that might be included here at 2.09.

14        What do you think?

15        Now the reason I think this could be useful

16   for both sides is the third paragraph.  The defense has

17   been talking about the difference between a criminal act

18   and a negligent act; and this gives you something to talk

19   about, it seems to me.

20        Now one thing I want to put out there.  We're

21   going to talk about this.  You guys are going to know

22   what I'm going to instruct.  Okay?  I am going to ask

23   you, however, not to include it in your PowerPoint.  If

24   you are going to include a PowerPoint for closing

25   argument, don't crop the jury instructions and put them

1    in there.  They haven't been given yet.  Let me give the

2    instructions.  Okay.  You can talk about them.  You can

3    read them.  You know, however you want to do it, I'm not

4    telling you other than putting it in the PowerPoint.

5    Okay?  I've run into that a little bit, and it's

6    troublesome.  So --

7              **MS. WILLIS:**  Will we be able to use the

8    verdict form in the PowerPoint?

9              **THE COURT:**  We're going to talk about that

10   verdict form in just a minute.

11             What else?  So one way to do this -- and I'm

12   not saying it's the right way, Ms. Willis, but it seems

13   to me that we could say something like if you were

14   convinced that defendant deliberately ignored a high

15   probability that the prescriptions at issue were written

16   outside the usual course of professional practice for a

17   legitimate medical purpose, then you may find that he

18   knew the prescriptions at issue were written outside the

19   usual course, blah, blah, blah.

20             What do you think?

21             Just a second.

22             (Pause.)

23             **THE COURT:**  Yes, ma'am.

24             **MS. WILLIS:**  Your Honor, that's fine.

25             **THE COURT:**  Mr. Mitchell?

UNREDACTED TRANSCRIPT

1          **MR. MITCHELL:**  I think that would be fine,

2    Your Honor.

3          **THE COURT:**  Okay.  All right.  So now let's

4    talk about the definition of the crime that -- the

5    language that Mr. Mitchell and Ms. Sterling included.

6          Mr. Mitchell, here's my problem with what

7    you've included.  The crime is already defined here.  The

8    standard that the jury is to look at is already defined

9    here.  What your language is suggesting -- and by the

10   way, I think we should probably include your language.  I

11   will make a copy of it and add it as an exhibit to this

12   hearing so that everybody will know what we're talking

13   about.

14         But I moved my contact sort of behind my eye.

15   So forgive me.  I'm working with it.

16         This case is complicated enough in terms of

17   terminology and setting the standard, that adding an

18   additional paragraph that inserts yet another term of art

19   being the standard of care to me further complicates the

20   case.  It doesn't help define what the crime is.

21         There is language in paragraph Number 9 that

22   talks about the wide breadth of discretion that

23   physicians have and it talks about decisions that doctors

24   make that may or may not fall outside this standard but

25   the standard is set already and it's set by the Federal

27

1    law.

2         Mr. Mitchell, the standard of care in a

3    medical malpractice case is one that's created by state

4    law.  So -- can't find it but, anyway, I think that it

5    further complicates the case in a way that's unnecessary.

6    I'll hear from you if you want to tell me otherwise, but

7    that's how I view it.

8         I'm listening.

9         **MS. STERLING:**  We're talking about paragraph

10   11 that we added, correct?

11        **THE COURT:**  Yes, ma'am.

12        **MS. STERLING:**  Okay.  Not the language in 8?

13   Because I can address both.  But on paragraph 11, we

14   picked that language up pretty much word for word from

15   the U.S. v. Volkman.

16        Is your eye okay?

17        **THE COURT:**  My eye is fine, but I can't see

18   out of it.

19        **MS. STERLING:**  We picked up that language from

20   the United States v. Volkman case, the Sixth Circuit

21   case, that had a lot, pretty much all the other language

22   that's your instruction also.

23        And I understand what you're talking about on

24   confusing the jury but the standard of care language has

25   been used during this trial and we think that this might

1  better clarify to them that that standard of care, what

2  we mean by that versus what the standard is here in the

3  criminal case.

4          **THE COURT:**  Where was <u>Volkman</u> --

5          **MS. STERLING:**  The Sixth Circuit.

6          **THE COURT:**  I know it's a Sixth Circuit case.

7  What jurisdiction did it come out of?

8          **MS. STERLING:**  Oh, it came out of Southern

9  District of Ohio.

10         **THE COURT:**  See, you know, and I know the

11 Sixth Circuit was very pleased with the instructions in

12 that case.  I think the facts of that case were different

13 from these.

14         **MS. STERLING:**  They were slightly different.

15         **THE COURT:**  Now I will agree with you on this.

16 The witness, Dr. Kyser, talked about standard of care.

17 He talked about inappropriate conduct.  But he also

18 answered questions in relation to this particular

19 standard, the one that's in this case; and that is the

20 usual professional practice for a legitimate medical

21 purpose.  He did answer at least twice that I remember

22 "yes" or "no" and said that, you know, in a hypothetical

23 setting that what Dr. Farmer is accused of would have

24 been a violation of that standard.  So my preference is

25 to stick with that rather than inserting yet another bit

1   of language.  Now one thing that might be useful is to

2   say that at the outset:

3            The Controlled Substances Act makes it

4   unlawful for a person knowingly or intentionally to

5   distribute or dispense a controlled substance.  The

6   defendant is charged with violating the Controlled

7   Substances Act by issuing prescriptions for controlled

8   substances unlawfully.

9            And then making this statement:  This case is

10  not about whether the defendant acted negligently or

11  whether he committed malpractice.

12           Then go further in describing what the case is

13  about.  The other language about standard of care I

14  simply think is confusing in this case.

15           How does the Government feel if I added just

16  that one line?

17           **MS. WILLIS:**  That's fine, Your Honor.  That's

18  fine with the Government, Your Honor.

19           **MS. STERLING:**  And we like that, too.  I think

20  that accomplishes what we're trying to get to.

21           **THE COURT:**  Okay.  And then the sentence that

22  you included in eight is actually a mirror image of a

23  sentence that is in Number 9.  Toward the bottom of that

24  paragraph it said:

25           This means that a physician's own individual

1    treatment methods or his own personal belief that the

2    prescribed drugs were beneficial to the patients do not

3    by themselves constitute good faith.

4         What you put in paragraph 8 is:  A physician's

5    own individual treatment methods do not by themselves

6    establish what constitute a usual course of professional

7    practice.

8         I just don't think it adds much, but tell me

9    why you think it does.

10        **MS. STERLING:**  The reason we wanted that in

11   there is because, as you know, the regulation says his

12   professional practice, right?  And I understand that what

13   he does himself by -- is not the end-all be-all for usual

14   course of professional practice.  But the way the first

15   sentence in paragraph 8 reads, it makes it sound like

16   what his practice is does not even matter in the

17   determination of usual course, because there is nothing

18   about his professional practice in this paragraph.

19        And so I think that this -- and, again, this

20   language is from Volkman, which I understand is the

21   Southern District of Ohio, but this language makes it a

22   little bit more clear that, while his practice is not the

23   only thing to consider, it does need to be considered in

24   making that determination.

25        **THE COURT:**  Ms. Sterling, I'm trying to follow

1    along with your position.  I just don't -- I'm not sure

2    it adds much.

3            See, the first part of paragraph 8 talks

4    about -- I mean, obviously, the jury is supposed to

5    compare Dr. Farmer's practice in this instance with what

6    the usual course of professional practice would be and

7    that's what Dr. Kyser testified about.  So I think, I

8    expect you will argue that Dr. Kyser may practice this

9    way.  Dr. Farmer may practice that way.  That doesn't

10   mean that they're outside the course of professional

11   practice.  That's an argument you can make; but so far, I

12   haven't heard an expert testify that what Dr. Farmer did

13   was appropriate or was within that professional standard.

14           So but you could still argue that Dr. Kyser

15   doesn't establish it.  He can give you his opinion about

16   what it is; but just because he does it one way doesn't

17   mean that's gospel, right?

18           **MS. STERLING:**  Yes, sir.

19           **THE COURT:**  So that argument is still

20   available to you.  I just don't think this sentence adds

21   much.

22           **MS. STERLING:**  Okay.

23           **THE COURT:**  So I'm going to exclude that.

24           Now, Ms. Willis, I think I've addressed their

25   language from the definition of the crime.  So now I

1   received your verdict form and this is -- by the way,

2   what happened last night, I now have a new pet peeve.  I

3   didn't realize I had this pet peeve until now and that

4   is, when a case is set for trial six months, four months,

5   you know, many months in advance, it's done so that

6   lawyers can prepare in advance and know sort of what

7   their arguments are going to be from beginning to end.

8           And I know things come up, but the verdict

9   form and jury instructions are kind of things that you

10  can get to the Court in advance so that I can think

11  through these issues in advance.  Getting them when I

12  walk into the office or overnight is just not -- it's not

13  the best way for the Court to operate in a thoughtful way

14  and that's what I'd like to be able to do.  So now I've

15  said that.

16          Why do you want to -- and let me tell you my

17  question and I want to give you the frame of reference

18  that I have for this.  If this were a cocaine case, the

19  Government would charge on or about January 1 until on or

20  about December 31, the defendant possessed with intent to

21  distribute in excess of 5 kilograms of cocaine and we

22  would go to trial.  The case, let's say, was a cooperator

23  says, "I got four shipments of cocaine.  They were 3

24  kilos each and the defendant delivered them to my house

25  four different times."  And then on the fifth one the

1    Government pulls him over, and they have 3 kilos of

2    cocaine this their trunk.  So the question is:  Is it

3    more or less than 5 kilos?

4            So the jury is given a verdict form that says:

5    As to Count 1, guilty, not guilty.  If it's guilty, go to

6    the next question.  Question 1 says:  Do you agree that

7    it was more than 5 kilos?  Yes or no?  If no, go to the

8    next question.  "No" is was it in excess of 500 grams or

9    whatever the number is.  That establishes the mandatory

10   minimum; and for that reason, the jury needs a Special

11   Verdict Form.

12           The Government charged in this case in similar

13   ways that between these two dates, the defendant, Richard

14   Farmer, prescribed or distributed Oxycodone to "M.T." or

15   to "J.T."  It doesn't list each and every one of the

16   prescriptions.  So as I understand the law on these

17   prescription drugs, quantity is not really the issue.

18   It's not going to bear on Dr. Farmer's sentence if the

19   jury does vote to convict.  So why are we going to zero

20   in on each precise prescription?

21           **MS. WILLIS:**  So the Government looks at each

22   prescription under the belief that the jury had to agree

23   on a factual basis, the same factual basis for the

24   charge, the same prescription, at least one that was

25   distributed.

UNREDACTED TRANSCRIPT

1          **THE COURT:**  What makes you say?  Is there a

2    case that you're relying on?

3          **MS. WILLIS:**  So I think that there's, when we

4    charge these cases, we charge them in two different ways.

5    We either have a range and do a Special Verdict Form or

6    charge each prescription as an individual count so it's,

7    like, a 60, 100-count indictment.  We went with a range,

8    thinking that we had to have a Special Verdict Form, so

9    that they could agree on what it was that he distributed,

10   on what prescription.  I do not have a case and if the

11   Court disagrees, then --

12         **THE COURT:**  To me, it makes it --

13         **MS. WILLIS:**  Obviously we had to have a

14   unanimity of theory, like, of a factual basis.  Like they

15   had to be unanimous on what was distributed.

16         **THE COURT:**  But each count charges a separate

17   drug.  So Count One charges that between these dates and

18   those dates, it was distributing Oxycodone to this

19   patient.  So at some point in that date range, if he

20   violated the law, with all due respect, I think you're

21   making this more complicated than it needs to be but, you

22   know, you've been doing this for a while and this is the

23   first one of these cases that I've dealt with.  So if

24   you've got some law as to why we need to do this, I would

25   like to see it.

UNREDACTED TRANSCRIPT

1          **MS. WILLIS:**  Your Honor, if the defense

2    doesn't object, then we're happy to go forward without

3    listing out the prescriptions.

4          **MS. STERLING:**  We are fine with the general

5    and not listing them.  We had initially discussed it and

6    we thought this would be a good idea and then we see it

7    and, Number 1, the thought of a jury sitting there and

8    having to go through each and every prescription on here,

9    we might be waiting for them to deliberate for days.

10          Also I think really each prescription would

11    come into play more if they find him guilty for

12    sentencing.

13          **THE COURT:**  Well, maybe but I think, you know,

14    a line for prosecutors is it just takes one, okay,

15    because we have relevant conduct in Federal court.  So,

16    you know, if it were going to make a difference on a

17    mandatory minimum sentence, then I would agree with you.

18    The jury does need to make a determination.  I just don't

19    think that's the kind of case we're dealing with.

20          I may be wrong.  So I don't think that I've

21    given y'all what I suggested as a verdict form.  Or did

22    I?

23          **MS. WILLIS:**  Your Honor --

24          **MS. STERLING:**  I don't think so.

25          **MS. WILLIS:**  -- I don't remember seeing that.

```
1          THE COURT:  Well, here's what it says.  It's a
2   two-pager, and it says:
3          As to Count One, we find the defendant guilty
4   or not guilty.  As to Count Two, we find the defendant
5   guilty or not guilty.  As to Count Three, guilty or not
6   guilty.
7          Pretty simple.
8          MS. STERLING:  I may not have made myself
9   clear.  While we initially thought it was a good idea, we
10  don't think it's a good idea right now to do a special
11  verdict.  We think it should be just count by count and
12  not by prescription.
13         MS. WILLIS:  If the defense is okay with it,
14  we're okay with just count by count.
15         THE COURT:  All right.  And, again, I don't
16  want to overlook an important issue.  So if you're aware
17  of some law on this, I don't want you to hide it from me.
18         MS. WILLIS:  Yes, Your Honor.
19         THE COURT:  Because, you know, I didn't
20  realize this was going to be the Government's Special
21  Verdict Form.
22         I'm going to go get my contact under control.
23  Besides that, is there anything else we need to cover
24  today?
25         MS. WILLIS:  Nothing from the Government.
```

UNREDACTED TRANSCRIPT

1           **THE COURT:**  I'll be right back.

2           **THE CLERK:**  All rise.  This Honorable Court

3  stands in recess.

4       (Recess.)

5           **THE COURT:**  Are we ready for the jury?

6           **MS. WILLIS:**  Your Honor, may I have a moment

7  to talk with Ms. Sterling?

8           **MR. MITCHELL:**  If I could have 45 seconds.

9           **THE COURT:**  Yes, sir.

10       (Pause.)

11          **THE COURT:**  Are we ready for the jury?

12          **MS. WILLIS:**  Yes.  I believe Mr. Griffin may

13  have gone out for a second.

14          **THE COURT:**  We'll wait a second.

15       (Pause.)

16          **THE COURT:**  Ready now?

17          **MS. WILLIS:**  Now we're ready, Your Honor.

18       (The following occurred in the presence of the

19       jury:)

20          **THE COURT:**  Good morning, ladies and

21  gentlemen.

22       From your perspective, we're getting a late

23  start, but I can assure you that we've been at it for a

24  while.  So thank you for your patience.  Happy

25  Valentine's Day.

38

1                     And I think we're ready to keep going.

2              **MS. WILLIS:**  Yes, Your Honor.

3              **THE COURT:**  Yes, ma'am.

4              **MS. WILLIS:**  We will recall Agent Mark Wray to

5     the stand for redirect.

6              **THE COURT:**  Oh, that's right.  I'm sorry.  Of

7     course.  Yes, sir, Mr. Wray.

8              **THE CLERK:**  Swear him in again?

9              **THE COURT:**  Please.

10             **THE CLERK:**  If you will raise your right hand

11    to be sworn.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **MARK WRAY,**

2    having been first duly sworn, took the witness stand and

3    testified as follows:

4                        REDIRECT EXAMINATION

5    **BY MS. WILLIS**

6    *Q.*    Good morning.

7    *A.*    Good morning.

8    *Q.*    Yesterday during cross-examination, there were

9    some, just to get on the same page, there was some

10   discussion about what Dr. Farmer --

11               **THE COURT:**  You don't have a mic on, do you?

12               **MS. WILLIS:**  I do not have a mic on.

13               (Pause.)

14               **MS. WILLIS:**  Is that better?  Can everybody

15   here me better now?

16               **THE COURT:**  Yes.  Thank you.

17   **BY MS. WILLIS**

18   *Q.*    Yesterday there was some discussion about

19   prescriptions that Dr. Farmer admitted to writing when

20   you went to his office.

21   *A.*    Yes, ma'am.

22   *Q.*    Just for clarity, what prescriptions did he admit

23   to writing?

24   *A.*    They were connected with the previous witnesses:

25   Ms. Jennifer Tutor, Tiffaney Tutor, Meagan Tutor, Jody

1    Govea.

2    *Q.*    And did he not admit to writing prescriptions for

3    William Winchell?  Is that correct?

4    *A.*    I don't recall that he ever confirmed that he had

5    written Mr. Winchell.

6    *Q.*    When you were getting files from Dr. Farmer's

7    office, was he there?

8    *A.*    Yes, he was.

9    *Q.*    When you were asking for the particular individuals

10   for whom you were requesting files, was he helping Ms.

11   Grisham obtain those files?

12   *A.*    Yes.  Collectively they were doing it, yes.

13           **MS. WILLIS:**  May I have the Court's

14   indulgence?

15           **THE COURT:**  Yes, ma'am.

16           (Pause.)

17           **MS. WILLIS:**  No further questions for this

18   witness.

19           **THE COURT:**  All right.  Mr. Wray, you are

20   excused, sir.

21           **THE WITNESS:**  Thank you.

22           **THE COURT:**  Thank you.

23           (Witness excused.)

24           **THE COURT:**  Yes, ma'am.

25           **MS. WILLIS:**  The Government calls Lynn Ellis

41

1    to the stand.

2              **THE CLERK:**  Ma'am, if you will stand next to

3    the podium there and raise your right to be sworn,

4    please.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **LYNN ELLIS,**

2    having been first duly sworn, took the witness stand and

3    testified as follows:

4              **THE COURT:**  That microphone will slide around

5    so you can move it.  Put it in front of you.  There you

6    go.  Even the base will slide over if you would like.

7              **THE WITNESS:**  Thank you.

8              **THE COURT:**  Yes, ma'am.

9                        DIRECT EXAMINATION

10   **BY MS. WILLIS:**

11   *Q.*    Good morning.

12   *A.*    Morning.

13   *Q.*    Can you state and spell your name for the record?

14   *A.*    Lynn Ellis.  L-Y-N-N; E-L-L-I-S.

15   *Q.*    And where are you from?

16   *A.*    I am --

17             **THE COURT:**  I'm going to interrupt you.

18             Would you slide it over a little better in

19   front of you so that it will project your voice?

20             **THE WITNESS:**  Is that better?

21             **THE COURT:**  I think so, yes, ma'am.

22   **BY MS. WILLIS**

23   *Q.*    And where are you from?

24   *A.*    I'm from Adamsville, but I lived in Memphis for

25   over 30 years.

1    Q.    What do you do?

2    A.    I'm a pharmacist.

3    Q.    Where are you a pharmacist?

4    A.    At The Medicine Shoppe Pharmacy on Knight Arnold.

5    Q.    Now is that the only Medicine Shoppe in town?

6    A.    It is now.

7    Q.    How long has it been the only Medicine Shoppe?

8    A.    About eight weeks or so.

9    Q.    And before that, were there two?

10    A.    Yes.

11    Q.    And were you affiliated with the other Medicine

12    Shoppe?

13    A.    We are independently owned.  We're a franchise.

14    Q.    Who opens The Medicine Shoppe where you work?

15    A.    My husband and I.

16    Q.    Who's your husband?

17    A.    He is Rick Ellis.

18    Q.    And how long have you and Rick owned The Medicine

19    Shoppe on Knight Arnold?

20    A.    It will be 29 years on June 30th.

21    Q.    Now during the course -- I'll back up.

22          Are you a pharmacist?

23    A.    Yes.

24    Q.    And how many pharmacists work at The Medicine

25    Shoppe on Knight Arnold?

*DIRECT - LYNN ELLIS*                                                    44

1    *A.*     Just two.

2    *Q.*     Who's the other pharmacist?

3    *A.*     Rick Ellis and myself.

4    *Q.*     Now, as part of your duties as a pharmacist, did

5    you have occasion to fill prescriptions by Dr. -- written

6    by Dr. Richard Farmer?

7    *A.*     Yes.

8    *Q.*     About how many of those prescriptions have you

9    filled?

10   *A.*     I have no way of knowing.  I've been filling his

11   prescriptions for years.

12   *Q.*     Would you say 5 years?  10 years?

13   *A.*     Probably 10.

14   *Q.*     And about how many prescriptions would you say you

15   filled of his in 2019 or 2018?  We will say 2018.  How

16   many prescription of his would you fill, like, in a

17   month?

18   *A.*     Three hundred.

19   *Q.*     Now do you remember anybody with the last name

20   "Tutor"?

21   *A.*     I didn't really mean 300.  That's -- I meant 10 a

22   week.  That's 40.  Sorry.

23   *Q.*     Okay.

24   *A.*     I'm nervous.

25   *Q.*     It's okay.  So not 300?  About --

*DIRECT - LYNN ELLIS*                                          45

1    *A.*    No.

2    *Q.*    -- forty a month.

3    *A.*    Ten a week or so, 40, yeah.

4    *Q.*    Okay.  So about a few hundred a year, like?

5    *A.*    Correct.

6    *Q.*    So would you say you're familiar with his

7    prescriptions?

8    *A.*    Yes.

9              **MS. WILLIS:**  May I approach the witness, Your

10   Honor?

11             **THE COURT:**  You may.

12             Have you shown this to counsel?

13             **MS. WILLIS:**  It's a binder of prescriptions,

14   yes.  Counsel is familiar with this binder.

15             **THE COURT:**  All right.

16             **MS. WILLIS:**  I am showing the witness a binder

17   and taking clips out of it.

18   **BY MS. WILLIS:**

19   *Q.*    Can you flip through this binder?

20   *A.*    (Complies.)

21   *Q.*    You don't have to flip through every page.  I was

22   just showing you a few.

23             So have you flipped through the first few pages of

24   this binder?

25   *A.*    Uh-huh.

*DIRECT - LYNN ELLIS*                                      46

1   Q.    What do these appear to be?

2   A.    They're prescriptions for patients of Dr. Farmer's.

3   Q.    And is there anything distinctive about the

4   prescriptions that Dr. Farmer -- that came from Dr.

5   Farmer's office?

6   A.    Well, most of the prescriptions we fill for Dr.

7   Farmer were for patients that were -- had an addiction

8   issue, that they were trying to become, of course, not

9   dependent on certain meds.  Then there were others that

10  were outside of what I thought was his normal prescribing

11  habits.

12  Q.    Okay.  I'm going to back up with my question.  Is

13  there anything about the way the prescriptions look that

14  is distinctive from Dr. Farmer's office?

15  A.    I recognize the blue prescription blanks and his

16  signature.

17  Q.    Now, did you have occasion to fill prescriptions by

18  anybody by the last name "Tutor"?

19  A.    Yes.

20  Q.    And how do you recall that?

21  A.    I recall them because their prescription were

22  unusual from the normal prescriptions that I saw from Dr.

23  Farmer.

24  Q.    And why do you say they were unusual?

25  A.    They're medications that were written or different

1    than what I was used to seeing.  They were narcotic

2    prescriptions.  I was not used to seeing him write those.

3    Q.    What kind of prescriptions were you used to seeing

4    Dr. Farmer write?

5    A.    Mostly for -- do you want me to name the

6    medications or the type?  Suboxone, it's a medication to

7    help people become hopefully less addicted to narcotics.

8    Q.    So, in addition to Suboxone, were there any other

9    medications that you usually saw from Dr. Farmer's

10   office?

11   A.    Sometimes antianxiety medication, sometimes

12   antidepressant.

13   Q.    And just for the jury, because they're not

14   pharmacists, can you give us examples of what those are?

15   A.    Alprazolam would be an antianxiety medication.

16   Paroxetine or Citalopram would be antidepressant

17   medication.

18   Q.    So what stood out about the prescriptions to the

19   Tutor prescriptions?

20   A.    Just the fact that they were narcotics and I was

21   not used to seeing Dr. Farmer write those prescriptions.

22   Q.    At any point did you call the office?

23   A.    Yes.

24   Q.    And why did you call the office?

25   A.    I called the office to verify that he had actually

1  written the prescriptions.

2  *Q.*    And what happened when you called the office to

3  verify that he had actually written the Tutor

4  prescriptions?

5  *A.*    I would speak to his office assistant, and then she

6  would either put me on hold or call me back to verify

7  these prescriptions.

8  *Q.*    So when you -- so for the narcotic prescriptions,

9  had you verified that Dr. Farmer wrote them?

10  *A.*    I was told that he had written them.

11  *Q.*    And did you call his office more than once?

12  *A.*    Yes.

13  *Q.*    Was there anything notable about the timing of when

14  many of the prescriptions were filled in relation to the

15  Tutor prescriptions?

16  *A.*    Oftentimes they would be on Saturdays.

17  *Q.*    And what, if anything, was notable about that?

18  *A.*    Well, the notable thing is I believe he had

19  shortened the office hours on Saturday; and also his

20  office assistant was not usually present on those

21  Saturdays.

22          **MS. STERLING:**  Objection.  Lack of personal

23  knowledge.

24  **BY MS. WILLIS:**

25  *Q.*    How do you -- why do you think that she was not

1   present?

2   A.    Mainly because we had spoken on the phone and she

3   had told me she didn't work on Saturdays.  Also when I

4   would call the office, I usually would not get an answer

5   because I don't believe anyone else would answer the

6   phone.

7   Q.    Are you familiar with somebody with the last name

8   "Govea"?

9   A.    Yes.

10  Q.    And how are you familiar with that person?

11  A.    I'm familiar with her receiving prescriptions

12  written by Dr. Farmer for her.

13  Q.    And was there anything notable about her

14  prescriptions to you?

15  A.    They were for narcotics.

16  Q.    And did you verify any of her prescriptions?

17  A.    Yes.

18  Q.    Now at some point did you call Dr. Farmer's office

19  about a prescription that The Medicine Shoppe filled for

20  an individual by the name of William Winchell?

21  A.    Yes.

22  Q.    What happened when you did that?

23  A.    Well, I called to verify the prescription was

24  written; and one of the reasons that I called just, other

25  than the fact that it was a narcotic, was because I

1   didn't think the signature looked correct.

2   *Q.*    So for the Tutor prescription and the Govea

3   prescription that you filled, did you think that those

4   signatures looked correct?

5   *A.*    At the time.

6   *Q.*    And for the Winchell prescription, did you think

7   that that signature looked correct?

8   *A.*    At the time but then later I thought -- I went back

9   and started comparing the prescription to other ones that

10  I had and I thought the signature looked different.

11  *Q.*    So when you called the office about that Winchell

12  prescription?

13  *A.*    I was told that he did not write that prescription.

14  *Q.*    And were you directed --

15  *A.*    That Dr. Farmer did not write that prescription.

16  *Q.*    And was there any discussion about calling the

17  police?

18  *A.*    Yes, I asked them if they wanted to handle that

19  themselves or if they wanted me to call.

20  *Q.*    Had you ever expressed concern about any of these

21  prescriptions to Dr. Farmer's office before?

22  *A.*    We have had several discussions about the

23  appropriateness of writing these medications.

24  *Q.*    And what were those?  Can you tell us about those

25  discussions?

UNREDACTED TRANSCRIPT

*CROSS - LYNN ELLIS*                                                      51

1   A.    Well, I just felt like I wasn't used to seeing him

2   write that, that these medications are very addictive,

3   and seemed like we were going in the opposite direction

4   of what we were used to doing with that office.

5            **MS. WILLIS:**  May I have the Court's

6   indulgence?

7            **THE COURT:**  Yes, ma'am.

8   **BY MS. WILLIS**

9   Q.    Do you recall the timeframe that you started

10  noticing the narcotic prescriptions?

11  A.    Sometime in 2018.

12           **MS. WILLIS:**  No further questions.  Thank you.

13           **THE COURT:**  Cross-examination.

14                     CROSS-EXAMINATION

15  **BY MS. STERLING:**

16  Q.    Good morning, Dr Ellis.  My name is Amy Sterling.

17  I'm going to ask you just a few questions about your

18  testimony.

19  A.    Sure.

20  Q.    Now you testified you thought it was abnormal for

21  Dr. Farmer to be writing the narcotic prescriptions,

22  right?

23  A.    Correct.

24  Q.    And I believe you were saying that's because of

25  addiction patients.  A narcotic would not be a typical

1    prescription you would write for addiction patients,

2    correct?

3    *A.*    Not typically.

4    *Q.*    You didn't have any knowledge, did you, of whether

5    the Tutors were addiction patients of Dr. Farmer's, did

6    you?

7    *A.*    I have no knowledge of that.

8    *Q.*    You do know that not only does he treat addiction

9    patients but he also has a different set of patients that

10   are there for psychotherapy, depression, anxiety, and so

11   forth?

12   *A.*    Correct.

13   *Q.*    You said at the time you thought that Meagan Tutor

14   and Jody Govea had -- or that Dr. Farmer had signed those

15   prescriptions, correct?

16   *A.*    Yes, yes.

17   *Q.*    And you called -- but you still called to verify,

18   correct?

19   *A.*    Yes, I did.

20   *Q.*    And that was because of the type of drug that was

21   prescribed?

22   *A.*    Yes.

23   *Q.*    Did you verify all of the Tutors' prescriptions

24   that were presented?

25   *A.*    Not all of them.

CROSS - LYNN ELLIS                                                53

1    Q.    Did you verify all of Jody Govea's prescriptions

2    that were presented?

3    A.    No.

4    Q.    Do you know how many of -- let's use Jody Govea --

5    how many of her prescriptions that you verified?

6    A.    I don't really know how many.  I just know that I

7    probably called a couple of times on each patient.

8    Q.    Do you keep a record of when you call to verify a

9    prescription?

10   A.    Sometimes I do.  Sometimes I notate it on the

11   prescription, and sometimes I don't.

12   Q.    If you cannot reach a doctor's office when you call

13   to verify, like you were saying on a Saturday, what would

14   you typically do?

15   A.    I called on Monday.

16   Q.    So would you fill it before?

17   A.    I usually fill --

18   Q.    -- Monday and just follow up?

19   A.    Uh-huh.

20   Q.    And you talked about Dr. Farmer's office hours and

21   that you thought his hours were different on a Saturday,

22   correct?

23   A.    Uh-huh.

24   Q.    But you are not aware of how he conducted his

25   patient visits, correct?

1    A.    No, no.

2    Q.    You're not aware of whether or not he typically

3    could see patients on the weekends if he needed to,

4    correct?

5    A.    Well, I just assumed he did, because I received

6    prescriptions dated on Saturdays.

7    Q.    So you're not aware of any reason why he could

8    not --

9    A.    Oh, no.

10   Q.    -- treat a patient on a Saturday, correct?

11   A.    No, not at all.

12          **MS. STERLING:**  No further questions.

13          **THE COURT:**  All right.  Redirect?

14          **MS. WILLIS:**  No redirect, Your Honor.

15          **THE COURT:**  All right.  Thank you very much.

16   You're excused.

17          (Witness excused.)

18          **MS. WILLIS:**  Your Honor, Government has a

19   stipulation to read.

20          **THE COURT:**  All right.

21          **MS. WILLIS:**  The parties in this case hereby

22   stipulate to the following facts in evidence:

23          At all relevant times, Richard Farmer, M.D.,

24   was a Doctor of Psychiatry licensed by the state

25   Tennessee.  Farmer maintained a drug enforcement

1    registration or DEA number.  The Controlled Substances
2    Act, or CSA, govern the manufacture, distribution, and
3    dispensing of controlled substances in the United States.
4         Under the CSA, the United States Drug
5    Enforcement Administration, or the DEA, regulated certain
6    pharmaceutical drugs designated as controlled substances
7    because of their potential for abuse or dependence, their
8    accepted medical use, and their accepted safety for use
9    under medical supervision.
10        The DEA issued registration numbers to
11   qualifying practitioners, including physicians, which
12   permitted those practitioners to dispense Schedule II,
13   III, IV, and V controlled substances consistent with the
14   terms of that registration.
15        Oxycodone is a Schedule II controlled
16   substance.  Alprazolam and Clonazepam are Schedule IV
17   controlled substances.  The Code of Federal Regulations
18   governs the issuance of prescriptions and provided, among
19   other things, that a prescription for controlled
20   substance must be issued for a legitimate medical purpose
21   by an individual practitioner acting in the usual course
22   of his professional practice.
23        The Code of Federal Regulations further
24   directed that an order purporting to be a prescription
25   issued not in the usual course of professional treatment

UNREDACTED TRANSCRIPT

1    is not a prescription within the meaning and intent of

2    the CSA; and the person knowingly filling such a

3    purported prescription, as well as the person issuing it,

4    shall be subject to the penalties provided for violations

5    of the provisions of law related to controlled

6    substances.

7              Tennessee's Controlled Substance Monitoring

8    Database, or the CSMD, monitors the dispensing of

9    Schedule II, III, IV, and V controlled substances in

10   Tennessee.  Generally, dispensers or pharmacists are

11   required to upload all controlled substance prescriptions

12   they fill daily or by the end of the next business day to

13   be included in the CSMD database.

14             For each controlled substance prescription

15   filled in the State of Tennessee, the CSMD includes the

16   patient's name, the particular controlled substance and

17   dosage dispensed, the quantity dispensed, the number of

18   days supplied, the prescribing physician's name, the date

19   the prescription was issued, the dispensing pharmacy's

20   name, the type of payment, and the date the controlled

21   substances were dispensed.

22             Exhibit 18 through 22 are reports of

23   information contained in the CSMD database.

24             And the Government would offer these exhibits

25   as 18 through 22 to be admitted.

1       **THE CLERK:**  Do you want to mark the

2  stipulation as an exhibit?

3       **THE COURT:**  The stipulation itself will be

4  marked as an exhibit.  So the numbers may be a little

5  different.

6       **MS. WILLIS:**  Okay.

7       **THE CLERK:**  18 will be the stipulation.

8       **MS. WILLIS:**  So these would be 19 through 23.

9       **MR. MITCHELL:**  Can we do the stipulation after

10  the numbed exhibits?

11       **THE COURT:**  Why?

12       **MS. WILLIS:**  Because we numbered it in the

13  stipulation.

14       **MR. MITCHELL:**  Sidebar?

15       **THE COURT:**  All right.  So the stipulation

16  will follow the -- ladies and gentlemen, we're trying to

17  be efficient here and so the lawyers got together and

18  numbered these in advance.  We don't want to mess that up

19  right now.  So we're going to go along with that.  The

20  stipulation that applies to these will be numbered after

21  them.

22       **MS. WILLIS:**  While those are being marked, can

23  I continue?

24       **THE COURT:**  Yes.

25       **MS. WILLIS:**  The Mississippi Prescription

1    Monitoring Program, or MSPMP, is an electronic tracking

2    program managed by the Mississippi Board of Pharmacy.

3    The MSPMP is an online service available 24/7 that

4    provides patients' controlled substance drug profile, as

5    well as prescriber and dispenser information, for

6    controlled substances dispensed in Mississippi.

7              Pharmacists are required to report

8    prescription information to MSPMP every 24 hours or next

9    business day of the date the drug was dispensed.

10             Exhibits 23 through 26 are reports of

11   information --

12             **THE COURT:**  All right.  Hold on for just a

13   second.  I want to double-check and make sure these are

14   done correctly.

15             **THE CLERK:**  I got 18, 19, 20, 21, and 22.

16             Is that correct?

17             (Said items were marked as Exhibits 18-22).

18             **MS. STERLING:**  Your Honor, is it okay if I --

19             **THE COURT:**  Please.

20             (Pause.)

21             **THE COURT:**  You may continue.

22             **MS. WILLIS:**  The Government offers Exhibits 23

23   through 26 for admission.

24             **THE COURT:**  And this is from the Mississippi

25   database?

UNREDACTED TRANSCRIPT

59

1          **MS. WILLIS:**  The Mississippi PMP.

2          (Said items were marked as Exhibit 23-26).

3          **THE COURT:**  For the record, those are

4    admitted.

5          **MS. WILLIS:**  Thank you, Your Honor.

6          Exhibits 27 through 30 are prescriptions for

7    named patients that were seized from various pharmacies

8    and are authentic business records admissible at trial.

9          (Said items were marked as Exhibit 27-30).

10         **THE CLERK:**  So they are collective, Judge, but

11   they are in separate -- so how many have you got there?

12         (Pause.)

13         **MS. WILLIS:**  There are 41 for Jody Govea.

14         **THE CLERK:**  Let me write this down.

15         **THE COURT:**  All right.

16         **MS. WILLIS:**  Then I just have one more to

17   read.

18         **THE COURT:**  Why don't you read the

19   stipulation?  Then we're going to sort out this, and the

20   jury doesn't have the watch us --

21         **MS. WILLIS:**  Sorry.

22         **THE COURT:**  -- make sausage this morning.

23         **MS. WILLIS:**  Exhibit 31 and 32 is a copy of

24   prescriptions for a named patient that was provided by

25   Walgreens Pharmacy and is an authentic business record

1    admissible at trial.

2           And that is -- and it's signed by all the

3    parties.

4           **THE COURT:**  All right.  So, Ms. Willis, what

5    is the last numbered exhibit that you are admitting

6    through stipulation?

7           **MS. WILLIS:**  32 and the stipulation itself

8    would be 33.

9           **THE COURT:**  Okay.  So would it make sense to

10    take a five-minute break, get all these marked and

11    situated, so that we can explain what just happened to

12    the jury?

13           **MS. WILLIS:**  Yes, Your Honor.

14           **THE COURT:**  Ladies and gentlemen, you're

15    welcome to stay; but I think it would make more sense if

16    we took a break.  You guys can get a drink or walk down

17    the hall.  We'll get this sorted out, and then we'll

18    resume.  Okay?

19           (The following occurred outside the presence

20           of the jury:)

21           **MS. WILLIS:**  The Government is about -- we're

22    just resting.  One thing about the stipulation, can we --

23    one thing about the stipulation --

24           **THE COURT:**  Do you want it on the record?

25           **MS. WILLIS:**  I mean, we're just resting and I

 1    guess we will go into --

 2              **MR. MITCHELL:**  Do you want to do a motion for

 3    judgment of acquittal?  Is that what you're asking?

 4              **THE COURT:**  Well, it sounds like that's what

 5    would come next.  We could bring them back for two

 6    seconds and then send them right back out or we could

 7    take that up over here.  I would rather have them outside

 8    and deal with it.  So why don't we just go ahead and

 9    bring them back in?  And I'm going to tell them when they

10    get here, "Don't worry.  You're not going to be here

11    long."

12              Ms. Willis, can you just explain, when the

13    jurors come back, go through the exhibits one more time,

14    what's what?

15              **MS. WILLIS:**  Yes.

16              **THE COURT:**  Could you -- yes, through the

17    stipulation.

18              **MS. WILLIS:**  For the jury.

19              **THE COURT:**  Yes.

20              **MS. WILLIS:**  Okay.

21              **THE COURT:**  When they get in here, I would

22    like for you to just kind of go, these are the Tennessee

23    ones; the Mississippi ones are those; the actual

24    prescriptions are these, something like that.

25              **MS. WILLIS:**  I can do that when they come out.

62

1    I'll do it.

2              (The following occurred in the presence of the

3              jury:)

4         **THE COURT:**  Ladies and gentlemen, don't get

5    too terribly comfortable because I anticipate we're going

6    to take another break very soon and part of this little

7    scenario that we're going through is the reality that

8    trial lawyers know about and it's the idea of hurry up

9    and wait.  We gear up for certain things and then we have

10   to wait a minute and I think that's going to happen with

11   you in just a minute.  So bear with us.  Trust that we're

12   working out here.  I don't want to tie you up over things

13   that are not appropriate for you to hear.

14             So now, Ms. Willis, we have just gone through

15   the stipulation and we've introduced a number of exhibits

16   and I would like for you, if you would, to recount --

17        **MS. WILLIS:**  Yes, sir.

18             So, Your Honor, a note from the jurors.  It's

19   not working now.

20        **THE COURT:**  Is it on Channel 2?

21        **JUROR:**  It is on "2."  It was working earlier.

22   I don't know what happened.

23        **THE COURT:**  These batteries, you know, they go

24   down pretty fast.

25             Okay.  Can you hear now?  Can you hear me now?

```
 1              JUROR:  I can't.
 2              THE COURT:  Does the switch work?
 3              JUROR:  It's on "2."
 4              THE COURT:  Is it on?
 5              JUROR:  It is.
 6              THE COURT:  Okay.  You can't hear?
 7              THE CLERK:  The system is not on.
 8              THE COURT:  Here we go.  How about that?
 9              JUROR:  Okay.
10              THE COURT:  We were hitting the wrong switch.
11    All right.
12              Now, we will -- what I'm going to do is ask
13    Ms. Willis to go back through those exhibits one more
14    time and make sure that we all know which exhibits, what
15    the exhibits are.
16              Yes, ma'am.
17              MS. WILLIS:  So Exhibits 18 through 22 are the
18    CSMD from Tennessee, and I'm just going to put them on
19    the first page on the Elmo so that you kind of see what
20    they look like.
21              So this is the CSMD which is the Controlled
22    Substance Monitoring Database data for Tiffanie Tutor,
23    and it's a number of pages.  It's five pages.
24              THE COURT:  Okay.
25              MS. WILLIS:  Number 19 is the CSMD for Meagan
```

1    Tutor, and this is the Tennessee prescription data for

2    her.  This exhibit is three pages.

3         Exhibit 20 is the CSMD for Jennifer Tutor, and

4    it is five pages.

5         And Number 21 is the CSMD.  Again, that's the

6    Tennessee prescription data for Jody Govea; and that is

7    three pages.

8         Exhibit 22 is 322 pages and this exhibit is

9    the CSMD data for Dr. Farmer from a period of 2017 to

10   2019 and the patient names have been redacted except for

11   the patient that you have heard about during the course

12   of this trial.

13        **THE COURT:**  These documents are printed front

14   and back; is that right?

15        **MS. WILLIS:**  That is correct, Your Honor.

16        Well, the 322-page document is front and back.

17   The shorter documents are just front.

18        **THE COURT:**  Thank you.

19        **MS. WILLIS:**  Exhibit 23 is the Mississippi PMP

20   data from Meagan Tutor and it is printed just on the

21   front and it is five pages.  So the first page looks like

22   this, and then the subsequent pages contain data.

23        24 is the Mississippi PMP data for Jennifer

24   Tutor and then the Mississippi data, the names are

25   redacted except for the first and last initial, but this

UNREDACTED TRANSCRIPT

1    is Jennifer Tutor's data.  It's printed one-sided, and

2    the exhibit is four pages.

3              Exhibit 25 is Mississippi PMP data for Jody

4    Govea.  Like the others, it is printed one-sided with the

5    date after the first page; and it is also four pages.

6              And then, finally, Exhibit 26 is the

7    Mississippi PMP data for Dr. Farmer, so for all of Dr.

8    Farmer's prescriptions filled in Mississippi from

9    January, 2017, to December of 2018.  The patients that

10   were not at issue in this trial have been redacted.  This

11   is a front/back exhibit, and it is 75 pages.

12             So those are the data exhibits.

13             Exhibits 27 through 30 are prescriptions and

14   they're in a notebook divided by -- I'm showing you -- a

15   notebook divided by patient.

16             So Exhibit 27 are prescriptions written to

17   Jody Govea.  Exhibit 28 is prescriptions for Jennifer

18   Tutor.  And just to back up.  I'm sorry.  For Exhibit 27,

19   there are 41 prescriptions in the notebook.  For Exhibit

20   28, there are 26 prescriptions in the notebook; and

21   there's is a number at the bottom corner of every sleeve

22   of the page.

23             For Exhibit 30, these are prescription in the

24   name --

25             **THE COURT:**  Hang on.  What about 29?

1           **MS. WILLIS:**  I'm sorry.  I meant 29.  I'm

2     looking at 29, and I misspoke.

3           So Exhibit 29, these are prescriptions in the

4     name of Meagan Tutor.  These are numbered.  It's Exhibit

5     29, but there are 24 prescriptions in the notebook.

6           Then Exhibit 30 are prescriptions in the name

7     of William Winchell.  There are 12 of these.

8           And then, finally, Exhibits 31 and 32 are

9     copies of prescriptions for Tiffanie Tutor from the

10    Walgreens.

11          And then Exhibit 33 is the stipulation that I

12    read to you out loud.

13          **THE COURT:**  Each of those exhibits is admitted

14    into evidence.

15          (Said items were marked as Exhibits 31-33).

16          **THE COURT:**  Thank you, Ms. Willis.

17          **MS. WILLIS:**  Thank you.

18          **THE COURT:**  Does the Government have any

19    additional proof to put on?

20          **MS. WILLIS:**  No, Your Honor.  The Government

21    rests.

22          **THE COURT:**  Now we're at that "hurry up and

23    wait" spot.  Ladies and gentlemen, we're going to take a

24    break probably about 10 to 15 minutes.  Okay.  We'll come

25    back and see where we are.

67

1                    (The following occurred outside the presence

2                    of the jury:)

3            **THE COURT:**  Mr. Mitchell.

4            **MR. MITCHELL:**  Yes, Your Honor.  We make a

5    motion for judgment of acquittal that the Government

6    has -- that their evidence is insufficient to sustain a

7    conviction in this matter.  They have failed to sustain

8    their burden specifically with regards to the intent of

9    knowingly or intentionally prescribing oxycodone,

10   Clonazepam or Alprazolam not for legitimate medical

11   purpose outside the usual scope of a professional

12   practice.

13                    I think it was established that all these

14   individuals had some type of medical condition, pain,

15   depression, scoliosis, endometriosis, that they had these

16   issues, and that Dr. Farmer, he prescribed these,

17   prescribed them in the normal course of his medical

18   practice for a legitimate medical purpose.

19                    Obviously, Dr. Farmer was identified in court.

20   However, the date of the offense, there was a range of

21   dates on most of the individual indictments, except for

22   Tiffanie Tutor.  There are allegations by the Government

23   and the witnesses of wrongdoing.  However, they never

24   establish a date.  Like, for example, Tiffanie Tutor

25   never said on July 10th, 2016, or July 11th, 2016, that

1    those scripts were written for -- in exchange for sexual

2    favors or anything like that; the same with Meagan Tutor

3    and Jennifer Tutor.

4              Certainly I think the Government will rely on

5    the script dates and the CSMD but there was no proof

6    tying together the alleged wrongdoing by Dr. Farmer

7    acting outside the scope of his medical practice for an

8    illegitimate purpose with the specific dates or

9    specific -- in that specific actions in that date range

10   is what I'm trying to say.

11             I would say that the venue is correct, but,

12   again, relying on the argument that he saw a patient for

13   a -- the patient presented with a legitimate medical

14   reason, a legitimate medical issue, and he prescribed a

15   controlled substance to them is acting within the usual

16   scope of his medical practice for a legitimate medical

17   purpose.  And the Government failed to meet each element

18   of the crime.

19             **THE COURT:**  All right.  Ms. Willis, do you

20   want to be heard?

21             **MS. WILLIS:**  Viewing the evidence in the light

22   most favorable to the Government, a reasonable juror

23   could conclude that the Government has proven Counts 1

24   through 9 in the indictment with the evidence that was

25   presented in its case in chief.  I can go one by one

 1    through each if the Court would like for me to, or I can

 2    just address the particular issues that --

 3              **THE COURT:**  Please.

 4              **MS. WILLIS:**  -- Mr. Mitchell raised.

 5              Mr. Mitchell raised that Tiffanie Tutor has

 6    one date and a date range.  Tiffanie Tutor acknowledged

 7    that she got Clonazepam and oxy -- well, it's two days --

 8    Clonazepam and Oxycodone from Dr. Farmer.  Both of those

 9    prescriptions have been issued into evidence, and they

10    are reflected in the CSMD.

11              Furthermore, Tiffanie Tutor testified that she

12    was never a patient of Dr. Farmer's; and we know that she

13    never had a patient file.  Given the substances that were

14    prescribed including Oxycodone, which is a Schedule II

15    controlled substance for pain, and also that the

16    combinations were written, so the Clonazepam on July

17    10th, 2016, and the Oxy on July 11, 2016.  That would

18    also be a combination which was not documented.  There

19    are a number of factors for Tiffanie Tutor that would

20    show that these prescriptions are outside the usual scope

21    of professional practice and not for a legitimate medical

22    purpose.

23              The defendant also raised that there are date

24    ranges in the indictment for each of the patients.  The

25    Government would submit for each of the days in the --

each of the ranges in the indictment, none of these
individuals were -- well, I'll take them one by one.

Jody Govea testified that she was never a
patient of Dr. Farmer; and there are prescriptions, both
in hard copy and in CSMD, that were submitted in the date
ranges for Jody Govea.

I've already addressed Tiffanie Tutor.

For Jennifer Tutor, the evidence shows that
she was not a legitimate patient of Dr. Farmer's after
2014.  The date range in the indictment starts in January
9th, 2017.  So that range was proven by the evidence
including the CSMD data, her testimony, and the actual
prescriptions.

William Winchell was also not a patient of Dr.
Farmer's.

And the Government would submit that for
Meagan Tutor, there are prescriptions in Meagan Tutor's
name for the date range.  A couple of things:  Meagan
Tutor indicated that Dr. Farmer or that there were
prescriptions provided in her name before she ever saw
him.  So that could not have been in the usual scope of
professional practice or for a legitimate medical
purpose.

The Government would submit, even based on her
account of the times that she did see Dr. Farmer, this

UNREDACTED TRANSCRIPT

1    would be outside the scope and not for a legitimate

2    medical purpose given the times that she met with him,

3    which would be after hours, and that's how it started off

4    from the beginning and given that he was writing her pain

5    pills for endometriosis and all kinds of other things.

6           So based on this evidence, the Government

7    submits that it has met its burden at this stage.

8           **THE COURT:**  Anything else, Mr. Mitchell?

9           **MR. MITCHELL:**  No, Your Honor.

10          **THE COURT:**  The hill that you're trying to

11   climb, Mr. Mitchell, is steep and it's steep for

12   everybody in your position, because at this point the

13   jury has heard evidence and you're asking the Court to

14   take the case away from them.  So the law makes the hill

15   steep.

16          And so what the law does is it asks the Court

17   to consider the evidence in the light most favorable to

18   the Government; and when I do that, even though there may

19   be arguments that the defense can make and certainly has

20   gotten testimony that is consistent with their theory and

21   they can make those arguments to the jury, the jury will

22   weigh those two arguments and decide which one is more

23   convincing.  The Court does not do that.  The Court takes

24   the evidence in the light most favorable to the

25   Government.

1           And when I do that, we've got they've put
2     forth an expert witness who's helped guide us as to what
3     the scope of the professional practice is and what
4     legitimate medical purposes are.  We've had a number of
5     witnesses who've come in and talked about the exchange
6     that Dr. Farmer worked out with them, that in some cases
7     it was sexual favors.  In others, it was for cleaning the
8     office and various other things.

9           Not only did the expert testify that in his
10    opinion it was outside the course of professional
11    practice from a commonsense standpoint, it was not the
12    sort of encounter between doctor and patient that would
13    stand up in the face of a standard like usual course of
14    professional practice for a legitimate medical purpose.
15    There were no examinations.  In some cases these
16    witnesses were not even patients of Dr. Farmer, and yet
17    they received these prescriptions.

18          Setting aside the issue of Dr. Farmer being a
19    psychiatrist and the illnesses or the injuries or the
20    pain that they were suffering would have been better
21    treated by either a pain management doctor or an
22    orthopedic doctor or some other specialty but not a
23    psychiatrist, that would be evidence that it was outside
24    the course of professional practice and for a legitimate
25    medical purpose.

1          So when the Court takes the evidence in the

2    light most favorable to the Government, the Court finds

3    that a reasonable jury could determine that Dr. Farmer is

4    guilty of each count in the indictment.  I'm not

5    forecasting that that is going to happen.  The defense

6    can make its case.  But at this point in the process the

7    Court denies your motion.

8          **MR. MITCHELL:**  Thank you, Your Honor.

9          **THE COURT:**  All right.  So we are on break.

10   Why don't those of us in here come back at 11:15?  And

11   we'll get started with the defense proof.  Okay.

12          (Recess.)

13          **THE COURT:**  Are we ready to proceed?

14          **MR. MITCHELL:**  Judge, I might have one slight

15   issue.  I think we can work through it.

16          **THE COURT:**  Okay.

17          **MR. MITCHELL:**  I know your eye's hurt.  I

18   don't know if I'm going to answer this extraction report

19   from our forensics expert or not.  If we do enter it, I

20   want to redact a column.  I don't know if we can enter it

21   and not publish it to the jury and then during a break

22   redact it?

23          **THE COURT:**  What is the column you want to

24   redact?

25          **MR. MITCHELL:**  There are some text messages to

UNREDACTED TRANSCRIPT

1    Dr. Farmer from friends, family, patients.

2              **THE COURT:**  Let me ask this, are they from any

3    of the witnesses --

4              **MR. MITCHELL:**  No, they are not from any of

5    the witnesses, but I don't want to open door for any type

6    of rebuttal proof from the government.

7              **THE COURT:**  I mean that's up to you, but what

8    does the government say about redacting the column?

9              **MR. MITCHELL:**  It's the extraction report that

10   has some text messages, and the text messages are from

11   family, friends, possibly patients.

12             **THE COURT:**  That are not evidence, that are

13   not witnesses in this case?

14             **MS. WILLIS:**  We don't care if you redact that.

15   I don't -- we wouldn't put it in just because you

16   redacted it, is that what you are trying to say?

17             **MR. MITCHELL:**  Not, what I'm trying to say is

18   if you are okay with us going ahead and entering it, if

19   we decided to enter it, go ahead and entering it, not

20   publishing it to the jury and during a break redacting

21   it.

22             **MS. WILLIS:**  I have no problem with that.

23             **THE COURT:**  I'm not practicing law for you,

24   but one way to deal with this might be to put a piece of

25   paper over that column when you do publish it, go ahead

1    and publish it to the jury, and then say that this, there

2    is a portion of this that will be redacted.

3              **MR. MITCHELL:**  Okay.

4              **THE COURT:**  Later.

5              **MR. MITCHELL:**  All right.

6              **THE COURT:**  That's just a thought.  And tape

7    works wonders.

8              Anything else?

9              **MR. MITCHELL:**  I don't believe so.

10             **THE COURT:**  Okay.  One thing I failed to

11   mention when I ruled on your motion, Mr. Mitchell, and

12   that is that these exhibits that the Government offered

13   and introduced late with the stipulations, they

14   corroborate the testimony that I alluded to from all

15   these patients and former patients or non-patients and

16   fit with the dates in the indictment.  And so that's also

17   part of my ruling.

18             **MR. MITCHELL:**  Thank you, Your Honor.

19             **THE COURT:**  Okay.  I think we're ready for the

20   jury.

21             Are you the witness?

22             **THE WITNESS:**  Yes, sir.

23             **THE COURT:**  Why don't you stand right there.

24   Just come on through the gate and just stand right there.

25   You can put your coat down, if you want.  Just stand

1   right there, if you would.

2              (The following occurred in the presence of the

3              jury:)

4        **THE COURT:**  Ladies and gentlemen of the jury,

5   we're ready to continue with the trial.

6         Mr. Mitchell, Ms. Sterling, do you have a

7   witness you wish to call?

8        **MR. MITCHELL:**  Yes, Your Honor, we would call

9   Ashley Rothstein.

10        **THE COURT:**  Ms. Rothstein.

11        **THE CLERK:**  Come forward a little bit and

12   raise your right hand to be sworn.

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **ASHLEY ROTHSTEIN,**

2    having been first duly sworn, took the witness stand and

3    testified as follows:

4                     DIRECT EXAMINATION

5    **BY MR. MITCHELL**

6    Q.    Ms. Rothstein, it's Ashley, correct?

7    A.    Correct.

8    Q.    A-S-H-L-E-Y?

9    A.    Correct.

10   Q.    R-O-T-H-S-T-E-I-N?

11   A.    Correct.

12   Q.    Have you ever testified in a court of law before?

13   A.    No, sir.

14   Q.    You are a little nervous?

15   A.    Yes.

16   Q.    That's okay.  Do you know Dr. Farmer?

17   A.    I do.

18   Q.    And what is your relationship with Dr. Farmer?

19   A.    He was my psychiatrist.

20   Q.    Okay.  And how long has he been your psychiatrist?

21   A.    For about 10 years.

22   Q.    Is it fair to say that you started seeing Dr.

23   Farmer possibly back in 2009, 2010?

24   A.    Yes.

25   Q.    How often would you see Dr. Farmer?

1    *A.*    Once a month for my appointment.

2    *Q.*    And when would you see Dr. Farmer?

3    *A.*    Since I'm an elementary school teacher, he would

4    accommodate me on Saturdays.  So usually my appointments

5    would be on Saturdays.

6              **MR. GRIFFIN:**  Your Honor, I'm going to object.

7    Can we have a side bar as relates to this testimony?

8              **THE COURT:**  Yes, sir.

9              (The following occurred at the bench:)

10             **MR. GRIFFIN:**  First of all, we do not know who

11   this witness is, but is she just a patient that is that's

12   going to testify as to the professionalism of Dr. Farmer

13   or his, you know, reputation as -- I didn't want to do

14   that front of the jury.

15             **MR. MITCHELL:**  I asked Katie Grisham about

16   three potential patients that Katie Grisham had to

17   FaceTime on the weekend to walk Dr. Farmer through the

18   prescription program, and I believe she's going to

19   testify to that.

20             **MS. STERLING:**  We don't expect her to testify

21   as to his character in the community or anything like

22   that.

23             **MR. MITCHELL:**  No character or anything like

24   that.

25             **THE COURT:**  But, A, it shows that he saw

1    patients on the weekends, which the Government's theory

2    has been that a lot of these interactions happened on the

3    weekend, so I think there is relevance there.  Number 2,

4    assuming she does testify that he had trouble working the

5    computer I think that would also be relevant to the

6    defense.  Now, it sounds like they are not going to get

7    into character testimony, so I think so far we're so

8    good.

9               **MR. MITCHELL:**  Yes, sir.

10              **THE COURT:**  Y'all agree?

11              **MR. GRIFFIN:**  Yes, Your Honor.

12              **THE COURT:**  Okay.

13              (The following occurred in open court:)

14   **BY MR. MITCHELL**

15   *Q.*    Ms. Rothstein, I think I was asking about when you

16   would see Dr. Farmer, you said you would see him on the

17   weekend, he would accommodate your schedule?

18   *A.*    Yes.

19   *Q.*    Would you ever see him during the week?

20              **THE COURT:**  Is your mic on?

21              **MR. MITCHELL:**  Is not on.

22   **BY MR. MITCHELL**

23   *Q.*    Would you ever see him during the week?

24   *A.*    In the summertime when I would be off or if it fell

25   on a holiday when schools were out, I would see him

1    during the week sometimes.

2    Q.    I think you can sit back and that microphone will

3    pick you up.  I know you told me you had a little bit of

4    laryngitis or something.

5          When you would see him on the weekend, describe

6    that interaction, where did you meet him, how did you get

7    in the office?

8    A.    We would usually meet at a certain time in the

9    parking lot, and then he would have to open the building.

10   We would walk into the office together after he unlocked

11   it, and we would go into the front office part, and he

12   would usually go into side area where I guess they keep

13   their records and technology.  And then we would go into

14   his private office, which is sort of in the back.

15   Q.    Okay.  And would you have your session with Dr.

16   Farmer there?

17   A.    Yes.

18   Q.    Describe that, what that would be like.

19   A.    There is a sofa.  He always used a specific lumbar

20   chair so there was --

21   Q.    I'm talking about like did you have like a therapy

22   session with him?

23   A.    Yes, yes, we would have our therapy session.  We

24   would talk about what was happening, what was going on in

25   my life, any concerns, anything like that.

UNREDACTED TRANSCRIPT

1    Q.    How long would that therapy session normally last?

2    A.    At minimum I would say an hour.  And sometimes on

3    Saturdays, being that there wasn't some one else waiting,

4    sometimes it may be two hours, depending on how -- he

5    would accommodate me however long I needed him.

6    Q.    Did Dr. Farmer write you prescriptions?

7    A.    Yes.

8    Q.    Okay.  And would he write them for you on Saturday?

9    A.    No, usually they were printed out by his office

10   manager, Katie, before I got there, and he would just

11   hand me the already preprinted prescription.

12   Q.    Are you saying that he would, Katie would print

13   them out like on Friday and they would be ready?

14   A.    Yes.

15   Q.    Was there ever a time when that didn't happen?

16   A.    Yes, if Katie was out of the office, there was a

17   time that my prescription had not been printed.

18   Q.    Now you've been a patient of Dr. Farmer's for a

19   while, and you know Katie Grisham, right?

20   A.    Yes.

21   Q.    Why might she not be available on a Friday, or do

22   you know why she wasn't able to print out the

23   prescriptions for you?

24   A.    I know her son was you ill and was hospitalized for

25   a time, so I think that she was out of the office for

*DIRECT - ASHLEY ROTHSTEIN* 82

1   quite awhile.  And I don't know that there was someone

2   who was there filling in for her, so --

3   Q.    So there were times when the prescriptions wouldn't

4   be available for you?

5   A.    Correct.

6   Q.    On those instances when the prescriptions weren't

7   available for you from Katie, would Dr. Farmer write the

8   prescriptions?

9   A.    He would sign the prescription, but he did not go

10  on the computer and print them out.

11  Q.    How did those prescriptions get printed out?

12  A.    I would FaceTime with Katie on the phone usually

13  using Dr. Farmer's phone.  He would dial her home phone

14  number, and I guess he didn't really know I guess how to

15  access the patient history and how to print it out, so

16  she talked me through a couple of times, you know, click

17  on this, click on this, click on this.  I'm not very

18  computer savvy either, so I just followed what she

19  prompted me to do, and sometimes it would work, and if it

20  didn't, then I would usually go by on a Monday and just

21  get my prescription then.

22  Q.    About how many times did that occur, do you recall?

23  A.    Probably about three times.

24  Q.    When was the last time that you remember FaceTiming

25  Katie?

*CROSS – ASHLEY ROTHSTEIN*                                             83

1     *A.*    2018.

2     *Q.*    When you would get your prescription on a Saturday,

3     what would you do with it?

4     *A.*    I would take it to The Medicine Shoppe on Estate.

5     That was the pharmacy that I used.

6     *Q.*    Do you remember the pharmacist's name that you --

7     *A.*    Kevin, Kevin Ellis.

8     *Q.*    Did you take it to any other pharmacy?

9     *A.*    Not unless The Medicine Shoppe, being a boutique

10    pharmacy privately owned by the pharmacist, was closed

11    for an extended holiday, I always used the same pharmacy.

12    Maybe twice maybe I took it to Walgreens, but only if The

13    Medicine Shoppe was closed.

14    *Q.*    I think that's all the questions I have.  One of

15    these individuals is going to ask you some questions

16    next, if you will just answer their questions.

17    *A.*    Okay.

18             **MR. MITCHELL:**  Thank you very much.

19             **THE COURT:**  Thank you.

20             Cross-examination?

21             **MR. GRIFFIN:**  Yes, Your Honor.

22             If I can approach the exhibit table, Your

23    Honor?

24             **THE COURT:**  Yes, sir.

25                        CROSS–EXAMINATION

UNREDACTED TRANSCRIPT

1  **BY MR. GRIFFIN**

2  Q.   Good afternoon, Ms. Rothstein?

3  A.   Good afternoon.

4  Q.   My name is Damon Griffin.  I represent the United

5  States.  I just have a few questions for you.

6  A.   Okay.

7  Q.   So you were a patient of Dr. Farmer for many years,

8  correct?

9  A.   Yes, sir.

10 Q.   And when you would see Dr. Farmer, as mentioned a

11 few minutes ago, there would be times that you would go

12 see him on Saturdays, right?

13 A.   Right, correct.

14 Q.   When you would go see him on Saturdays, Ms.

15 Grisham, who is normally in the office on workdays would

16 not be there, correct?

17 A.   Correct.

18 Q.   And as a result, there would be preprinted

19 prescriptions that would be printed before you would get

20 there, in other words, some other day before you got

21 there, right?

22 A.   Correct.

23 Q.   And then all -- when you would -- at times when you

24 were there, you would see Ms. Grisham or the printout

25 that Ms. Grisham would do for Dr. Farmer, so you

1   believed, you would see Dr. Farmer sign those

2   prescriptions on the spot, right?

3   A.     Correct.

4   Q.     And there would be even instances, as you

5   testified, of where Dr. Farmer would give you access to

6   his computer, correct?

7   A.     Yes, the office computer, yes.

8   Q.     Access to Dr. Farmer's computer, the office

9   computer, but you would have access to the computer,

10   wouldn't you?

11   A.     Yes.

12   Q.     And when you would have access to the computer, you

13   stated that you would get FaceTime help to go through the

14   program to print prescriptions at times?

15   A.     My prescription on my history.

16   Q.     And, again, who would all be in the office at that

17   time?

18   A.     Myself and Dr. Farmer, and then Katie would be on

19   FaceTime on the phone.

20   Q.     And Dr. Farmer would sign these prescriptions in

21   front of you?

22   A.     Yes, if they had just come off the printer, yes.

23   Q.     Now, isn't it true that as a patient of Dr.

24   Farmer's, it's not your testimony today that he

25   prescribed for you Oxycodone, is it?

CROSS - ASHLEY ROTHSTEIN                                    86

1    A.    No.

2    Q.    It's not your testimony today that Dr. Farmer

3    prescribed you hydrocodone, is it?

4    A.    No.

5    Q.    As a matter of fact, Dr. Farmer prescribed for you

6    Suboxone, correct?

7          **MR. MITCHELL:**  Objection, objection, can we

8    approach or side bar?

9          **THE COURT:**  Yes, sir.

10         (The following occurred at the bench:)

11         **MR. MITCHELL:**  I don't think what Ms.

12   Rothstein's medical issues or the reason she saw Dr.

13   Farmer are relevant.  It's her private medical history

14   that he's trying to get into.

15         **THE COURT:**  She has come here and agreed to

16   testify about his treatment of her.  I think at least I'm

17   hoping we're not going to dwell on this.

18         **MR. GRIFFIN:**  No.

19         **THE COURT:**  I think so far he's -- this is

20   appropriate cross-examination because she's testifying

21   from the defense standpoint that this was a normal way to

22   operate a psychiatric practice for patients who had

23   reasons they couldn't get there during normal business

24   hours, and so he accommodated her on Saturdays.  So

25   exploring what he did, what sort of medicine he

1    prescribed is appropriate.

2              **MR. MITCHELL:**  Thank you, Your Honor.

3              (The following occurred in open court:)

4    **BY MR. GRIFFIN**

5    *Q.*    So, Ms. Rothstein, let me make sure.  Let us step

6    back for a minute.  It's not your testimony today that

7    Dr. Farmer prescribed you hydrocodone?

8    *A.*    Correct.

9    *Q.*    It's not your testimony today that Dr. Farmer

10   prescribed you Oxycodone, right?

11   *A.*    Correct.

12   *Q.*    However Dr. Farmer did prescribe for you Suboxone,

13   right?

14   *A.*    Correct.

15             **MR. GRIFFIN:**  No further questions.

16             **THE COURT:**  Redirect?

17             **MR. MITCHELL:**  Thank you, Your Honor.

18                      REDIRECT EXAMINATION

19   **BY MR. MITCHELL**

20   *Q.*    Ms. Rothstein, just a couple questions.  When you

21   were FaceTiming with Katie, with Dr. Farmer at the

22   computer --

23   *A.*    Yes.

24   *Q.*    -- he didn't give you a password or anything like

25   that, correct?

1    *A.*    Correct.

2           **MR. MITCHELL:**  That's the defense attorney in

3    me.

4    **BY MR. MITCHELL**

5    *Q.*    And did Dr. Farmer give you unfettered access?  Do

6    you know what I mean by unfettered access?

7    *A.*    Yes.  No, he made sure I did it on his phone with

8    him dialing the number to Katie, and he stood next to me

9    as I was on the office computer.

10          **MR. MITCHELL:**  That's all the questions I

11   have.  Thank you.

12          **THE COURT:**  All right.  Ms. Rothstein, thank

13   you.  You may step down.

14          (Witness excused).

15          **THE COURT:**  Does the defense wish to call an

16   additional witness?

17          **MR. MITCHELL:**  Sgt. Bret Simonsen.

18          **THE CLERK:**  Sir, if you will come forward,

19   raise your right hand to be sworn.

20

21

22

23

24

25

*DIRECT – SGT. BRET SIMONSEN*                                                89

1               **SGT. BRET SIMONSEN,**

2    having been first duly sworn, took the witness stand and

3    testified as follows:

4              **THE CLERK:**  You may take the witness stand.

5              **THE COURT:**  That microphone, the base of it

6    will move around, so feel free to adjust it however you

7    need to.

8              **THE WITNESS:**  Yes, sir.

9                    DIRECT EXAMINATION

10   **BY MR. MITCHELL**

11   *Q.*   Sgt. Simonsen, good morning.

12   *A.*   Good morning, sir.

13   *Q.*   Thank you for coming down here today.

14         What is your full name?

15   *A.*   Bret Matthew Simonsen.

16   *Q.*   B-R-E-T-T or one T?

17   *A.*   One T.

18   *Q.*   Last name is S-I-M-O-N-S-E-N?

19   *A.*   That's correct.

20   *Q.*   I addressed you as Sgt. Simonsen.  Are you in the

21   military or is that law enforcement?

22   *A.*   I'm employed by the Shelby County Sheriff's

23   Department.

24   *Q.*   And when did you start with the Shelby County

25   Sheriff's Department?

UNREDACTED TRANSCRIPT

*DIRECT - SGT. BRET SIMONSEN*                                    90

1    *A.*    In 2001, I believe.

2    *Q.*    And what position do you hold currently?

3    *A.*    Currently I'm a supervisor over in our GIB unit.

4    *Q.*    What is a GIB unit?

5    *A.*    General Investigations Bureau.

6    *Q.*    Prior to that position, what position did you hold

7    in November of 2018?

8    *A.*    I was assigned to Nashville TDS group which is DEA

9    Tactical or Diversion Squad.

10   *Q.*    And are you familiar with the Richard Farmer case?

11   *A.*    I am.

12   *Q.*    And what was your role in the Richard Farmer case?

13   *A.*    My duties as being assigned to the DEA Diversion

14   Squad was to handle complaints of prescription fraud,

15   diversion that occurred in West Tennessee.  My -- I was

16   basically the originating officer on that case.

17   *Q.*    Okay.  Is it fair to say that you're familiar with

18   Agent Wray as well?

19   *A.*    I am.

20   *Q.*    Y'all worked together on this case, correct?

21   *A.*    We did.

22   *Q.*    Okay.  All right.  Based on your investigation,

23   there was an indictment, correct?

24   *A.*    Yes, sir.

25   *Q.*    And due to that indictment, Dr. Farmer was arrested

*DIRECT - SGT. BRET SIMONSEN*                                    91

1    on May 17th, 2019?

2    A.    Yes, sir.

3    Q.    When he was taken into custody, they seized his

4    body, right?  They take him into custody, correct?

5    A.    That's correct.

6    Q.    And when they take him into custody, they take his

7    personal belongings as well?

8    A.    I believe they did, yes, sir.

9    Q.    Are you familiar with what was taken into custody

10   or what was taken into evidence?  Excuse me.  I said

11   custody.  Into evidence.

12   A.    I'm not intimately familiar, no, sir.

13   Q.    Are you -- do you know if his cell phone was taken

14   into custody at that time?

15   A.    It was.

16   Q.    Okay.  If I can pass forward a document or a

17   three-page document to you that has been --

18            **MR. MITCHELL:**  I've shown it to the

19   Government.

20   **BY MR. MITCHELL:**

21   Q.    Previously marked as for identification purposes

22   and ask if you recognize those three documents?

23            **THE COURT:**  Is this Exhibit 17 --

24            **MR. MITCHELL:**  17, yes.

25            **THE COURT:**  -- for identification?

UNREDACTED TRANSCRIPT

DIRECT - SGT. BRET SIMONSEN                           92

1           **THE WITNESS:**  I do.

2    **BY MR. MITCHELL**

3    *Q.*    Is it fair to say that that is a receipt for items,

4    a black Apple iPhone?

5    *A.*    Yes, sir.

6    *Q.*    And on that document is there a file number that

7    corresponds to the case number for Dr. Richard Farmer's

8    case?

9    *A.*    There is.

10   *Q.*    And on that document, the first page is dated

11   4-17-19?

12   *A.*    Yes, sir.

13   *Q.*    And on the second page, is it dated 4-17-19?

14   *A.*    It is.

15   *Q.*    And on the second page, does it indicate that the

16   iPhone was taken into evidence?

17   *A.*    Yes, sir.

18   *Q.*    And on the third page of that document, does it

19   indicate that on May 6th, 2019, the phone was returned?

20   *A.*    That's correct.

21           **MR. MITCHELL:**  Judge, if I may have that

22   entered into evidence at this point.

23           **THE COURT:**  Any objection?

24           **MS. WILLIS:**  No objection.

25           **THE COURT:**  Without objection, Exhibit Number

1  17 is no longer for identification purposes only.  It is

2  now admitted into evidence.

3              **MR. MITCHELL:**  Approach the witness, Your

4  Honor.

5              **THE COURT:**  Yes, sir.

6  **BY MR. MITCHELL**

7  *Q.*    Sgt. Simonsen, I'd like to direct your attention to

8  approximately April 18th or 19th -- April 19th of 2019.

9  Did you have the occasion to be in this building with Dr.

10  Farmer?

11  *A.*    I don't recall, sir.

12  *Q.*    Do you recall shortly after Dr. Farmer's arrest him

13  making bond?

14  *A.*    Yes.

15  *Q.*    And do you recall as part of the conditions of that

16  bond that he surrender his DEA license?

17  *A.*    Yes, sir.

18  *Q.*    And you were present there when he surrendered his

19  DEA license?

20  *A.*    That's correct.

21  *Q.*    Do you have any knowledge about whether or not Dr.

22  Farmer's phone, while in the custody of law enforcement,

23  was subject to a forensic download or examination by the

24  Government?

25  *A.*    It was not.  There was no forensic download

1    conducted on that phone.

2    *Q.*    And why not?

3    *A.*    The reason it was not conducted is we noticed that

4    the iPhone that was taken off his person was not the

5    phone that he normally uses.  That was a new phone as he

6    indicated to us he had just gotten that phone.  So as far

7    as evidentiary purpose, we didn't see any need to do a

8    forensic on it.

9    *Q.*    Did he tell you that he had that phone beginning in

10   November of 2018?

11   *A.*    No, sir.

12   *Q.*    He didn't tell you when he had that phone at all?

13   *A.*    He said he had just recently purchased that phone.

14   *Q.*    You thought that it wasn't -- it wouldn't benefit

15   the case or wasn't important to the case to do a forensic

16   download of the phone?

17   *A.*    That's correct.

18              **MR. MITCHELL:**  That's all the questions I

19   have.

20              **THE COURT:**  Cross-examination.

21              **MS. WILLIS:**  Just two questions.

22              **THE COURT:**  Can you turn your mic on?

23              **MS. WILLIS:**  Yes, so you can hear my

24   questions.

25                        CROSS-EXAMINATION

UNREDACTED TRANSCRIPT

1   **BY MS. WILLIS:**

2   Q.    Good morning, Sgt. Simonsen.

3   A.    Good morning.

4   Q.    Just a point of clarification, I think on direct

5   you indicated that he was taken into custody May 17th,

6   2019.  Did you really mean April 17th, 2019?

7   A.    Yes, ma'am.

8   Q.    And when you got the phone, were you able to get a

9   passcode for the phone?

10  A.    Dr. Farmer and his wife gave me a couple of codes

11  that he was -- believed would work on his phone.  He

12  wasn't entirely sure at the time.

13  Q.    Did you ever try the passcode?

14  A.    I did.

15  Q.    You did or did not?

16  A.    I did.

17  Q.    I'm sorry.  Did or did not?

18  A.    I did.

19  Q.    D-I-D?

20  A.    D-I-D.

21  Q.    What happens when you did?

22  A.    Through a couple of different combinations,

23  eventually the phone did open up.  Looked at it, cursory.

24  Like I said, it's a new phone.  I didn't deem to go any

25  further into it at that point.

1              **MS. WILLIS:**  No further questions.

2              **THE COURT:**  Redirect?

3                        REDIRECT EXAMINATION

4    **BY MR. MITCHELL**

5    *Q.*    Did you or do you have any knowledge of anyone in

6    law enforcement on April 25th, 2019, attempting to

7    contact Jennifer Tutor's phone through Dr. Farmer's

8    phone?

9    *A.*    No.

10             **MR. MITCHELL:**  Thank you.

11             **THE COURT:**  All right.  Sgt. Simonsen, thank

12   you.  You are excused.

13             **THE WITNESS:**  Thank you, sir.

14             (Witness excused.)

15             **THE COURT:**  Mr. Mitchell?

16             **MR. MITCHELL:**  Judge, I would call Mike

17   Tillery.

18             (Pause.)

19             **MR. MITCHELL:**  He was sitting out in the

20   hallway.

21             **THE CLERK:**  Raise your hand to be sworn,

22   please.

23

24

25

1          **MICHAEL TILLERY,**

2     having been first duly sworn, took the witness stand and

3     testified as follows:

4                          DIRECT EXAMINATION

5     **BY MR. MITCHELL**

6     *Q.*    Please state your name for the record.

7     *A.*    Michael Tillery.

8     *Q.*    Is that M-I-C-H-E-A-L; T-I-L-L-E-R-Y?

9     *A.*    M-I-C-H-A-E-L; T-I-L-L-E-R-Y.

10    *Q.*    Mr. Tillery, by whom are you employed?

11    *A.*    Black Swan Digital Forensics.

12    *Q.*    What is Black Swan Digital Forensics?

13    *A.*    We are a forensics company.  We take digital

14    devices -- cell phones, computers, laptops, tablets --

15    and we take forensic images of them and convert them into

16    searchable data.

17    *Q.*    What is your profession?

18    *A.*    I'm the senior digital forensics engineer.

19    *Q.*    And what is Cellebrite?

20    *A.*    Cellebrite is a software manufacturer that is used

21    with -- across the county and police departments and

22    other governmental agencies to conduct cell phone and

23    digital forensics.

24    *Q.*    What are your -- I guess would you consider

25    yourself to be a Cellebrite certified mobile examiner?

1   A.    I am certified through Cellebrite.  I hold two

2   certifications from Cellebrite themselves.  One is a CCO,

3   which is Cellebrite Certified Operator, and then a CCNP,

4   which is a Cellebrite Certified Physical Analyst.

5         And with those titles, they -- with those

6   certifications, they allow me to actually perform the

7   extractions and analyze the data.

8   Q.    Give me one second.  Once, I guess -- using the

9   Cellebrite technology or the software, are you able to

10  download searchable data from a cell phone?

11  A.    That is correct.  What the software does, it

12  actually takes a forensic image of the phone.  It takes a

13  picture and a snapshot of that exact moment in time of

14  everything that is on that phone and things that have

15  recently been deleted on that phone.  So there is

16  really -- it's -- it really is just a snapshot, a picture

17  of everything that's on that device.

18  Q.    Once that digital evidence is extracted, are you

19  able to -- is that evidence searchable?

20  A.    That is correct.  Part of the process of what we do

21  is, once we acquire the device, if it's a handheld device

22  like a tablet or a cell phone, we'll put it in airplane

23  mode.  We will then connect it to our machine.  Our

24  software will run and make a complete copy of it.

25        From that, Cellebrite then converts it into a

1    searchable format.  It's a lot like -- it's a lot like a

2    Windows program.  There's headers.  And you can actually

3    see date and times calls came in, which direction the

4    calls went; text messages, which direction they went;

5    dates and times messages were deleted; pictures, when and

6    where the pictures were taken.  There's actual features

7    where I can show coordinates and actually prove where

8    somebody was with longitude and latitude at a specific

9    date and time based off of metadata in those pictures.

10   So it's pretty advanced.

11   Q.   You had mentioned your certifications.  Do you

12   belong to any professional organizations?

13   A.   I do.  I actually belong to IACIS which is the

14   International Association of Computer Information

15   Systems, the Association of Detectives and Security

16   Agencies of Illinois, Criminal Defense Investigation

17   Training Council, National Association of Criminal

18   Defense Lawyers, National Association of Legal

19   Investigators, National Legal Aid & Defenders

20   Association, and the United States Association of

21   Professional Investigators.

22            **MR. MITCHELL:**  At this time I would like to

23   have Mr. Tillery as a digital forensic expert.

24            **MS. WILLIS:**  No objection.

25            **THE COURT:**  Without objection, Mr. Tillery

UNREDACTED TRANSCRIPT

1    will be -- the Court will deem him qualified to give

2    opinions as an expert in the area of digital forensic

3    examination and analysis.

4    **BY MR. MITCHELL**

5    Q.    Mr. Tillery, did you receive a black Apple iPhone X

6    from my office via FedEx?

7    A.    Yes, I did.

8    Q.    And was that purported to be Dr. Farmer's cell

9    phone?

10   A.    Yes, it was.

11   Q.    Were you able to download any information that

12   would identify that cell phone?

13   A.    Yeah, the cell phone was actually connected to area

14   code (901)262-7550 and there was a passcode that was

15   provided to me with that cell phone which was 572436,

16   which worked on the cell phone, allowed me to access it

17   to begin my investigation and the download of the phone.

18        **MR. MITCHELL:**  May I approach the witness?  I

19   have given him a document.

20        **THE COURT:**  Have you shown it to the --

21        **MS. WILLIS:**  Yes.

22        **MR. MITCHELL:**  I've shown it to the

23   Government.

24   **BY MR. MITCHELL:**

25   Q.    The document that you have there, what is that

*DIRECT - MICHAEL TILLERY*                                    101

1    document?  Do you recognize it?

2    A.    I do.  This is the information from the Cellebrite

3    file that actually identifies the phone that the

4    forensics were run on, and this copy actually matches my

5    record copy as well.

6              **MR. MITCHELL:**  Judge, may I have that entered

7    as the next numbered exhibit?

8              **THE COURT:**  Any objection?

9              **MS. WILLIS:**  No objection.

10             **MR. MITCHELL:**  May I approach?

11             **THE COURT:**  How many pages is it?

12             **MR. MITCHELL:**  Two-page document.

13             **THE CLERK:**  Number 34.

14             **THE COURT:**  Exhibit 34 is admitted into

15   evidence.

16             (Said item was marked as Exhibit 34).

17   **BY MR. MITCHELL**

18   Q.    Mr. Tillery, did I ask you to review that phone for

19   specific phone numbers and e-mail addresses?

20   A.    Yes, you did.

21   Q.    And did you do that?

22   A.    Yes, I did.

23   Q.    Do you recall those phone numbers and that e-mail

24   address?

25   A.    I do.  The first phone number is (662)782-8230.

UNREDACTED TRANSCRIPT

1    Once I completed my full forensic download of this phone

2    and began my search and investigation of these numbers,

3    this phone number returned no phone calls made or

4    received, no text messages made or sent or received, no

5    contact information sent or received from that number.

6          The next number I was asked to search was

7    (901)236-1283.  That yielded the exact same results as

8    the first phone number:  No contact information, no phone

9    calls to and from, no text messages to and from.

10         The third number I was asked to search was

11   (901)254-0881.

12   *Q.*   If I could stop you right there, did you also

13   review some additional Cellebrite information for that

14   phone number?

15   *A.*   I did.  That was actually provided to me by your

16   office, and I was asked to look it over.

17   *Q.*   Who is that phone number for?

18   *A.*   Jennifer.  I believe her last name is slipping my

19   mind. Tu --

20   *Q.*   Tutor?

21   *A.*   Tutor, yes, Jennifer Tutor.

22         And upon further investigation of that number and

23   Dr. Farmer's phone, I found some anomalies of when I was

24   informed that that phone was actually in Federal custody.

25   *Q.*   Specifically between the dates of April 17th, 2019,

*DIRECT - MICHAEL TILLERY* 103

1   and June -- I'm sorry -- May 6, 2019, was the

2   (901)254-0881 number contacted from that iPhone, Dr.

3   Farmer, Dr. Richard Farmer's phone?

4   *A.*    I don't believe it was contacted.  I believe what I

5   found that struck me as odd was there was a log entry in

6   the phone with the Apple Identity Lookup Service for that

7   phone number.

8   *Q.*    And what does that mean to the common person?

9   *A.*    So generally what it tells me is between 5-6-2019

10  and 4-25-2019, when the phone was supposed to be in

11  custody, the phone was actually on.  It was powered on.

12  It was on its own cellular network, and somebody was

13  searching the phone.

14  *Q.*    Were they searching for that number?

15  *A.*    That is what I believe happened.  There was --

16  there are several log entries over that timeframe where

17  numbers were locked up, but they weren't contacts or

18  there was no data of those numbers ever being in the

19  phone.  So that means somebody was typing in a number in

20  the contacts trying to see whose number it was.

21  *Q.*    So I think what you're telling the jury is that

22  someone got into the contacts of that phone and then

23  typed in that number to see if it corresponded to a

24  contact in the phone?

25  *A.*    That is correct.

UNREDACTED TRANSCRIPT

1    Q.    I see.

2    A.    And during that timeframe the phone was also --

3    again, it was powered on.  It had to have been charged at

4    some point because there were text messages that came

5    into the phone during the time it was in custody.  So

6    that meant it was on the cellular network.  And all that

7    is on the report.

8    Q.    And did I also ask you to review a e-mail address?

9    A.    That is correct; adrmeagan@icloud.com.

10   Q.    Adrmeagan?

11   A.    Correct.

12   Q.    Spelled M-E-A-G-A-N?

13   A.    Correct, at icloud.com, and a search of that device

14   yielded no results for that e-mail address.  It was not

15   in that phone anywhere.

16   Q.    Now there was some prior testimony about deleting

17   items from your phone.  When you simply delete a text

18   message or delete a telephone call, is it permanently

19   deleted from the phone?

20   A.    No.  The way this iPhone works, when you mark

21   something for deletion, it gets deleted from your ability

22   to see it.  It is still on that phone.  There are three

23   things that permanently delete something off the phone.

24   One is a factory reset.  Whenever you do a factory reset,

25   that pretty much deletes, wipes everything off of that

1   phone so it's unrecoverable.  Two would be volume of use.

2        Bear with me as I use my daughter as an example for

3   this.  If she deletes 300 texts and then she texts

4   another 600 times, those first 300 deleted texts have

5   been wiped off the table because they've been overwritten

6   by use.  That doesn't happen very much because most

7   phones have lots of storage nowadays.

8        And then the third would be an operating system

9   update.  When something gets marked for deletion, it gets

10   put on a special table; and then once you do the

11   operating system update, the operating system then will

12   clear that table to make room for new stuff.

13   *Q.*   One last question, one last, I guess, line of

14   questioning.  Were you able to tell when the phone first

15   came into use?

16   *A.*   I did; and, you know, I don't have that note in

17   front of me.  I was able to ascertain that, but I don't

18   have that note in front of me.

19   *Q.*   Do you recall if it was 2019, 2018, 2017?

20   *A.*   You know, I would love to give you an answer; but I

21   don't recall.

22   *Q.*   Do you have your computer with you?

23   *A.*   I do.

24        **MR. MITCHELL:**  Judge, may I bring it up to

25   him?

1       **THE WITNESS:**  Bear with me.  I'm sorry.  There

2    appears to be an update that was queued I didn't know

3    about.

4       **THE COURT:**  We have a solution.

5       **MR. MITCHELL:**  The Government was so kind as

6    to provide me their copy.

7       **THE WITNESS:**  Perfect.  So we were looking for

8    the first date of use.  So the very first phone call that

9    is recorded on this phone was June 11th, 2019, at 12:06

10   a.m.; and it was a missed call, obviously.  Hopefully he

11   was asleep.  The very first text message is from April

12   25th -- I'm sorry -- yeah, April 25th, 2019, at 10:45

13   p.m.; and then the first network history, March 23rd,

14   2019.

15       Those are the three things I usually -- I look

16   at to ascertain when a phone was actually used.

17   **BY MR. MITCHELL:**

18   *Q.*   Can you do a search by date?

19   *A.*   I did.

20   *Q.*   Can you search for --

21       **THE COURT:**  Is there a dispute about this?

22       **MS. WILLIS:**  No, Your Honor, I think that

23   both --

24       **THE COURT:**  Maybe y'all could stipulate.

25       **MR. MITCHELL:**  Judge, I think the Government

UNREDACTED TRANSCRIPT

*DIRECT - MICHAEL TILLERY*                                      107

1    and I would be willing to stipulate that he purchased --

2              **THE COURT:**  Turn your mic on.

3              **MR. MITCHELL:**  I'm out of batteries.

4              **THE COURT:**  Okay.

5              **MR. MITCHELL:**  I believe the Government is

6    willing to stipulate, and the defense as well, that he

7    purchased a phone and began using it in November of 2018.

8    **BY MR. MITCHELL:**

9    *Q.*    Are you able to search on her computer?

10   *A.*    I am.

11   *Q.*    Can you look for that date?

12             **THE COURT:**  If you leave the one without a

13   battery, we'll replace it for you.

14             **MR. MITCHELL:**  I didn't anticipate this

15   problem.  All right.

16   **BY MR. MITCHELL:**

17   *Q.*    Can you look for a iCloud text on November 19th,

18   2018?

19   *A.*    Absolutely.  Give me one moment.  Let me get the

20   first one queued up.  I am sorry.

21        The first one was November 25th, 2018?

22   *Q.*    I was asking.  I don't know if you can look for the

23   iCloud text from November 19th, 2018.

24   *A.*    November 19th, 2018.  November 19th, 2018, 10:57

25   p.m.?

```
1    Q.   That will work.
2         When did you do your -- do you recall when you did
3    your extraction?
4    A.   I'm sorry?
5    Q.   Do you recall when you did your extraction?
6    A.   I do.
7    Q.   What date was that?
8    A.   June 20th, 2019.
9    Q.   Is that what you recall?
10   A.   June 20th, 2019, at 10:17 p.m. when I started it.
11             MR. MITCHELL:  Thank you very much.
12             No further questions.
13             THE COURT:  Cross-examination.
14             MS. WILLIS:  Yes, Your Honor.
15             THE COURT:  Do you have a mic?  Sorry.  I know
16   you have it.
17             MS. WILLIS:  I'm going to grab my computer, if
18   that's okay.
19             THE COURT:  Sure.
20                     CROSS-EXAMINATION
21   BY MS. WILLIS:
22   Q.   Good morning.
23   A.   Good morning.
24   Q.   So on direct examination I think we've established
25   that you looked at a phone, correct?
```

UNREDACTED TRANSCRIPT

109

1   *A.*     Correct.

2   *Q.*     You did a forensic analysis of the phone.

3   *A.*     That is correct.

4   *Q.*     Okay.  And in your review of the phone, you

5   reviewed a phone with a phone number (901)262-7550; is

6   that correct?

7   *A.*     That is correct.

8   *Q.*     Now is that the only phone number of the phone that

9   you reviewed?

10  *A.*     Correct.  This model phone had only one SIM card in

11  it, and that was attached to one phone number.

12  *Q.*     So you didn't review a phone associated with

13  (901)828-4485?

14  *A.*     That's correct.

15  *Q.*     You didn't did review a phone associated with

16  (901)409-0572.

17  *A.*     That's correct.

18  *Q.*     You didn't review a phone associated with --

19          **THE COURT:**  I'm sorry.  Are you saying

20  "didn't" or "did"?

21  **BY MS. WILLIS:**

22  *Q.*     Did not.  You did not review a phone associated

23  with (901)281-2655.

24  *A.*     That is correct.

25  *Q.*     Did you review a phone associated with

UNREDACTED TRANSCRIPT

1    (901)828-4916?

2    A.    I did not.

3    Q.    (901)491-3748, did you review a phone associated

4    with that phone number?

5    A.    I did not.

6    Q.    So is it fair to say that if there were other phone

7    numbers associated with Richard Farmer, you wouldn't have

8    been able to look at what was in them just based on that

9    phone report?  Is that correct?

10   A.    If the -- phone numbers or devices?

11   Q.    You only looked at one device.

12   A.    I looked at one device with one phone number but,

13   again, with the way this model phone works, the newer

14   model iPhones have dual SIM card adapters in them so they

15   can actually carry more that one phone number.  There was

16   no trace of any secondary phone number or SIM card in

17   this phone.

18   Q.    So to review any data associated with those other

19   phone numbers, you would have needed to look at other

20   devices; is that fair to say?

21   A.    Correct.

22   Q.    Now it was your testimony that you looked

23   through -- you did a forensic analysis of the phone.  Is

24   it your testimony that the only trace of (901)254-0881

25   you saw anywhere was seemed like somebody searched for

1    the phone number?

2    A.    It was an Apple Identity lookup; that's correct.

3         **MS. WILLIS:**  May I have the Court's indulgence

4    just a moment?

5         **THE COURT:**  Yes, ma'am.

6         **MS. WILLIS:**  I'm showing the witness what will

7    be marked for identification as Government's Exhibit --

8    well, as Exhibit 35.

9         **THE COURT:**  All right.  And you've shown it to

10   opposing counsel?

11        **MS. WILLIS:**  I've shown it to opposing

12   counsel.

13        **THE COURT:**  Okay.

14        (Said item was marked as Exhibit 35 for

15        identification).

16   **BY MS. WILLIS:**

17   Q.    Is that a fair and accurate representation of a

18   screenshot from the report that you did?

19   A.    Yeah, from -- not from my report but, yes, that is

20   a fair and accurate representation of a screenshot using

21   Cellebrite.

22   Q.    What report was that from?

23   A.    Looking at this, I can't tell because the header's

24   not there.

25   Q.    Okay.  If this were on the phone, would you have --

CROSS - MICHAEL TILLERY                                              112

1    did you look at the photos on the phone?

2    A.    I don't believe I did.

3    Q.    So if there was a photo with a number in it, you

4    wouldn't have seen it.

5    A.    No, I was asked to search the phone numbers, not

6    the pictures.

7    Q.    Okay.  Now is it your testimony that you could see

8    in the phone the calls that were made going back to

9    November of 2018 or before?

10   A.    I believe I stated when I was able to see the first

11   call that was in the call log, and I'd have to look at

12   the report again to tell you when that one --

13   Q.    So the first, if you said it was November 19th,

14   2018, does that sound right?

15   A.    For the first phone call that was in the log?  No.

16   Q.    Yes.  So the only phone calls you can see were in

17   April of 2019?

18   A.    Whatever was in the call log on my report is what

19   we could see and let me see if I can get my report --

20   Q.    Okay.

21   A.    -- to open now so I can give you a definite answer.

22         So the first call logged on the phone during my

23   extraction was 5-12-2019.

24   Q.    So you couldn't see any calls before May of 2019 by

25   looking at the phone.

UNREDACTED TRANSCRIPT

1    A.    By the extraction, there was no data; that's

2    correct.

3    Q.    What about text messages?

4    A.    November 19th, 2018.

5    Q.    So how many text messages could you see around that

6    time period in November?

7    A.    Oh, around November?  It looks like quite a few.

8    It looks like nine.

9    Q.    So nine text messages total for the month of

10   November?

11   A.    That's correct; in the native iMessage application.

12   There are also some other third-party apps like Facebook,

13   Messenger, and stuff like that, that could be used but

14   specifically for texts, that goes all the way back to

15   November and I'm looking the third party up now.  They

16   line up with it.  They start in November 27th.

17   Q.    Okay.  So is it fair to say that if there were

18   phone calls between the numbers that you looked for, the

19   three numbers that the defense gave, well, Mr. Mitchell

20   gave, that number ending in 8230, 1283, and 0881, if

21   there were phone calls between those numbers and

22   (901)262-7550 from November, 2018, or any time before,

23   you wouldn't have been able to see them on the phone?

24   A.    Not necessarily.  Because the text messages go so

25   far back, I would assume that -- because the text

CROSS - MICHAEL TILLERY                                                    114

1    messages are available from November of 2018, the call

2    log should be there.  With the call log being as recently

3    cleaned as it was -- and "clean" isn't a bad word.  Just

4    some people clean out their call logs quite regularly

5    just out of user behavior.  I generally do that, too.  I

6    like to see the last 10 or 15 calls.  I don't need to go

7    back five or six years like these text messages do.  So I

8    would say that they would be there.  They should -- they

9    could be there but by user behavior they actually just,

10   they weren't there.

11   Q.    So you're saying the call log could be there.  It

12   could have numbers on it, but it was deleted?

13   A.    Yeah, the call log was cleaned up.  That's not a --

14   and, again, that's not a negative connotation.  It's just

15   somebody cleaned their call log.

16   Q.    So they deleted it.

17   A.    Yes.

18   Q.    And you couldn't see what was deleted in the call

19   log.

20   A.    Correct, not with that one.  And that's also

21   because, looking at the -- the operating system release

22   dates, that call log being cleaned and the deleted data

23   not being recovered lines up with an update that was

24   actually applied to the phone.

25   Q.    Okay.  So there was information deleted, which

UNREDACTED TRANSCRIPT

REDIRECT - MICHAEL TILLERY                                    115

1    would be the call log here, from that phone, that

2    couldn't be recovered.  No one can get it even if they

3    look for the deleted information?

4    A.    Correct.

5    Q.    Is that fair to say?

6    A.    Correct.

7    Q.    So did you do a logical or a physical?

8    A.    I did two advanced logicals using two different

9    methods.  That's Cellebrite's best practice for this type

10   of phone.

11   Q.    And so we don't know if there were any calls from

12   the numbers.  If there were a text between any of those

13   numbers and the phone that you looked at, you would

14   expect to see it in your report?

15   A.    I would.

16   Q.    So it's fair to say that you think that those nine

17   texts that are in your report are the only texts that

18   occurred from this 262-7550 number in November of 2018?

19   A.    Correct.

20             **MS. WILLIS:**  No further questions.

21             **THE COURT:**  All right.  Redirect.

22                      REDIRECT EXAMINATION

23             **MR. MITCHELL:**  Is my mic working?  There we

24   go.

25   **BY MR. MITCHELL:**

1    *Q.*    Mr. Tillery, just a couple of questions.  Ms.

2    Willis asked you about a number of different phone

3    call -- phone numbers.  Okay.  You have no personal

4    knowledge whether Dr. Farmer maintains cell phones and

5    cell phone numbers for his staff or family, do you?

6    *A.*    I do not.

7    *Q.*    And with regards to any deletion of texts, photos,

8    or anything like that, or phone calls that you were just

9    talking about -- and we're a little bit outside of my

10   area of knowledge -- did you say that an update in the

11   operating system would possibly delete all that?

12   *A.*    Correct.  And that's kind of the example of what's

13   going on with the call log, why the call history is so

14   short, but the text message history is so long.  You've

15   got text messages going back two years.  So I did recover

16   some deleted text messages after the operating system

17   update was applied, and I was able to search those for

18   those numbers, and none of them were the numbers you

19   asked me to search.

20        So, again, we've got a longer text history that's

21   accurate and a shorter call history that's accurate but

22   just happened to be cleaned up right before an operating

23   system update was applied.

24        **MR. MITCHELL:**  Okay.  Thank you.

25        **THE COURT:**  All right.  Mr. Tillery, you are

1    excused, sir.

2              **THE WITNESS:**  Thank you, sir.

3              **THE COURT:**  Thank you.

4              (Witness excused.)

5              **THE COURT:**  Ladies and gentlemen, I think it's

6    lunchtime.  So we're going to take a break for lunch.  If

7    you will bear with me for a minute, I'm going to talk to

8    the lawyers and see how long we're going to get to eat.

9    So give me one minute, please.

10             (The following occurred at the bench:)

11             **THE COURT:**  What do y'all think?  What's

12   coming here?

13             **MS. STERLING:**  We have one more witness, our

14   handwriting expert; and I expect direct and cross will be

15   an hour.

16             **THE COURT:**  Total.

17             **MS. STERLING:**  Total, yeah.

18             **THE COURT:**  Okay.

19             **MS. STERLING:**  I mean, I don't know what

20   they're going to ask.  It could be longer.  It could be

21   shorter.  That's just kind of an estimate.

22             **THE COURT:**  And then is the Government

23   anticipating any rebuttal?

24             **MS. WILLIS:**  Yes.

25             **THE COURT:**  All right.  So then we have a

1    decision to make.

2              **MS. WILLIS:**  I think ours will be, like, ten

3    minutes.

4              **THE COURT:**  I understand.

5              We can go off the record.

6              (The following occurred in open court:)

7              **THE COURT:**  Ladies and gentlemen, we still

8    have a little work to do.  So what we're going to do is

9    take an hour and a half for lunch.  If y'all will come

10   back at 2:00, we will be ready to keep going.  Okay.

11   Thank y'all very much.  Don't talk about the case.  Grab

12   your drink in here, and I think the lunches should be

13   waiting on the second floor.

14              (The following occurred outside the presence

15              of the jury:)

16              **THE COURT:**  Can y'all come back about a

17   quarter of 2:00?  And that way we can sort of nail down

18   the jury instructions and any other extraneous issues.

19              **MR. GRIFFIN:**  Yes, Your Honor.

20              **MS. WILLIS:**  Yes, Your Honor.

21              **THE COURT:**  All right.  Thanks, y'all.

22              (Recess.)

23              **THE COURT:**  Mr. Ashford, good afternoon.

24              **MR. ASHFORD:**  Good afternoon.

25              **THE COURT:**  Before we adjourned yesterday, the

UNREDACTED TRANSCRIPT

1    defense asked that I reconsider the bond conditions for

2    Dr. Farmer, and I have done that.  And I do think that it

3    would be appropriate for Dr. Farmer to be released

4    subject to house -- I'm saying house arrest, but that's

5    probably -- I don't know the terminology.

6              Mr. Ashford, what do you remembered?  Would it

7    be home detention or home confinement?  What do you call

8    it?

9              **MR. ASHFORD:**  It would just say home

10   detention, just give him enough room to go to doctors'

11   appointments, attorneys' visits, court.

12             **THE COURT:**  All right.  So home detention?

13             **MR. ASHFORD:**  Yes, sir.

14             **THE COURT:**  Do you typically include a curfew,

15   or it's simply if he's not at these other appointments,

16   then he is to be at home, is that right?

17             **MR. ASHFORD:**  Yes, sir.

18             **THE COURT:**  That's what I want.

19             **MR. ASHFORD:**  Okay.

20             **THE COURT:**  And what I want for him and his

21   family is to coordinate with you and your office to make

22   sure that you know when these appointments are supposed

23   to be.  So the idea is that one would ask for permission

24   before taking it upon themselves to go somewhere, right?

25             **MR. ASHFORD:**  Yes, sir.

1          **THE COURT:**  Is that your understanding of home

2    detention?

3          **MR. ASHFORD:**  Yes, sir.

4          **THE COURT:**  All right.  Is there any question

5    about that from the defense?

6          **MR. MITCHELL:**  None from the defense.  I will

7    reiterate that point to them.

8          **THE COURT:**  All right.  Now we've been through

9    this drill once, and it didn't work out very well.

10         Dr. Farmer has been in custody now for four

11   nights, and given his age and the fact that the case has

12   now gotten close to being completed, the Court hopes that

13   he understands how seriously we take this.  Obviously the

14   other conditions are still in place, still in place, so

15   even though these people have testified, he is still not

16   to contact any of them, okay?

17         **THE DEFENDANT:**  Yes, sir.

18         **THE COURT:**  Do not contact any of the jurors.

19   Do not contact anyone that has anything to do with this

20   case other than your lawyer.

21         **THE DEFENDANT:**  Okay.

22         **MR. MITCHELL:**  Can we have a side bar real

23   quick?

24         **THE COURT:**  Yes.

25         (The following occurred at the bench:)

UNREDACTED TRANSCRIPT

1          **MR. MITCHELL:**  I wanted a side bar because I

2     don't want Dr. Farmer to know this, but his phone is at

3     home and his daughter is staying there.  And Jennifer

4     Tutor has continued to try and contact him.  She's

5     received text messages.  We've advised her to just block

6     her number out of his phone.

7          **MS. STERLING:**  She's not saying physical

8     contact, but the phone numbers come through.

9          **MR. MITCHELL:**  The number is coming through.

10     I don't think she knows he's in custody, but the burden

11     is on him.  It's not on Jennifer Tutor at all, it is

12     totally on him.

13          **THE COURT:**  Well, the only thing I would ask

14     is, you know, to the extent that the government can

15     contact her and just advise her that he is instructed not

16     to communicate with her.  That way, you know, maybe

17     she'll back off.  But, you know, you guys can't very

18     well --

19          **MR. MITCHELL:**  It's not your job to police

20     her.

21          **THE COURT:**  No, but at the same time --

22     Anyway, y'all figure it out.  I'm trying to give you a

23     break here.

24          **MR. MITCHELL:**  I understand.

25          **MS. STERLING:**  I'm pretty sure his daughter is

1    going to do it.  I don't think she's going to handle his

2    phone.

3              THE COURT:  Last time I checked, cell phones

4    were not required.  So, you know you could

5    (demonstrating), throw it in a trash bin for all I know.

6    And I know the government objects, and I'll note your

7    objection and, you know, we may all -- or I may end up

8    getting burned on this one, but I think we made our

9    point, okay.

10             MR. MITCHELL:  Thank you.

11             MR. GRIFFIN:  Thank you.

12             (The following occurred in open court:)

13             THE COURT:  Mr. Ashford, we're just going to

14   enter an order that makes this happen; is that right?

15             THE CLERK:  Yes, Your Honor, that's what I've

16   drafted if that's acceptable.  It's the wording on home

17   detention from our orders.

18             THE COURT:  There you go.  That works for me.

19             Mr. Ashford, do you need anything else from

20   us?

21             MR. ASHFORD:  No, sir.

22             THE COURT:  Thank you.

23             MR. ASHFORD:  Thank you.

24             THE COURT:  I've got the verdict form for

25   y'all.

1          **MS. STERLING:**  Thank you.

2          **THE COURT:**  So when you talk about a general

3    verdict form, that's what I'm talking about.  Does that

4    work for y'all?

5          **MS. STERLING:**  Yes, Your Honor.

6          **THE COURT:**  Okay.  The next thing is we worked

7    on the jury instructions over the break, and I am trying

8    to figure out how to word it.

9          **MS. WILLIS:**  Your Honor, the government would

10   withdraw the request for the causation aiding and

11   abetting instruction.

12         **THE COURT:**  That's the one that I had trouble

13   with, I just have to tell you.  It just didn't make

14   sense, at least not to me.  So we will strike that.

15         Let me ask your thoughts on this:  There is an

16   instruction early on, it's a general instruction about

17   the evidence that's introduced in the case, and there is

18   verbiage in there about I ruled that you could not see

19   some of the exhibits that the lawyers wanted you to see,

20   sometimes I ordered you to disregard things that you saw

21   or heard or I struck things from the record.  I don't

22   recall doing any of that, so my thought is to remove that

23   verbiage.

24         **MS. WILLIS:**  I believe it's the phone thing

25   that they got that in today, the property receipt

UNREDACTED TRANSCRIPT

1    yesterday.

2             THE COURT:  Yes, but it was just marked for

3    identification.  It wasn't that I excluded it or told the

4    jury they couldn't see it.

5             MS. WILLIS:  Right.

6             THE COURT:  Are y'all okay with my excluding

7    or just removing that verbiage?

8             MS. WILLIS:  That's fine.

9             MR. MITCHELL:  Yes, Your Honor.

10            THE COURT:  I know we still have a little ways

11   to go, so we'll see.

12            MR. GRIFFIN:  Your Honor, so you don't want us

13   to use the verdict form in closing, like put it on the

14   Elmo or something?

15            THE COURT:  Well, I mean if that's what you

16   are going to do, that would not bother me as much as

17   including jury instructions in some sort of PowerPoint.

18            THE CLERK:  Is it okay if the marshals leave?

19   They said he's good to go.

20            THE COURT:  Yeah, that's fine with me.

21            MS. WILLIS:  Your Honor, just to clarify the

22   elements of the offense, you don't consider that jury

23   instructions, do you?

24            THE COURT:  No, no.

25            MS. WILLIS:  Thank you.

                    UNREDACTED TRANSCRIPT

1    **THE COURT:**  But there is a lot more in this

2  that defines the crime, and I do consider that jury

3  instruction.

4    **MS. WILLIS:**  Understood.

5    **THE COURT:**  All right.  Anything else we need

6  to talk about when it comes to the jury instructions?

7    **MS. WILLIS:**  Nothing from the government.

8    **THE COURT:**  Are we ready for the jury?

9    **MS. STERLING:**  Yes.

10    **THE COURT:**  All right, marshal.

11    **COURT SECURITY OFFICER:**  Judge, we got one she

12  thought it was 2:30.  She was down in the basement.

13  She's coming up on the elevator.

14    **THE COURT:**  I did say 2:00, didn't I?

15    **COURT SECURITY OFFICER:**  When she comes in,

16  they are going to knock on the door.

17    **THE COURT:**  Y'all ready?

18    **MR. MITCHELL:**  Yes, Your Honor.

19    **MS. WILLIS:**  Yes, Your Honor.

20    (The following occurred in the presence of the

21    jury:)

22    **THE COURT:**  Ladies and gentlemen of the jury,

23  we're ready to continue with the trial.

24    Ms. Sterling?

25    **MS. STERLING:**  Yes, we would like to call

UNREDACTED TRANSCRIPT

1    Grant Sperry as a witness.

2              **THE CLERK:**  Sir, if you would stand at the

3    podium and raise your right hand to be sworn, please.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*DIRECT – GRANT SPERRY*                                               127

1                    **GRANT SPERRY,**

2    having been first duly sworn, took the witness stand and

3    testified as follows:

4            **THE CLERK:**  You may take the witness stand.

5            **MS. STERLING:**  Your Honor, with your

6    permission I would like to conduct from here so I have

7    more space.

8            **THE COURT:**  Yes, ma'am.

9            **MS. STERLING:**  And I will be using the Elmo.

10                   DIRECT EXAMINATION

11   **BY MS. STERLING**

12   *Q.*    Good afternoon.

13   *A.*    Good afternoon.

14   *Q.*    Please state your name and address for the jury.

15   *A.*    Yes, my name is Grant R. Sperry, S-P-E-R-R-Y, 7859

16   Cross Pike Drive, Germantown, Tennessee.

17   *Q.*    Mr. Sperry, what is your profession?

18   *A.*    I'm a forensic document examiner.

19   *Q.*    And in that profession, what are your primary

20   responsibilities?

21   *A.*    My primary responsibilities include the examination

22   and comparison of questioned handwriting, hand printing

23   and machine produced entries for the purpose of either

24   identifying or eliminating a particular person or machine

25   as the source of those entries.

1        Additionally, I conduct examinations to determine

2   the origin of certain items such as a paper or pen.  I

3   also date documents and conduct those types of

4   examinations and also conduct various other examinations

5   related to alterations, manipulations, erasures, charred

6   documents, water soaked documents, pretty much anything

7   that comes up that's in question about a document, I've

8   been trained to and I conduct those types of

9   examinations.  I frequently prepare reports and

10  occasionally testify at proceedings such as these.

11  Q.   And how long have you been a forensic document

12  examiner?

13  A.   A little over 40 years now continuously.

14  Q.   And do you have any specialized training and

15  education that has prepared you to conduct examinations

16  of any questioned documents?

17  A.   Yes, ma'am.  I've completed a two-year in-residence

18  program that was conducted by the United States Army

19  Criminal Investigation Laboratory way back when.  And

20  that particular training program was broken down a couple

21  of phases, academic and practical application, where I

22  was under the supervision of forensic document examiners

23  with many, many years of experience.  I learned all about

24  the instrumentation and that type of thing.  I was tested

25  routinely.  And at the end of that two-year structured

1    course at the lab in Ft. Gordon, Georgia at the time, I

2    was certified by the Department of the Army and the

3    Criminal Investigation Laboratory or Criminal

4    Investigation Division as a forensic document examiner.

5         In addition to that, I have completed the

6    fundamentals of forensic document examination at the FBI

7    Laboratory in Quantico.  I've completed a Secret Service

8    course in Washington, DC.  I've received training at

9    Royal Canadian Mounted Police Laboratory in Montreal.  I

10   received training through the Central Intelligence Agency

11   Laboratory, Immigration and Naturalization Service

12   Laboratory, Rochester Institute of Technology, Georgia

13   Bureau of Investigation, and various other places over

14   the course of the past 40 years.

15   Q.   Are you affiliated with any professional

16   associations or societies?

17   A.   Yes, ma'am.  I'm past president of the American

18   Society of Questioned Document Examiners, which is the

19   oldest organization of professional document examiners in

20   the world.  I'm also a Diplomate of the American Board of

21   Forensic Document Examiners.  I'm certified by the

22   American Board.  The certification requires, not only

23   the -- some minimum standards in terms of a baccalaureate

24   degree and that type of thing, but also requires that

25   you've been on the bench for five years before you can

1    apply for certification.  And it's written, practical

2    application, oral interviews, and I have maintained that

3    certification over the years through continued education.

4        I receive training every year.  I attend some sort

5    of professional conference to maintain my level of

6    knowledge of what's going on in the field.  I'm also

7    affiliated with the Southeastern Association of Forensic

8    Document Examiners.  I am a Fellow with the American

9    Academy of Forensic Sciences in the document section, and

10   I'm a charter member of the scientific working group of

11   Imaging Technologies, which is an FBI-sponsored working

12   group.

13   Q.   Mr. Sperry, have you conducted research or

14   published any articles in the questioned documents field?

15   A.   Yes, ma'am.  I'm published in a couple of journals.

16   One is the Journal of the American Society of Questioned

17   Document Examiners, which is a peer-reviewed journal.

18   I've done research in disguised writings.  I've done

19   research in the area of different types of

20   machine-related applications such as the platens on

21   typewriters and things like that.  I'm also published in

22   the Journal of Forensic Sciences, which is also a

23   peer-reviewed journal.

24   Q.   Have you previously been accepted in court as a

25   forensic document or as an expert in the forensic

1    document examination field?

2    A.    Yes, ma'am.

3    Q.    Approximately how many times?

4    A.    Approximately 370, all courts of the military,

5    international courts, federal courts, state courts

6    throughout the country.

7    Q.    Have you ever been retained by the U.S. Attorney's

8    Office here in this district in the Western District of

9    Tennessee?

10   A.    Many times, many occasions.

11   Q.    Have you testified for them?

12   A.    Yes, ma'am.

13         **MS. STERLING:**  Okay.  At this time the defense

14   would offer Mr. Sperry as an expert in the scientific

15   field of forensic document examination.

16         **MS. WILLIS:**  No objection.

17         **THE COURT:**  Mr. Sperry will be recognized as

18   an expert in the field of forensic document examination.

19   **BY MS. STERLING**

20   Q.    Now, Mr. Sperry, I am going to hand you what has

21   previously been admitted into evidence as Exhibits 27

22   through 30 and ask you just to take a quick look at

23   those.

24         And as you will see, there are Exhibits 27 through

25   30, and each of them have subnumbers.  On each page you

1    will see a sticker with a subnumber, so 27-1 and so on.

2    A.    Okay.

3    Q.    Have you seen those documents before?

4    A.    I have seen the copies, copies of -- these are

5    originals.  I've seen copies of the originals, yes,

6    ma'am.

7    Q.    Do you think you've seen all of -- copies of each

8    and every one of those originals?

9    A.    No, I've seen copies of the following exhibits:

10   30-6, 28-2, 29-22, 28-25, 27-27, 27-31, 29-18, 29-8,

11   29-21, 29-10, 29-3, 29-19, 29-24, 29-23, 29-16, 29-15,

12   29-17, 30-2, 30-3, 30-8, 30-1, 30-7, 30-9, 30-10, 29-14,

13   30-11, and 30-12.  All of those as copies were submitted

14   to me as questioned scripts.

15         In addition, the following, which are in here,

16   exhibits were submitted to me as bearing the purported

17   known signatures of Dr. Farmer.  And those exhibits are

18   27-1, 29-13, 28-24, 28-20, 28-12, 28-18, 28-16, 28-13,

19   28-7, 27-15, 27-23, 27-16, 27-10, 27-28, 27-24, 27-34,

20   27-35, 27-33, 27-36, 27-37 and 27-38.

21              **MS. STERLING:**  May I have permission to

22   approach again?

23              **THE COURT:**  Yes, ma'am.

24   **BY MS. STERLING**

25   Q.    Now handing you what has been marked for

1   identification only Exhibit 11, if you could take a look

2   at that and let us know have you seen that before?

3   A.   Yes, ma'am, I have.  These are what's been marked

4   for identification as Defense Exhibit -- I'm sorry -- 11

5   as a collective 17 documents that bear the purported

6   course of business signatures of Dr. Farmer.

7   Q.   So you've seen those before?

8   A.   Yes, I have.

9   Q.   And what was the purpose of us providing those to

10  you?

11  A.   Provided those to me to give me representative

12  samples, additional representative samples presumably

13  that are not related to this case of Dr. Farmer's

14  signature, and I received copies of these.

15          **MS. STERLING:**  Permission to approach the

16  witness again?

17          Permission to approach the witness?

18          **THE COURT:**  Yes, ma'am.

19          **MS. STERLING:**  I've shown the government

20  Exhibit 13 which has been admitted.

21  **BY MS. STERLING**

22  Q.   I'm going to take Exhibit 11 from you because the

23  government would like to see it.

24          Mr. Sperry, if you can take a quick look at that

25  Exhibit 13, which is a collective document.  I will say

1    it's six pages, but we realized today that pages 4

2    through 6 are actually dups of pages 1 through 3, so it's

3    really the first three pages we would like you to look

4    at.

5    A.    Correct, yes, I received -- I examined copies of

6    these documents which are or were submitted as specimen

7    writings of a Jennifer Tutor writing "Richard Farmer" or

8    "R. Farmer."

9    Q.    And the purpose of us providing that to you was

10   what?

11   A.    To evaluate the writings and, if possible, compare

12   those to the questioned signatures of Dr. Farmer.

13   Q.    Mr. Sperry, as you know, this case involves

14   handwriting that has been questioned --

15   A.    Yes, ma'am.

16   Q.    -- specifically on some prescriptions.  Before we

17   proceed further, would you briefly explain to the jury

18   what makes handwriting identifiable?

19   A.    Sure.  So handwriting identification is based on a

20   couple premises.  One is a little more unique to

21   handwriting than other forensic disciplines.  First is no

22   two handwriting habits, two individuals with their own

23   handwriting habits have ever been found to be alike, will

24   ever be alike.  I'm talking about the habits that a

25   person has with respect to their writing.

1          And the other, which is a little bit more unique to

2   handwriting than anything else, is that no two writings

3   of the same individual will ever be exactly alike.  We're

4   not machines, so we're incapable of machine-like

5   replication.  So we have what we call range of variation,

6   so there is variation with respect to all of the habits

7   that we have.  And part of what I do is assess that

8   variation, which is why the writings are representative

9   over a period of time.

10         So the question is:  So how do we acquire these

11  habits?  Well, handwriting normally for most folks begins

12  at an early age.  And at that point in time, you are

13  trying to copy what's in front of you, whether it's on a

14  screen or whether it's in a book or whatever.  So the

15  focus of attention is on how do I make an A, how do I

16  make a B and trying to copy that.  Well, even at that

17  early stage you are incorporating some individual

18  characteristics because our perception of things is

19  different.  Our coordination, our dexterity, those types

20  of things are unique to us as individuals and so however

21  great or not they are, that's -- you are beginning to

22  introduce some individual features.

23         As you become more and more accustomed to writing,

24  the focus of attention becomes less and less on, gee, how

25  do I make an A, B and C but on what's being written.  So

DIRECT – GRANT SPERRY                                136

1    at the time most people reach graphic maturity, which is

2    anywhere between 18 and 20 years of age normally,

3    handwriting is a neuromuscular function that has --

4              **THE COURT:**  Mr. Sperry, I'm sorry to interrupt

5    you.  Could you scoot the mic over, maybe go that

6    direction with it so that when you are talking, it's

7    picking up more of your voice.

8              **THE WITNESS:**  I'm sorry.

9              **THE COURT:**  Unfortunately, the seat doesn't

10   move, but the mic does.

11             **THE WITNESS:**  I keep trying to get it to move,

12   Your Honor.

13             So by the time a person reaches graphic

14   maturity, the handwriting habits are pretty well fixed.

15   Now handwriting does change over time.  As you know,

16   infirmities, you get older, the quality of the writing

17   sometimes will deteriorate based on circumstances.  So

18   handwriting habits incorporate a number of different

19   areas.  So you have letter formations certainly, spacing

20   habits, height relationships, pen pressure, idiosyncrasy

21   types of things such as where the I dot is placed and

22   periods are placed and all that kind of stuff, relative

23   spacing habits, absolute spacing habits, absolute slant,

24   all those are habit areas, and there are more, and all of

25   those contain variation.

1           So what's variation?  All right.  So variation

2    is, as an example, you have let's say a T, and I'm

3    looking at -- I'm looking at writings of a particular

4    writer over a period of two years I've got writings.  And

5    that writer has got -- his name is Steven.  And every

6    single time I see that T crossing, it is a little T

7    crossing, and it is near the top in that area of the T.

8    Okay.  So I can pretty well gather that that particular

9    habit, that T crossing, that's kind of what we call a

10   fixed habit.  That's all the time he's going to cross his

11   T there.

12          Another habit in Steven is the N.  Sometimes

13   the N is made more angular, sometimes it's made rounder.

14   It varies.  So now I've established the range of

15   variation over that period of time with the N.  There is

16   more variation there.  So when I'm taking those sets of

17   writing and now I've got a questioned Steven signature, I

18   would expect, that if Steven wrote it, I'm going to see a

19   T crossing at the top.  I'm probably going to see a

20   variation between the N's similar to what I've seen in

21   his known writings, apply that to all various habits.

22   Now that's assuming that the writing is not a tracing.

23   That's assuming that the writing is not a simulation or

24   somebody is trying to copy somebody's writing from memory

25   or a model in front of them.  So there are certain other

DIRECT - GRANT SPERRY                                             138

1   things that would preclude even getting into the area of

2   variation, but that's the idea.

3          So the bottom line is that any two writings

4   can be identified with their writer provided that the

5   writing contains sufficient individual class

6   characteristics for identification purposes and provided

7   that the comparable writings are comparable, in other

8   words, that I have actually writings and I can compare

9   them to that questioned writing.

10  Q.    I've handed you several different exhibits.  First

11  let's talk about the notebook.  Did you examine the

12  handwriting of the prescriptions in the notebook, again,

13  given that there are some of those that you have not seen

14  before, but the copies of those that you did see, have

15  you examined the handwriting for those?

16  A.    Yes, I examined the handwriting as depicted in the

17  copies, correct.

18  Q.    And then did you examine the handwriting in what I

19  previously showed you as Exhibit 11?

20  A.    Yes, I did.

21  Q.    And did you also examine the handwriting in what I

22  handed to you as Exhibit 13?

23  A.    Yes, I did.

24  Q.    Can you tell the jury about the technical

25  examinations that you conducted of that evidence?

1    *A.*     Sure.  The first thing that I do, and this is --

2    the process in this case is not unlike any other case

3    involving questioned and known writings.  The first thing

4    I always do is conduct an examination of the questioned

5    signatures, in this case signatures.  And the purpose of

6    that is to determine the features and characteristics of

7    value, if they are of value, in the questioned signature.

8         The reason I always conduct an examination of the

9    questioned writings first is that if the questioned

10   writings, for whatever reason, has no value for

11   identification, then there is really no point in looking

12   at the known writings.  I already independently

13   determined that they have no value.  An example would be

14   someone makes an X, there is not a lot there to work

15   with.

16        So in this particular case, I conducted those

17   examinations of the questioned.  I found that the

18   questioned signatures that I examined have a very, very

19   wide variation in terms of the quality of the signature.

20   They all are somewhat pictorially similar to the known

21   writings I'll get to in a minute of Dr. Farmer.  But I

22   determined that they do have value for identification.

23   There are features and characteristics there that

24   cumulatively give that signature some value towards being

25   able to identify it with its writer and to be able to

1    eliminate the person that did not write it.

2         The second examination, which is a separate exam

3    entirely, is an examination of the known writings.  Now

4    the submitted known writings in this case, as an example,

5    Dr. Farmer's known writings, encompass a period of time

6    that surrounds in and around the dates of the questioned

7    scripts.  So I have very contemporary writings in my

8    opinion to work with.  The purpose of that examination

9    and intercomparison, because I intercompare all those, is

10   to determine the writing habits of Dr. Farmer, the range

11   of variation, which I've already kind of briefly touched

12   on, of the various habits that are in Dr. Farmer's

13   signature.

14        Also I cross-compare.  By that I mean sometimes

15   clients will send writings in and they will call it the

16   writings -- these are the known writings of Smith.  And I

17   go through and I find out that, well, three of them may

18   be the writings of one person but somehow or other this

19   particular application was written by somebody else and I

20   exclude it.  So I always cross-compare to see if the

21   known writings are in fact the writings of one person.

22   If they are not, then I exclude it and I just don't use

23   it as a known writing.

24        So having done all of that, then comes the

25   comparison.  So then I take the questioned one by one and

1    I compare it with the writing habits of Dr. Farmer.  Lay

2    people look for similarities.  I look for differences.

3    You would expect that if the person wrote something that

4    it's going to be similar, it is going to look similar to

5    what's in question.  What's important is that if there is

6    differences there, those differences have to be accounted

7    for.  Are they differences as a result of a different

8    writer?  Are they differences as a result of a variation

9    not represented?  Are they differences of a result of

10   accidental or disguise or whatever?  So that's where it

11   is on me, and I put into play quite a bit of experience

12   and training in this area into that decision.

13         So at the end of the day, after conducting the

14   various comparisons of the questioned and known, I reach

15   a conclusion as to the probability of whether or not the

16   person that wrote the knowns wrote the questioned.

17             **THE COURT:**  Can I -- does anybody need any

18   water?  Mr. Broom, do you need some water?

19             **JUROR:**  I'm okay.

20             **THE COURT:**  Are you sure?

21             **JUROR:**  I got some water right here, yes, sir.

22             **THE COURT:**  If y'all need to stand for any

23   reason, feel free to do that.  I've noticed maybe a

24   couple of you are starting to feel that afternoon drag.

25   You know, it's after lunch.  So everybody okay?  All

1    right.

2           Sorry to interrupt.

3           **MS. STERLING:**  That's okay.  That's a good

4    place to interrupt.

5    **BY MS. STERLING**

6    *Q.*    Mr. Sperry, you were talking about known writings,

7    and some of the prescriptions that are in the notebook in

8    front of you, were those some of the known writings that

9    you examined?

10   *A.*    Yes, ma'am.

11   *Q.*    And then the Exhibit 11 that has been marked for

12   identification, which I'm holding right now, were these

13   also known writings of Dr. Farmer that you used in your

14   comparison?

15   *A.*    Yes.

16          **MS. STERLING:**  At this time, I would like to

17   move into evidence Exhibit 11.

18          **MS. WILLIS:**  Objection.  Side bar?

19          **THE COURT:**  Yes, ma'am.

20          Y'all might want to stand at this point.

21          (The following occurred at the bench:)

22          **MS. WILLIS:**  I take no issue with the

23   signatures coming in.  There are some letters in there

24   that mentioned things like, Dr. Farmer gave me a urine

25   drug screen, and stuff that aren't related to the

1  signature, so we would like the hearsay in that redacted.

2          **THE COURT:**  Well, here's the problem:  If the

3  expert reviewed it, and he relied on it as part of the --

4          **MR. MITCHELL:**  I think it's typed.

5          **MS. WILLIS:**  It's the typed part.  There is

6  stuff that's typed in there, and Dr. Farmer just signed

7  the letter.

8          **THE COURT:**  Do y'all care about redacting

9  that?

10         **MS. STERLING:**  No.

11         **THE COURT:**  I mean it sure doesn't affect his

12  opinion one way or the other.

13         **MS. STERLING:**  No, it does.

14         **MS. WILLIS:**  I'm just saying that whole

15  exhibit going back to the jury, the content of those

16  letters we take issue with.

17         **THE COURT:**  Then what we're going to need to

18  do is substitute a copy that's been redacted before they

19  go back to jury.

20         **MS. WILLIS:**  Yes, that's great with us.

21         **THE COURT:**  I am relying on you to remember,

22  but we've got a lot of moving parts.

23         **MS. STERLING:**  They'll remember.

24         **THE COURT:**  And it's Exhibit 11?

25         **MS. STERLING:**  Yes.

*DIRECT – GRANT SPERRY*                                          144

1          (The following occurred in open court:)

2          **THE COURT:**  Exhibit 11 will be admitted

3    subject to –– ladies and gentlemen, there is some parts

4    of the document that will need to be redacted before it's

5    sent back later in the case.  So subject to that, we are

6    going to admit it as Exhibit Number 11.  Had it already

7    been marked for identification?

8          **MS. STERLING:**  It had been marked for

9    identification.  Do we want to cross that out?

10         **THE COURT:**  So it will now be admitted into

11   evidence.

12         **MS. STERLING:**  Thank you.

13         **THE COURT:**  Yes, ma'am.

14   **BY MS. STERLING**

15   *Q.*    Mr. Sperry, are you always able to fully identify

16   or eliminate a person as the author of a particular

17   writing?

18   *A.*    No, ma'am.

19   *Q.*    Why is that not possible?

20   *A.*    Well, I mean the questioned writings always seem to

21   vary and have various levels of identifiability.  So if

22   I'm working with a writing that is a tracing, as an

23   example, where someone has actually put a writing over

24   another writing and created an impression, that's a

25   drawing.  So it's very likely not going to be any

1    individual characteristics, someone has just traced the

2    outline of a signature, so that's a pretty good defense

3    against it being identified.  I can certainly tell you

4    it's a tracing, but trying to identify the writer may be

5    a problem.

6         Another example of where it is possible is if I've

7    got a handwritten signature, and all I've got for known

8    writing is hand printed or very, very limited handwritten

9    signatures insufficient for me to gather enough

10   information about that person's writing habits.  So there

11   is a number of reasons why it's not black and white.

12   There is a gray area that we have to deal with.

13   Q.    Well, if you can't fully identify or eliminate a

14   person, is there a way or is it possible for you to

15   arrive at a less definitive conclusion that still

16   accurately reflects the weight of the evidence?

17   A.    Yes, there is, and there is actually standards in

18   place for that that most forensic document examiners

19   follow or should follow.  These are standards that the

20   FBI has, together with the scientific working group on

21   document examination have come up with as well as the

22   ASTM, which is the American Society of Testing and

23   Materials International.  And we use a nine-point scale.

24        So if you visualize a horizontal bar graph, at one

25   end, you have a full identification.  At the other end,

1   you have full elimination.  The person wrote it, person

2   didn't write, no doubt about it.  Right in the middle we

3   have an area that I refer to as the neither nor area.

4   After everything is done, I still can't tell one way or

5   the other whether the person wrote it or not for whatever

6   reason.  Coming in from the identification, a very, very

7   small little area up there occupying right next to the

8   identification is the term "highly probable," meaning a

9   virtual certainty that this person wrote it.  There may

10  be -- there is no fundamental differences whatsoever.

11  There may be a slight limitation because of a copy,

12  missing some detail, but overwhelming evidence is the

13  person highly probable wrote it.

14       Coming a little closer toward the middle, that bar

15  graph is a conclusion probably.  And a little closer

16  right up to I don't know is -- but on the positive

17  side -- is indications.  That means there is more

18  agreement there on the identification side than I would

19  expect to exist between any two writers.

20       On the other side, same terms, different meanings.

21  The indication is did not, probably did not, highly

22  probable did not, and a full elimination.  And the reason

23  bar graphs sometimes are helpful for folks to understand

24  the terminology is that a lot of times people say, well,

25  if you are saying there is indications somebody wrote it,

1    there must be indications they didn't, and that's not

2    true, because you can't be in both places at the same

3    time.  So if there are indications somebody wrote

4    something, that means I don't have enough evidence to go

5    beyond that, but there certainly are no fundamental

6    differences.  If it's indications or probably or highly

7    probably did not write, then you can bet there are a

8    number of fundamental differences there that suggest the

9    person did not write it.

10   Q.    Before we go any further about any conclusions you

11   may or may not have come to, do you have any other

12   terminology that you use that would be helpful for the

13   jury to know before you talk about your conclusions?

14   A.    No, that should do it.

15   Q.    Now based on the various examinations and

16   comparisons that you have done of Dr. Farmer's known

17   handwriting --

18   A.    Correct.

19   Q.    -- versus the questioned handwriting, have you

20   reached any conclusions?

21   A.    Yes, I have.

22   Q.    Would you please tell the jury what your

23   conclusions are?

24   A.    Yes, ma'am, there were 27 questioned documents that

25   I examined, each containing a questioned Dr. Farmer's

1   signature.  One of those exhibits is Exhibit 28-2.  It's

2   my opinion it's highly probable that Dr. Farmer wrote the

3   signature on that particular exhibit.

4        On the other hand, it is highly probably Dr. Farmer

5   did not write the Farmer signature on Exhibits 30-6,

6   29-22, 28-25, 27-27, 27-31, 29-18, 29-8, 29-21, 29-10,

7   29-3, 29-19, 29-24, 29-23, 29-16, 29-15, 29-17, 30-2,

8   30-3, 30-8, 30-1, 30-7, 30-9, 30-10, 29-14, 30-11 and

9   30-12.

10  *Q.*   Mr. Sperry, in doing that comparison, were you able

11  to determine how many writers there were among those

12  questioned samples?

13  *A.*    Not precisely.  I did conduct some intercomparisons

14  and there certainly appears to be multiple writers, more

15  than two.

16  *Q.*    More than two writers?

17  *A.*    Yes, ma'am.

18  *Q.*    Based on the various examinations that you did of

19  the known writings of Jennifer Tutor versus the

20  questioned writings of Dr. Farmer, did you come to any

21  conclusions about that?

22  *A.*    The conclusion, yes, the conclusion I reached is

23  that, number one, the writings of Ms. Tutor that were

24  provided are what we call specimen writings.  Those are

25  writings where someone is, you know, you sit them down

1    and you dictate to them what they are to write, and they

2    are supposed to write it.

3           In this particular case, we have three pieces of

4    paper with Ms. Tutor allegedly writing "Richard Farmer"

5    or "R. Farmer."  I evaluated the naturalness of the

6    writing, the features and characteristics in there, and

7    in my opinion, these are less than natural executed

8    writings, that they are consistent with what I've seen

9    over the years where someone is trying to distort perhaps

10   their natural writing habit.  There are some features and

11   characteristics that are in agreement with some of the

12   Farmer signatures which create at least a limited

13   indication that she may have written some of those, but

14   again it's a very, very weak conclusion on the

15   identification side and definitely need additional

16   handwritings to form a solid base of comparison.

17   Q.    Of the questioned, the set of questioned

18   handwriting, those prescriptions, did those cover a

19   certain time period?

20   A.    Yes, I believe they covered a period of time from

21   November, November I believe of 2017 through February of

22   2019.

23   Q.    And this -- I don't want to go through each of the

24   27 or 26 -- 27, I'm sorry, I don't want to go through

25   each of the 27, but I'm going to ask you to flip to some

1   of these, and I know this will be a little bit laborious,

2   but it's necessary to get it into the record.  Would you

3   first turn to in the notebook Exhibit 29-3.

4        And you testified, correct, that this was not --

5   well, I'll wait until you are there.  I'm sorry.  I

6   thought you were already there?

7   A.   No.  29 --

8   Q.   Dash 3.

9   A.   Okay.

10  Q.   You testified this was not Dr. Farmer's signature,

11  correct?

12  A.   Highly probable it's not Dr. Farmer's signature,

13  that's correct.

14  Q.   That prescription, what is the date of that

15  prescription?

16  A.   11-17-2017.

17  Q.   Can you flip to 29-8.  Was this also one of the

18  ones that you found to not be Dr. Farmer's signature?

19  A.   Let me get back to it.

20       Correct.

21  Q.   Can you go to 29-18?

22  A.   Okay.

23  Q.   And is that also one that you concluded was not Dr.

24  Farmer's signature?

25  A.   Yes.

1    Q.    And the date on that prescription?

2    A.    The date is 11-1-2018.

3    Q.    If you will move two back -- or two forward, 29-20,

4    is this also one that you concluded was not Dr. Farmer's

5    signature?

6    A.    Yes, ma'am.

7    Q.    What is the date on that one?

8    A.    11-8-2018.

9    Q.    The next page, 29-21.  Was your conclusion that

10   this was not his signature?

11   A.    Yes, highly probable it's not his signature.

12   Q.    You know where I'm going.  What's the date on that

13   one, please?

14   A.    11-17-2018.

15   Q.    29-23.

16   A.    11-20-2018.

17   Q.    And that also was one that Dr. Farmer did not sign

18   in your opinion?

19   A.    Yes, with virtual certainty he did not sign that.

20   Q.    29-24?

21   A.    Okay.

22   Q.    Is that also one that you are certain he did not

23   sign?

24   A.    Virtually certain he did not sign it.

25   Q.    And the date on that?

1    *A.*    1-29-2019.

2    *Q.*    Now we're going go to Section 30, the next patient

3    or purported patient.  And you will see 30-1, was that

4    found to be by you not his signature?

5    *A.*    Yes, it's highly probable he did not write that.

6    *Q.*    And the dates on that?

7    *A.*    The date is 10-19-2018.

8    *Q.*    30-8?

9    *A.*    Okay.

10   *Q.*    Did you conclude that he did not write that?

11   *A.*    Yes.

12   *Q.*    What was the date?

13   *A.*    Date on that is 11-21-18.

14   *Q.*    30-10, please.

15   *A.*    I concluded highly probable he did not sign that

16   signature, the Farmer signature, and the date on it is

17   1-28-2019.

18   *Q.*    30-12?

19   *A.*    Same conclusion, and the date on that is 2-1-2019.

20   *Q.*    So based on what you just read out, how many

21   different dates did you find that Dr. Farmer did not

22   write those prescriptions?

23   *A.*    I don't recall how many.  There were a lot of

24   different dates.  I don't recall the number.

25   *Q.*    If I told you there were 11 different dates, would

1   you agree with that?

2   A.    Yes, I believe there were 11, appears to be 11.

3   Q.    Going back a little earlier, you testified that you

4   have not reviewed or not seen all of those prescriptions

5   in the notebook, correct?

6   A.    Correct.

7   Q.    Now, Mr. Sperry, we sent you some additional

8   prescriptions, copies of prescriptions that we received

9   from the government just last week, correct?

10  A.    You did, electronically, correct.

11  Q.    And I believe, does it sound correct that was on

12  February 5th that we sent those to you?

13  A.    Yes.

14  Q.    Have you had a chance to review those additional

15  prescriptions?

16  A.    Absolutely not.

17  Q.    Why not?

18  A.    Insufficient time to conduct the exams.

19  Q.    Then you have not been able to review each of the

20  prescriptions in that book to determine if they were

21  forged?

22  A.    That's correct.

23  Q.    And you are also not able to say with certainty

24  that the only dates that had forged prescriptions were

25  the dates that we just went through?

1    *A.*    Correct.

2    *Q.*    Now, Mr. Sperry, would your testimony be clearer

3    and better understood through the use of a demonstrative

4    exhibit or, plural, exhibits?

5    *A.*    Yes, ma'am.

6           **MS. STERLING:**  Let the record reflect I have

7    shown this to the government.

8           May I approach the witness?

9           **THE COURT:**  Yes, ma'am.

10   **BY MS. STERLING**

11   *Q.*    Mr. Sperry, are you familiar with what I just

12   handed you?

13   *A.*    Yes, ma'am, I am.

14   *Q.*    What are those?

15   *A.*    These are enlargements of writings, questioned

16   writings and known writings of Dr. Farmer as well as

17   known writings of Ms. Tutor.

18   *Q.*    Did you prepare those demonstrative exhibits?

19   *A.*    I did.

20   *Q.*    Are those exhibits true and accurate reproductions

21   of the original evidence that you have reviewed today?

22   *A.*    Correct.

23   *Q.*    And would these help the jury better understand

24   your testimony?

25   *A.*    I believe so.

1   *Q.*    And these are the exhibits or they are signatures

2   that you have referred to in your testimony so far; is

3   that correct?

4   *A.*    That is correct.

5            **MS. STERLING:**  Permission to approach again?

6            **THE COURT:**  Yes, ma'am.

7            **MS. STERLING:**  I would like to move these into

8   evidence.  I would like to number them each separately.

9            **THE COURT:**  That would make sense.

10            What are our numbers?

11            **MS. STERLING:**  36, 37 and 38.  Are these

12   admitted or --

13            **THE COURT:**  Yes, without objection?

14            **MS. WILLIS:**  No objection.

15            **MS. STERLING:**  No objection, right.

16            **THE COURT:**  So Exhibit 36, 37 and 38 are

17   admitted.  These are one page documents that I think the

18   witness will explain, but they appear to be an

19   enlargement of signatures or writings.

20            **MS. STERLING:**  Do I have permission to publish

21   these to the jury?

22            **THE COURT:**  Yes, ma'am.

23            (Said item was marked as Exhibits 36 through

24            38).

25   **BY MS. STERLING**

UNREDACTED TRANSCRIPT

1    Q.    Mr. Sperry, what I'm putting up here first is what

2    has been marked as Exhibit 36.  I'll do this, move it

3    down a little bit first, and then I can move it up.

4         These are the questioned signatures of

5    prescriptions, correct?

6    A.    Those -- well, you have shown three of the four are

7    on the screen.

8    Q.    There you go.

9    A.    So these are representative samples --

10             **THE COURT:**  Might be able to zoom it back.

11             **MS. STERLING:**  I think I've already zoomed all

12   the way.  Yeah.

13             **THE COURT:**  Okay.

14             **MS. STERLING:**  If you need me to move it, just

15   let me know.

16             **THE WITNESS:**  Okay.  These are representative

17   samples, obviously four out of the 27, that were

18   submitted to me as questioned signatures depicting

19   questioned Farmer signatures.  For the record, line 1,

20   that particular signature is an image of the signature on

21   Exhibit 30-6.

22             One on line 2 is from Exhibit 29-22, line 3,

23   30-11, and line 4, 30-12.

24   **BY MS. STERLING**

25   Q.    And would you tell the jury, can you use these to

1   explain to the jury how you come to your conclusion?

2   *A.*    Sure.  This is just an illustration of the

3   questioned.  So I'll point out a few things on the

4   questioned that you can kind of look at now, and then

5   when we put the known writings up of Dr. Farmer, you will

6   find this helpful.

7        Notice the absolute slant of the writings.  A slant

8   is sometimes not a big deal, but it is in this case.  The

9   slant of the writing is somewhat -- a little bit off to

10  the right but somewhat perpendicular.  Notice you have an

11  R formation here, and that's kind of a shoulder R, looks

12  like a shoulder R.  Here's another example there on line

13  2.  And an E that is prominently formed, at least in this

14  one, and then the line 3 and line 4 you can see clearly

15  the E.

16       Then R, various types of R.  We have what we call a

17  tented R there.  Here you've got an R that comes back,

18  and follow the movement, line 2 overhand to cross the F,

19  all the way through like that.  So the line quality of

20  these signatures, you can see that the A is fairly well

21  formed, but it's fairly angular.  You can see the

22  angularity here and what purports to be the M-E-R.  And

23  here's a little variation down here.  Here you have a

24  shoulder R or maybe a speed R -- I'll get to that in a

25  minute -- here, line 4, more of a rounded feature in the

1    name Farmer.  And certainly more of a what we call again

2    a shoulder R.  In line 4 that R, you can see the left

3    side of R, right side of the R kind of creates a couple

4    shoulders, that's where we get that term "shoulders"

5    from.  And a terminal stroke that comes back, crosses the

6    F and up and over is the movement.

7         So when you look at that and then go ahead and

8    maybe put the known writings up.

9    Q.   Sure.  This is Exhibit 37.  And before you discuss

10   that, can you, for the record, tell us which exhibit

11   numbers of the previously admitted exhibits that these

12   lines match up with.

13   A.   On the known writings?

14   Q.   Of known writings.

15   A.   We've got a total of five known writings that I

16   used as representative samples of Dr. Farmer's normal

17   signature.  Line 1 is from Exhibit 27-1.  Line 2 is from

18   29-13.  Line 3 is from 27-36.  Line 4 is from 27-38.  And

19   line 5 is from, down here at the bottom, is from the

20   course of business writings from Government Exhibit or

21   from Defense Exhibit 11 rather collectively.

22   Q.   I'll put these side by side for you now.

23   A.   Okay.  So --

24   Q.   Is that --

25   A.   This is -- when I was talking about variation of

1   Dr. Farmer's signature, if you look at the known

2   writings -- again, this is a representative sample.

3   Very, very consistent in absolute slant.  This writing is

4   really rapidly executed.  Just because a writing has a

5   right of vertical slant doesn't mean necessarily that is

6   rapidly executed, but you can tell by the introductory

7   strokes, the tapering, and even from a copy, some of the

8   pen pressure habits, that that F and the rest of it is

9   continuously moving left to right at a fairly rapid clip

10   in terms of execution.  And he's consistent in that

11   regard.

12        So looking at the F, let's look at what we looked

13   at earlier.  There is an absolute slant of the F.  As a

14   matter of fact, all of the writing moves really far to

15   the right.  Let's not say 45 degrees, but it's getting

16   pretty close to the right side.

17        The questioned is more perpendicular.  I'll move

18   ahead to the crossing.  The F is crossed -- Dr. Farmer,

19   it's his habit to cross the F by coming off of the R,

20   coming around and then underneath, terminal.  Even with

21   this stroke here in line number 2, he's coming over and

22   then underneath.

23        The R's, I'll move down here to line 4, Dr. Farmer

24   incorporates what is called a speed R into his signature.

25   A speed R is something along the lines of this.  We used

1    to call that an old Palmer R.  Palmer was a writing

2    system a lot of people were taught.  And he uses the

3    speed R in the body and in the terminal R in both places

4    continuously, everywhere.

5         The A is much more angled to the right.  So you can

6    see the A is a relatively small, elongated writing

7    feature.

8         Over here on the questioned, look at the size of

9    the A there in relationship to the others.  Dr. Farmer,

10   for the most part, the M is angular but a relatively

11   small overall middle bar to the M.  Sometimes it's hard

12   to even determine where the M is because the movement is

13   so shallow in those areas.

14        Notice the E in Dr. Farmer's signature, relatively

15   small there, there, very small.  The E is a small loop

16   above the baseline and the R is created off of that.

17   Line 4 is a good example of that.  So here's a tented E.

18   What's going on there?  This is a nice big loop.  Dr.

19   Farmer does not do that.  Line 3 and line 4, you have

20   that particular type of E.

21        These are some of differences that I found

22   consistently between the questioned and the known that

23   led me to the conclusion that it's highly probable,

24   virtual certainty, in my opinion, that Dr. Farmer did not

25   write the signatures that I examined as copies.

1    These are efforts, in my opinion, based on the

2    pictorial resemblance -- I mean if you look at them, I

3    pointed out differences, so you are looking at

4    differences now, but if you just kind of drove up to it

5    and looked at it and said, generally, yeah, that kind of

6    looks like the F is kind of, kind of does have a

7    right-hand slant, but the internal habits are all wrong,

8    and they are just not Dr. Farmer's.

9    Q.   I am now going to take away the known writings of

10   Dr. Farmer and Exhibit 38, which are the known writings

11   of Jennifer Tutor.  If you could identify for the record

12   which exhibit of the previously admitted exhibits do

13   these writings come from?

14   A.   Okay.  So these writings are what we call, again,

15   specimen writings.  She provided these to an investigator

16   presumably.  And this is actually -- number 1 is the

17   first -- this is all from Defense Exhibit 13.  And the

18   first entry that she wrote based on the document that I

19   received is "Richard Farmer."  And you notice how the F

20   kind of does look a little like you recall the F in the

21   questioned entry in terms of its formation.  And then

22   apparently started to write "R. Farmer" in this fashion.

23        Now you have the variations in the R's here in

24   "Richard."  Kind of a hand printed R, maybe a speed R

25   developing here as well as in line 3 in this area.  The

DIRECT - GRANT SPERRY                                                162

1    quality, the skill level that's apparent or the skill

2    that's exercised in the first signature deteriorates in

3    some of the others below it.  This is more of a tented R.

4    Down here is more of a -- if I can just scroll down just

5    a little bit on hers.  Here is an R that's formed in this

6    fashion.  So perhaps a speed R, but written much, much

7    slower.  Variations of the R's greater than what I expect

8    to exist for a person that's actually sitting down and

9    writing something one after the other after the other

10   after the other, there is more consistency normally --

11   you have less variation when you have somebody writing

12   something when they are doing it naturally one after the

13   other after the other as supposed to over a period of a

14   week or two.  So for someone to write down and show this

15   kind of variation in a single sitting is in my opinion

16   unusual.

17   Q.   Do you want me to put these next to the questioned?

18   A.   Sure.  Again, you've got the -- here's a shoulder R

19   perhaps or a speed R such as you have here, line 2 on the

20   known writings of Ms. Tutor and line 2 on the questioned

21   signatures.  You know, it's certainly got that type of

22   movement on the F starting there.  You know, the size of

23   the A here and over in here up tight against the F.

24   Again, the R's, variation of the tented R versus perhaps

25   the speed R, more of a capital letter there.  Those are

UNREDACTED TRANSCRIPT

*CROSS - GRANT SPERRY*

1    just some of the characteristics that -- a few of the

2    characteristics -- there were a lot -- that warrant in my

3    opinion suspicion that at least a need with this writer

4    to examine and compare further writings of both course of

5    business as well as specimen writings, if possible, of

6    Ms. Tutor to these questioned signatures.

7              **MS. STERLING:**  The defense has no further

8    questions at this time for Mr. Sperry.

9              **THE COURT:**  All right.  We can raise the

10   lights, please.

11             Cross-examination?

12             **MS. WILLIS:**  Yes, sir, Your Honor.

13                   CROSS-EXAMINATION

14   **BY MS. WILLIS**

15   *Q.*    Good afternoon, Mr. Sperry.

16   *A.*    Good afternoon.

17   *Q.*    Now I'm going to apologize.  I don't have a report

18   or anything.  You didn't prepare one, correct?

19   *A.*    That's correct.  It was insufficient time to

20   prepare a Rule 26 -- or 16, I'm sorry.

21   *Q.*    That's fine.  I'm just going to ask you some

22   things --

23             **THE COURT:**  Can you turn your mic on?

24   **BY MS. WILLIS**

25   *Q.*    Can you go really slow and give us the exhibit

1   numbers of all the known writings, so all the knowns that

2   you compared the questionable ones to?

3   A.    Sure.  First of all, again, with the easy one --

4   Q.    Can you also -- I'm sorry to make it complicated.

5   Can you give the known writing, exhibit number and the

6   date?

7   A.    I can't give you the date.  I don't have the date

8   in front of me.  I just have the exhibit numbers.

9   Q.    Okay.  Do you still have the binder in front of

10  you?

11  A.    I do have a binder.

12  Q.    Would it be too difficult to ask you to -- do you

13  know where to find them in the binder?  They should be in

14  date order.

15  A.    We're talking about known writings, correct?

16  Q.    Yes.

17  A.    Okay.  I can do it.  It might be a little bit --

18  Q.    We will just go with the exhibit numbers for the

19  sake of time.

20  A.    Okay.  So the exhibit numbers that I used were --

21  out of the booklet were 27-1, 29-13, 28-24, 28-20, 28-12,

22  28-18 -- excuse me -- 28-16, 28-13, 28-7, 27-15, 27-23,

23  27-16, 27-10, 27-28, 27-24, 27-34, 27-35, 27-33, 27-36,

24  27-37 and 27-38.

25  Q.    Thank you.  So those were the known ones that you

1    were comparing the questionable ones to; is that correct?

2    A.    Well, that's partially correct.  I used those, but

3    I also used the course of business writings which

4    collectively are Defense Exhibit 11.

5    Q.    Okay.  And then you mentioned on direct that there

6    was -- I just want to make sure I get this right -- that

7    28-2 was highly probable as Dr. Farmer's signature?

8    A.    Yes, ma'am.

9    Q.    Now, you are an expert in -- you're a forensic

10   document examiner?

11   A.    Yes, ma'am.

12   Q.    So when you look at documents, do you look at more

13   than just the signature on them?

14   A.    I do in most cases, especially if the documents I

15   have are originals.

16   Q.    So you have that notebook next to you?

17   A.    I do.

18   Q.    Can I ask you to look at it?

19   A.    Sure.

20   Q.    So those are originals in that notebook?

21   A.    Yes.

22   Q.    So if you were looking at the originals, would you

23   also have been looking at things like the paper that they

24   were printed on?

25   A.    Oh, yes.

1   Q.    Would you have been looking at other parts of the

2   document?

3   A.    I would look at the paper.  I would look at any

4   other entries and compare inks nondestructively to see if

5   we have similar writing instruments involved.  On

6   scripts, I've examined many, many, many scripts before, I

7   would be looking for indented writings, in other words,

8   impressions of another entry that's actually impressed on

9   an original.

10  Q.    Okay.  And today your testimony on direct, all you

11  were testifying about was whether the signature on the

12  signatures that you were looking at were Dr. Farmer's

13  signature based on your examination, correct?

14  A.    Yes, ma'am, that's correct.

15  Q.    And you were not looking at the paper or where they

16  were printed or anything like that; is that correct?

17  A.    I could not do that, that's correct.

18  Q.    And you couldn't testify about whether Dr. Farmer

19  authorized someone to sign his name?

20  A.    Of course not.

21  Q.    And you, for example, if Dr. Farmer was busy in the

22  medical office and asked someone to sign something for

23  him, you wouldn't be able to tell that, correct, just

24  from the signature?

25  A.    That's correct.

1    Q.     And you didn't examine the signature of Katie

2    Grisham; is that correct, or did you?

3    A.     I did not.

4    Q.     And you've testified in a lot of cases; is that

5    correct?

6    A.     Yes, ma'am.

7    Q.     Have you ever come across a case where someone

8    authorized someone to sign for them?

9    A.     Yes.

10   Q.     Now, have you in your experience examined

11   forgeries?

12   A.     I'm sorry?

13   Q.     In your experience, have you been involved in cases

14   examining forgeries?

15   A.     Quite a few.

16   Q.     Have you found that if someone were using a

17   document to do something illegal, one way to distance

18   themselves is have someone else sign the document?

19   A.     Oh, yes, that happens frequently.

20   Q.     Now looking at the signatures, either the originals

21   or the copies, is there more information on those

22   documents than just the signatures?

23   A.     On some of them there is extraneous handwritten

24   entries, but, yes, there is more information, I'm sorry,

25   yes, script information, machine printed information,

*CROSS - GRANT SPERRY*                                                168

1    yes, of course.

2    Q.    Medical terminology like about what types of

3    prescriptions to be filled?

4    A.    Absolutely.

5    Q.    So to understand what was actually involved in

6    creating these prescriptions, you would need more

7    information, correct?

8    A.    If that was a question in terms of if I am being

9    asked to address how the documents were created, are

10   there any indications that there is, you know, multiple

11   pads of paper involved, that type of thing, then I would

12   have to have the original.  That would be the information

13   that would be helpful.

14   Q.    Would you need more information about the

15   circumstances surrounding those documents to determine

16   when they were printed, where they were printed from,

17   things of that nature?

18   A.    If that information is available, it would

19   certainly help at least with a baseline, yes.

20        **MS. WILLIS:**  Court's indulgence.  May I have

21   the Court's indulgence?

22        **THE COURT:**  Yes, ma'am.

23   **BY MS. WILLIS**

24   Q.    Now, just a couple more questions.

25        On direct examination you were asked if you had

UNREDACTED TRANSCRIPT

1   seen all the prescriptions in that book; is that correct?

2   A.    That is correct.

3   Q.    And you indicated that you didn't have time to look

4   at all of the prescriptions in the book given when they

5   came in; is that correct?

6   A.    No, I believe I said that -- I don't know what

7   other prescriptions are in this book beyond what I

8   examined.  What I said was there were exhibits or

9   prescriptions that were sent electronically to me, and I

10  simply, on the 5th of February, did not have time,

11  sufficient time to conduct the examinations and

12  comparisons prior to court.

13  Q.    So do you know what percentage were selected to

14  send to you?

15  A.    No.

16  Q.    When we say known writing or known sample, we're

17  talking about the writing of Dr. Farmer; is that correct?

18  A.    Well, if we're talking about the exhibits that I've

19  attributed to Dr. Farmer, yes.

20          **MS. WILLIS:**  I don't have any further

21  questions.  Thank you.

22          **THE COURT:**  Redirect?

23              REDIRECT EXAMINATION

24  **BY MS. STERLING**

25  Q.    Mr. Sperry, in your experience, if someone

1    authorized someone else to sign their name, would it be a

2    signature that looked like it was trying to recreate that

3    person's signature?

4    *A.*    Normally not.

5    *Q.*    And did you, in reviewing the signatures that you

6    did, did you find that the ones that you said were not

7    signed by Dr. Farmer, did they appear to have been

8    attempting to replicate his signature?

9    *A.*    Sure, there is obviously pictorially similarities

10   between those signatures and the known writings of Dr.

11   Farmer, so someone, people involved in writing those are

12   attempting to pass those off as Dr. Farmer's signatures.

13   *Q.*    Was there anything brought out on cross-examination

14   that would modify or change your conclusions as to the

15   forged signatures of Dr. Farmer?

16   *A.*    No, ma'am.

17           **MS. STERLING:**  I have no further questions.

18           **THE COURT:**  All right.  Mr. Sperry, thank you.

19           **THE WITNESS:**  Thank you, Your Honor.

20           **THE COURT:**  You are excused, sir.

21           (Witness excused).

22           **THE COURT:**  Mr. Mitchell, Ms. Sterling?

23           **MR. MITCHELL:**  Your Honor, that's the defense

24   proof.

25           **THE COURT:**  All right.

UNREDACTED TRANSCRIPT

1          **MR. MITCHELL:**  For right now.

2          **THE COURT:**  All right.  Why don't we take a

3    short break, ladies and gentlemen, about five or ten

4    minutes, and we will come back and see where we are,

5    okay.

6              (The following occurred outside the presence

7              of the jury:)

8          **THE COURT:**  Did you want to --

9          **MR. MITCHELL:**  I need to voir dire Dr. Farmer,

10   but may I speak with him briefly?

11         **THE COURT:**  You may.

12         **MR. MITCHELL:**  Judge, would it be okay to go

13   to the witness room?

14         **THE COURT:**  I'll just -- yeah, that's fine.

15         **MR. MITCHELL:**  Judge, do you want him to take

16   the stand?

17         **THE COURT:**  I want him to stand.

18         **MR. MITCHELL:**  Is the Court ready?

19         **THE COURT:**  Ready.

20         **MR. MITCHELL:**  Dr. Farmer, if you would stand

21   up.

22         **THE CLERK:**  Do you want me to swear him in?

23         **THE COURT:**  Just a second, Mr. Mitchell.

24         **THE CLERK:**  If you will raise your right hand.

25

UNREDACTED TRANSCRIPT

1                          **RICHARD FARMER,**

2    having been first duly sworn, stood at counsel table and

3    testified as follows:

4                          DIRECT EXAMINATION

5    **BY MR. MITCHELL**

6    *Q.*    Dr. Farmer, you and I just spoke about your right

7    to testify in your own defense, correct?

8    *A.*    Yes.

9    *Q.*    And I explained to you that you have the absolute

10   right to testify and you also have a right not to

11   testify, correct?

12   *A.*    Yes.

13   *Q.*    And you have been in trial for the duration of this

14   trial, correct?

15   *A.*    I have.

16   *Q.*    You've seen all the witnesses, and you've heard all

17   the proof, right?

18   *A.*    Yes.

19   *Q.*    You've had a chance to discuss the case with us as

20   the proof kind of came out, and you and I had a chance to

21   just discuss in the witness room about the case right

22   now, correct?

23   *A.*    Right.

24   *Q.*    Okay.  And have you made a decision on whether or

25   not you wish to testify or not?

1    *A.*     Yes.

2    *Q.*     What is that decision?

3    *A.*     I wish not to testify at this time.

4    *Q.*     Okay.  Now, are you under the influence of any

5    drugs or alcohol that would affect your reasoning or your

6    ability to make that decision?

7    *A.*     No, I'm not.

8    *Q.*     There has been some issues with you getting some

9    medications you take on a regular basis.  Have you been

10   able to take those medications?

11   *A.*     Yes, I have.

12   *Q.*     You took those medications yesterday and this

13   morning, and you are of sound mind?

14   *A.*     This is true, yes.

15   *Q.*     Do you have any questions for me or the Court that

16   you may not understand your rights or anything like that?

17   *A.*     No, no questions.

18              **MR. MITCHELL:**  Thank you.

19              **THE COURT:**  All right.  So, Dr. Farmer, you

20   know, it's pretty basic.  You have a right to testify if

21   you want to.

22              **THE DEFENDANT:**  Yes, sir.

23              **THE COURT:**  You have a right not to testify if

24   you want to.

25              **THE DEFENDANT:**  Yes, sir.

*DIRECT - RICHARD FARMER*

1    **THE COURT:**  And it's my understanding that you

2  choose not to testify, am I right?

3    **THE DEFENDANT:**  That is correct, sir, yes.

4    **THE COURT:**  All right.  Thank you very much.

5    So I'm assume the defense is about to rest,

6  and when they do, is the government seeking to introduce

7  rebuttal proof?

8    **MS. WILLIS:**  Yes, Your Honor.

9    **THE COURT:**  All right.  Are y'all ready for

10  the jury?

11    **MS. WILLIS:**  I think our rebuttal proof will

12  take like five minutes.

13    **THE COURT:**  That's all fine.  Okay.

14    Y'all ready?  Mr. Mitchell, are you ready?

15    **MR. MITCHELL:**  Ready, Your Honor.

16    (The following occurred in the presence of the

17    jury:)

18    **THE COURT:**  Ladies and gentlemen, we are ready

19  to keep going.

20    Mr. Mitchell?

21    **MR. MITCHELL:**  At this time, Judge, the

22  defense rests.

23    **THE COURT:**  All right.  Does the government

24  seek to introduce any rebuttal proof?

25    **MS. WILLIS:**  Yes, Your Honor.

1                    **THE COURT:**  All right.  You may call your

2        witness.

3                    **MS. WILLIS:**  We would call Agent Wray to the

4        stand.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

*DIRECT - MARK WRAY*

1              **MARK WRAY,**

2   having been first duly sworn, took the witness stand and

3   testified as follows:

4              **MS. WILLIS:**  I'm showing the defense an

5   exhibit.

6              The government has shown defense counsel what

7   will be marked as exhibit, I believe, 36 -- 39.

8                        DIRECT EXAMINATION

9   **BY MS. WILLIS**

10  *Q.*    Agent Wray, have you had the opportunity to review

11  phone records from AT&T for a particular phone number?

12  *A.*    Yes, ma'am, I have, yes.

13  *Q.*    Is that phone number (901)262-7550?

14  *A.*    That's correct.

15  *Q.*    Do they come with a certificate of authenticity?

16  *A.*    Yes, ma'am.

17  *Q.*    Based on your review of those phone records, was

18  that just for November of 2018?

19  *A.*    That's correct.

20  *Q.*    And were there more than nine -- did you look at

21  the SMS messages?

22  *A.*    Yes, ma'am.

23  *Q.*    Were there more than nine SMS messages?

24  *A.*    Yes, ma'am.

25  *Q.*    Were there SMS messages between that 7550 number

1   and number 0881 that's associated with Jennifer Tutor?

2   *A.*    That's correct, there were.

3   *Q.*    Were there phone calls as well?

4   *A.*    Yes, ma'am.

5             **MS. WILLIS:**  The government would move Exhibit

6   39 into evidence.

7             **THE COURT:**  Any objection?

8             **MR. MITCHELL:**  No objection, Your Honor.

9             **THE COURT:**  You don't know how many pages

10  there are, do you?

11            **MS. WILLIS:**  This will be a collective

12  exhibit.  It has a certificate of authenticity on the

13  front dated February 13th, 2020.  And there are it

14  appears two sets of data, well, three sets.  One is 33

15  pages.  One is 55 pages.  My apologies.  One is 10 pages.

16  Appears to be a weird pagination issue.  And then the

17  other one, I don't know, it's about 10 pages.  So

18  collectively I cannot say how many pages, Your Honor, I'm

19  sorry, probably about 100.

20            **THE COURT:**  Here's what we'll do.  We will

21  admit those records as Exhibit Number 39.  And we will

22  count the pages and sort that out later.  You go ahead.

23            (Said items were marked as Collective Exhibit

24            39).

25  **BY MS. WILLIS**

1   Q.   Just one more question, Agent Wray.  In connection

2   with reviewing those phone records, were there multiple

3   numbers associated with Richard Farmer just from AT&T?

4   A.   Yes, there were.

5            **MS. WILLIS:**  No further questions.

6            **THE COURT:**  Before you cross-examine, can I

7   ask an elderly question?  What is an SMS message?

8            **THE WITNESS:**  It's referred to as a text

9   message.  When I look at the data, I usually get records

10  from voice, time, which will be phone calls.  SMS would

11  be a text message.

12           **THE COURT:**  Thank you.

13           Cross-examination?

14                    CROSS-EXAMINATION

15  **BY MR. MITCHELL**

16  Q.   Agent Wray --

17           **THE COURT:**  Mic.

18  **BY MR. MITCHELL**

19  Q.   Agent Ray, clearing up that SMS, that's short

20  messaging system?

21  A.   That's what I understand.

22  Q.   And there is also another, is it MMS?

23  A.   For photos, I believe, pictorials.

24  Q.   And there is an iPhone message also, right?

25  A.   I haven't looked a lot at iPhones -- that's my.

1   Q.   I guess the point is that there is different types

2   of messaging, and like Group Me App or Group Me, What's

3   App, those are short message systems, and then there is

4   the iCloud message, right?

5   A.   When I've looked at SMS, it's only been referred to

6   texts when I've looked at them.

7   Q.   Okay.  Now you've been in the courtroom for the

8   entire trial, right?

9   A.   Yes.

10  Q.   As the agent?

11  A.   Yes, sir.

12  Q.   And you listened to Mr. Tillery speak about when he

13  did his forensic download of that phone, that there were

14  nine text messages on that phone, correct?

15  A.   For the month of November, as I recall.

16  Q.   Okay.  And you also heard him testify that anything

17  that's deleted, and there is system update, an operating

18  system update, that that will wipe clean the -- anything

19  that was deleted, it won't show on the phone, correct?

20  A.   As I recall, he referred to the deletion had to do

21  with the voice time, which would be your actual talking

22  with one another.  I recall that he said that the dates

23  of the texts went back much further than that.

24  Q.   I think his point, wasn't it, was that anything you

25  deleted in the operating system updated, that that delete

1   was wiped clean.  Anything that wasn't deleted, whether

2   that's voice, picture, text message would remain on the

3   phone I think is what his testimony was, wasn't it?

4   A.    I want to make sure I'm clarifying, so if the voice

5   had been deleted, it's gone.

6   Q.    Yes.

7   A.    But if the text had not been deleted, they are

8   still there.

9   Q.    They there are still there, but if the text had

10  been deleted and there is an operating system update,

11  it's wiped clean; if a picture is deleted and there is an

12  operating update, it is wiped clean.  That was my

13  understanding of his testimony.

14          **MS. WILLIS:**  Objection.

15          **THE COURT:**  Sustained.

16  **BY MR. MITCHELL**

17  Q.    Is that not yours?

18          **THE COURT:**  Sustained.  Mr. Tillery's

19  testimony will speak for itself.

20          **MR. MITCHELL:**  Okay.  Nothing further.

21          **THE COURT:**  All right.  Any redirect?

22          **MS. WILLIS:**  No redirect.

23          **THE COURT:**  All right.  Can I see the lawyers

24  at side bar?

25          You may step down.

1          (The following occurred at the bench:)

2          **THE COURT:**  Before the government closes its

3    proof, do y'all want to ask me to take judicial notice

4    that that office is in the Western District of Tennessee?

5          **MR. GRIFFIN:**  I actually asked, there is a

6    witness that I asked whether this occurred in the Western

7    District of Tennessee when they would drive to Memphis to

8    Dr. Farmer's office.

9          **THE COURT:**  Okay, well --

10         **MS. WILLIS:**  There is no harm in you taking

11   judicial notice.

12         **THE COURT:**  I'm glad you mentioned that.  That

13   went over my head, but --

14         **MR. GRIFFIN:**  We would like still,

15   nevertheless --

16         **THE COURT:**  Do it in front of the jury, and

17   then I'll, I'll take judicial notice of it.

18         (The following occurred in open court:)

19         **THE COURT:**  All right.  Any additional

20   evidence or proof?

21         **MS. WILLIS:**  Your Honor, the government would

22   request that the Court take judicial notice that 1355

23   Lynnfield, or Dr. Farmer's office is in Memphis,

24   Tennessee, which is in the Western District of Tennessee.

25         **THE COURT:**  The Court will take judicial

1    notice that that address is located in the Western

2    District of Tennessee.

3              Anything else from the government?

4              **MS. WILLIS:**  No further proof from the

5    government, Your Honor.

6              **THE COURT:**  All right.  So, ladies and

7    gentlemen, we are now at the conclusion of the proof.  So

8    the next step in this process is going to be closing

9    arguments, and then the Court will instruct you on the

10   law.  As much as I would like to tell you that that could

11   happen in the next 15 minutes, it doesn't work that way.

12             What would end up happening as a practical

13   matter is we would get -- probably if we started right

14   now, my guess is that we would be pushing 5:00 before all

15   of that was done.  Then I would hand you a folder and

16   have you go back and start your deliberations.  Chances

17   are you would do that for a very short time and say we

18   would like to go home for the weekend.  Plus we don't

19   come back on Monday.  Monday is a holiday.  So that means

20   Tuesday you would come back and try to remember what was

21   said Friday afternoon.

22             So my suggestion is that we adjourn for today.

23   The lawyers and I still have some work to do on some

24   other matters, and we can take that up outside your

25   presence.  We won't slow you down.  You can come back

1    Tuesday morning, we can have the closing arguments, I can

2    instruct you on the law, and you can get started

3    deliberating.  How's that sound?  I'm seeing a lot of

4    heads nodding, even a thumbs up.  So I'm going to take

5    that as, please let us go.

6              Now, I've talked to you every day about not

7    talking about the case with anyone.  One of the things

8    that might happen over the weekend, people are going to

9    know that you've been on jury duty, they are going to

10   want to quiz you about it.  The only thing that you can

11   say is it's a criminal case, it's in federal court, and

12   the judge has told me not to say anything else.

13   Hopefully that will back them off, but you have to be

14   persistent and you have to be deliberate about that.

15             There is a question about Monday.  Some people

16   take the day off.  Government agencies take the day off,

17   but some other people do not.  Banks take the day off,

18   but other people don't.  So some of you may feel like,

19   well, I should go back to work on Monday.  I can tell you

20   that this case not over, and as far as we are concerned

21   you are on jury duty until the case is over.  So my

22   preference would be that you take the day off and that

23   you just let your office know or your job know that you

24   are still on jury duty until the judge says otherwise.

25   Anybody have a major problem with that?  Seeing none,

1    then we will approach it that way then, and we will see

2    you back here on Tuesday.

3             Here's the thing.  Tuesday morning I've got

4    some matters that I have to take up in the morning that I

5    just can't reschedule.  I'm going to ask you to get here

6    at 10 o'clock.  We will get started just as soon after 10

7    o'clock as possible.  Okay.  Is that sufficient?  Okay.

8    So we will look to see y'all back here at 10 o'clock on

9    Tuesday morning.

10            Are there any questions?  Well, y'all have a

11   nice weekend.  It looks like the sun is still out, so you

12   can enjoy that for how long that lasts.  Thank you so

13   much.

14            Make sure you have a juror badge when you come

15   back on Tuesday.

16            (The following occurred outside the presence

17            of the jury:)

18            **THE COURT:**  Is there anything else we need to

19   cover today?

20            **MS. WILLIS:**  Nothing from the government.

21            **THE COURT:**  All right.  Anything from the

22   defense?

23            **MR. MITCHELL:**  Nothing from the defense, Your

24   Honor.

25            **THE COURT:**  All right.  Dr. Farmer, we've

UNREDACTED TRANSCRIPT

1   talked about your bond conditions.  You know, I know that

2   phones work both ways, and there may be people trying to

3   contact you, but you have to be vigilant and don't take

4   those calls.

5            **THE DEFENDANT:**  My phone is put away, Your

6   Honor.

7            **THE COURT:**  That's good, but I hope you

8   understand, and I think you do, that it is just not

9   appropriate for you to be in communication with witnesses

10  in the case.  All right.

11           Anything else this afternoon?

12           **MR. GRIFFIN:**  No, Your Honor.

13           **MS. WILLIS:**  Not from the government.

14           **THE COURT:**  You all have done an excellent

15  job.  So we will see you back here on Tuesday.

16           **MR. MITCHELL:**  Thank you for the Court's time.

17           (Adjournment).

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3        I, Mark S. Dodson, do hereby certify that the

4    foregoing    pages are, to the best of my knowledge,

5    skill and ability, a true and accurate transcript from my

6    stenotype notes in the matter of:

7

8    UNITED STATES

9    vs.

10   DR. RICHARD FARMER

11

12        Dated this 15th day of February, 2020.

13

14   S/*MARK S. DODSON*
     Official Court Reporter
15   United States District Court
     Western District of Tennessee
16

17

18

19

20

21

22

23

24

25

                       UNREDACTED TRANSCRIPT